1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5   UNITED STATES OF AMERICA        *    Docket 00-CR-319
                                    *
6   versus                         *    New Orleans, Louisiana
                                    *
7   HARRY HANDY, ET. AL.           *    December 7, 2006
    * * * * * * * * * * * * * * * * *

8

9                    PROCEEDINGS BEFORE THE
                   HONORABLE A.J. MCNAMARA
10                 UNITED STATES DISTRICT JUDGE

11

    APPEARANCES:
12

13  For the United States:        U.S. Attorney's Office
                                  BY: TONY GORDON SANDERS, ESQ.
14                                500 Poydras Street, Room B-210
                                  New Orleans, Louisiana 70130
15

16

17

    For the United States:        U.S. Attorney's Office
18                                BY:  JEFFREY MITCHELL, ESQ.
                                  500 Poydras Street, Room B-210
19                                New Orleans, Louisiana 70130

20

21

    For the Defendant:            Laurie A. White & Associates
22                                BY:  LAURIE A. WHITE, ESQ.
                                  633 Carondelet Street
23                                New Orleans, Louisiana 70130

24

25

1   Official Court Reporter:        Jodi Simcox, RMR
2                                   500 Poydras Street, B-406
                                    New Orleans, Louisiana 70130
3                                   (504) 589-7780

4
    Proceedings recorded by mechanical stenography, transcript
5   produced by computer.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              I N D E X

3                                                          Page

4

5   WILLIAM CLIFTON STOUTZ
          Direct Examination                                6
          Cross-Examination                               101
6         Redirect Examination                            109

7   HARRY BOYER
          Direct Examination                              112
8         Cross-Examination                               138

9   HARRY HANDY
          Direct Examination                              148
10        Cross-Examination                               161

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**PROCEEDINGS**</u>

**(December 07, 2006)**

1

2

3    **THE DEPUTY CLERK:**  All rise.

4    **THE COURT:**  Good morning.  Be seated, please.

5    **THE DEPUTY CLERK:**  Criminal Docket 00-0319, United

6  States versus Harry Handy.

7    **THE COURT:**  Counsel, make your appearance for the

8  record, please.

9    **MR. MITCHELL:**  Jeff Mitchell for the United States.

10   **MR. SANDERS:**  Tony Gordon Sanders on behalf of the

11  United States, Your Honor.

12   **MS. WHITE:**  Laurie White on behalf of Mr. Handy and

13  seated with me at the table is my law clerk.

14   **THE COURT:**  Is Mr. Stoutz in the court?

15   **MR. MITCHELL:**  Not at the moment, Your Honor.  He has

16  a 9:00 a.m. court appearance --

17   **THE COURT:**  I understand that.

18   **MR. MITCHELL:**  -- but he will be here.

19   **MR. SANDERS:**  We also met with him last night, Your

20  Honor, and reaffirmed with him that he needed to be here as

21  soon as close to 10:00 as possible.  We did not excuse him from

22  being here at 10:00.

23   **THE COURT:**  I had a conversation with him, or my

24  office did yesterday, too, and told him to be here at 10:00.

25      We're going to take a five-minute recess because

```
 1   I'm going to have the marshal go get him.  Okay.
 2              THE DEPUTY CLERK:  All rise.
 3                 (WHEREUPON, the Court took a recess.)
 4              THE DEPUTY CLERK:  All rise.
 5              THE COURT:  I'm advised that Mr. Stoutz is here.  Let
 6   the record reflect that Mr. Stoutz, is it?
 7              MR. STOUTZ:  Correct, Your Honor.
 8              THE COURT:  Is now in the courtroom.  I have just
 9   issued a warrant to have you picked up.
10              MR. STOUTZ:  I apologize, Judge.  I was running from
11   across the street from the parking lot.
12              THE COURT:  I think counsel has already made an
13   appearance for the record, have they not?
14              MR. SANDERS:  That's correct, Your Honor.
15              THE COURT:  Ms. White, it's your burden, your
16   courtroom.
17              MS. WHITE:  Thank you, Judge.
18              THE COURT:  Go ahead.  Call your first witness.
19              MS. WHITE:  I would call Mr. Stoutz and ask for
20   sequestration because I have other witnesses here, that would
21   be Mr. Boyer.
22              THE COURT:  Mr. Boyer, if you'll remain outside until
23   you're called to testify.
24              MR. BOYER:  Yes, sir.
25              (WHEREUPON, William Clifton Stoutz, having been duly
```

```
 1   sworn, testified as follows.)
 2              THE DEPUTY CLERK:  Please state your full name and
 3   correct spelling for the record.
 4              THE WITNESS:  William Clifton Stoutz, S-T-O-U-T-Z.
 5                      DIRECT EXAMINATION
 6   BY MS. WHITE
 7   Q.   Mr. Stoutz, are you an attorney?
 8   A.   I am.
 9   Q.   And are you a criminal defense lawyer?
10   A.   I am, as well as civil matters.
11   Q.   Do you handle matters in federal court criminally?
12   A.   I do.
13   Q.   And back in 2001, were you handling matters in federal
14   criminal court?
15   A.   Honestly, I couldn't tell you in 2000 -- I don't remember
16   when it was I was sworn in.  I think it was just around the
17   same time as Mr. Handy's case.  That was my first federal case,
18   so whatever year that was.
19   Q.   March 21st, 2001, would have been when Mr. Handy was
20   rearraigned, which means a guilty plea.
21   A.   That would have been my first federal case.
22   Q.   Was that your first appearance in federal court as well?
23   A.   Correct.
24   Q.   Now, you appeared on March 21st, 2001, for the
25   rearraignment and you filed a motion to enroll in the case at
```

1    that time?

2    A.    That's correct.

3    Q.    Had you represented Mr. Handy before that date?

4    A.    In federal matters or state matters?

5    Q.    In any matter.

6    A.    Yes.

7    Q.    You had represented him in state matters?

8    A.    I had been representing Mr. Handy, other than the one case

9    that he had, he went to trial on and was convicted in state

10   court, I represented him on just about everything else since I

11   think he was about 18 years old.

12   Q.    So you had a relationship with Mr. Handy that extended

13   long before just this one date of you coming into court to

14   re-arraign him?

15   A.    Absolutely, yes.

16   Q.    Now, was he a client that you spoke with often?

17   A.    Yes.

18   Q.    And was he someone that you had been successful for in his

19   criminal matters in state court?

20   A.    Just about in every matter he had.

21   Q.    In fact, everything had either been dismissed, refused

22   null prossed?

23   A.    Most likely.  I don't remember each particular one.  It

24   was everything from getting him bonds to be released from jail

25   to -- I don't think I ever did a trial with him.  I may have,

 1   but I don't --

 2   Q.   Now, to your knowledge, he had one prior conviction?

 3   A.   That's correct.

 4   Q.   Were you his representative -- his legal representative on

 5   that?

 6   A.   No, that was, I believe, J.C. Lawrence.

 7   Q.   You were aware of that conviction though for drugs?

 8   A.   I was.  And I believe it was on appeal at the time, maybe.

 9   Q.   That this case was going on?

10   A.   I knew it was on appeal.  I don't know if I was aware of

11   the fact that it was still on appeal when this was going on,

12   but I knew that he was appealing the case and he was out on an

13   appeal bond, I believe.

14   Q.   From your history with Mr. Handy and your representation

15   of him in the past, you knew about his prior criminal history?

16   A.   Absolutely.

17   Q.   All right.  You were aware of what type of person he was?

18   In other words, his intellectual capacity, his legal knowledge,

19   were you aware of that with Mr. Handy?

20   A.   I don't know if I would say I was aware of his

21   intellectual capacity the way I became aware of it when he

22   explained it to the presentence person.  In other words, his

23   schooling and things of that sort.  I made my own assumptions,

24   but --

25   Q.   What were your assumptions about him?

1   A.   That he probably wasn't as fully educated to understand

2   some of the things when you're talking about the legal field.

3   I don't think he really understood much about the legal field,

4   other than what he knew about Tulane and Broad, the criminal

5   court building.

6   Q.   To your knowledge, was this Mr. Handy's first time ever

7   arrested in federal court on a federal criminal charge?

8   A.   Yes.

9   Q.   And when you appeared on his behalf for the rearraignment,

10  was that your first day to do anything on this case?

11  A.   Oh, no.  I started on this case the day he was arrested.

12  Q.   Okay.  Do you remember when that was?

13  A.   I remember it was in the morning sometime because I

14  believe he was taken to court that same afternoon.

15  Q.   I mean, the date.

16  A.   Oh, no, no.  I don't remember the date.

17  Q.   So you were not on the record, but you actually were

18  involved with Mr. Handy from the time he was arrested?

19  A.   Yes.

20  Q.   Okay.  And how long from his arrest until his

21  rearraignment was that?

22  A.   Say how long --

23  Q.   From his arrest that you said you got involved that

24  morning until the rearraignment.

25  A.   The period of time?

```
 1   Q.   Yes.
 2   A.   Oh, I would guess, you know, like normal federal cases,
 3   months.  But I couldn't tell you --
 4   Q.   Do you you recall?
 5   A.   I couldn't tell you a date, no.
 6   Q.   Do you have a file on this case?
 7   A.   I do.
 8   Q.   And where is that file?
 9   A.   The majority of it is with the U.S. Attorney.
10   Q.   And where is the rest of the file?
11   A.   In my office.
12   Q.   Did you remove documents out of your file?
13   A.   I did.
14   Q.   All right.  And what was your manner in which you
15   determined which documents were to be removed?
16   A.   Which ones I thought pertained to this matter here.  I
17   think I came up with -- his -- his file took up about a half of
18   a normal box size.
19            And I removed two files out of there that included
20   all of the paperwork that dealt with, I believe, the
21   presentence report, the objections, various letters,
22   affidavits.  You know, anything I thought might be pertinent to
23   this hearing.
24   Q.   Did you have any time records?
25   A.   Time in --
```

JODI SIMCOX, RMR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1   **Q.**   In other words, the time you spent on this case?

2   **A.**   No.

3   **Q.**   Did you have any internal office notations or status sheet

4   maybe that you kept up with of when you saw the client, or when

5   he called, or when you sent a letter?

6   **A.**   No, as a matter of fact, I just started putting those

7   pages in my files a couple of years ago.

8   **Q.**   So at the time that you were representing Mr. Handy, we

9   don't have any proof of anything of when you saw him or what

10  you did with him except for your testimony?

11  **A.**   Nothing, other than the sheets I signed in at the jails or

12  at the U.S. Attorney's Office.

13  **Q.**   Are those in your file?

14  **A.**   No, I would have never gotten them.

15  **Q.**   Did you obtain all the discovery from the federal

16  government in this case?

17  **A.**   Eventually, yes.

18  **Q.**   Ever?

19  **A.**   I wasn't the first person to receive it.  Mr. Boyer

20  received it, I believe, and then I --

21  **Q.**   Where did you get it from, that's my question.

22  **A.**   I can't tell you.  I don't know.  But I did get discovery

23  because I got paperwork faxed -- not faxed, but copied with a

24  cover letter that was to Mr. Boyer.  Any information would have

25  gone to Mr. Boyer first, or maybe just gone to him by himself

1    and --

2    Q.   Because he was the lawyer of record?

3    A.   Correct.

4    Q.   You weren't on the record?

5    A.   Until I enrolled.

6         THE COURT:  Let me interrupt you just for a moment.

7    I want to make sure that there's no one in the courtroom right

8    now that is going to be a witness in this case; is that

9    correct?  All right.

10        MR. SANDERS:  Your Honor, may we approach just for

11   just a minute?  We have a probation officer here who would be

12   excused probably on a rule for sequestration, but he was --

13        THE COURT:  Do you have an objection to a probation

14   officer being in the courtroom?

15        MS. WHITE:  No.

16        THE COURT:  You can keep him in.

17        MR. SANDERS:  I hate to interrupt you.  We maybe

18   should have taken care of that in the beginning.

19        MS. WHITE:  If you want to.

20        MR. SANDERS:  May we approach just a minute, Your

21   Honor?  We may be able to excuse the probation officer and let

22   him go back to his job.

23                    (OFF THE RECORD)

24   BY MS. WHITE

25   Q.   Did you know the U.S. Attorney in this case that was

```
 1   handling it?
 2           THE COURT:  I'm sorry --
 3   BY MS. WHITE
 4   Q.   Did you know who the U.S. Attorney was handling this case?
 5   A.   While the case was going on?
 6   Q.   Yes.
 7   A.   Yes, absolutely.
 8   Q.   Who was it?
 9   A.   John Morello.
10   Q.   Did you ever meet with him prior to the rearraignment
11   date?
12   A.   I don't know if I met with him or we talked over the
13   phone, but we did have a meeting because there was some things
14   that we discussed in terms of the plea and, more specifically,
15   the amount of cocaine involved.
16   Q.   Okay.  Did you ever meet with Mr. Morello with your
17   client?
18   A.   I doubt it.  No.
19   Q.   All right.  How many times do you think you saw Harry
20   Handy in jail pertaining to this case?
21   A.   Including the U.S. Marshal's Office upstairs?
22   Q.   No, in jail.
23           THE COURT:  Well, the Marshal's Office is a lock-up.
24   BY MS. WHITE
25   Q.   Okay.  Upstairs too.
```

1   A.   Three to four.

2   Q.   And do you remember specifically where they were?

3   A.   The first time I saw him -- well, I didn't meet with him,

4   but I did speak with him.  It was in the courtroom when he came

5   for his first appearance.

6   Q.   Were you counting that as one of them?

7   A.   No, I wasn't actually.  The next one I would have gone up

8   and talked to him upstairs after that, that would have been the

9   first time.

10        The second time would have been, I believe, when we

11  got discovery and I went to speak to him.  I didn't have the

12  CDs with me.  We were going to try to find out a way of how he

13  could listen to the CDs.  So in the meantime, I was listening

14  to all the CDs and I had the discovery.

15        So whatever it was that I got at that time pertaining

16  to discovery, I brought that to the jail with me, I believe.

17  Because we explained the circumstances and the facts of the

18  arrest, everything that took place from beginning to end.

19  Q.   What jail did you visit him at?

20  A.   Templeman.

21  Q.   And was he always at Templeman when you visited him or

22  upstairs in this building?

23  A.   I remember I was visiting with him at the end of the

24  hallway on the left, and that's always in Templeman I or II.

25  Q.   In this parish is all I meant.

1  A.   Yes, yes, in this parish.

2  Q.   The CDs that you talked about, these were computer CDs?

3  A.   Correct.

4  Q.   And did you ever take a computer into the prison for him

5  to hear those?

6  A.   I don't recall if we ever got one there or were able to do

7  it.  I know we were making some attempts.  I just don't

8  remember if he ever got to listen to them.

9  Q.   So you have no recollection of that?

10 A.   Correct.

11 Q.   And did you make copies of the paper discovery, or did you

12 get paper discovery?

13 A.   I did get paper discovery.

14 Q.   Did you give that to Mr. Handy?

15 A.   I most likely would have.  I can't tell you yes or no.

16 Q.   Did you and Mr. Boyer discuss and make a determination of

17 who was going to handle what, whether it was up to you to

18 provide the discovery or go over the discovery or go over the

19 guidelines?  Did you divide your tasks?

20 A.   Yes.  But the way it went was Harry was lead counsel.

21 Q.   And when you say *Harry*, you're talking about Mr. Boyer?

22 A.   Correct.  Even when I wasn't on the record or had filed my

23 motion at that point, Harry Boyer, as the attorney, would

24 explain things to me.  This was my first federal case.  I felt

25 like I understood the things he was telling me every single

```
 1   time he told them to me.  Then I would relay them to Harry
 2   Handy.  Harry Boyer, if he was there with me and Harry Handy,
 3   his explanations would be a little shorter.
 4           You know, he doesn't waste a whole lot of time.  So
 5   then I would have been there to say:  Harry Handy, do you have
 6   any questions?  What about this?  You know, and then if he had
 7   questions, then Harry Boyer and I could talk about those later.
 8   Because I would want sufficient answers to what the questions
 9   were, and especially when I didn't know the answers myself.
10   Q.   How many times do you think you and Mr. Boyer met with
11   Mr. Handy?
12   A.   Together?
13   Q.   Together.
14   A.   Twice, maybe.
15   Q.   All right.  And what do you --
16           THE COURT:  I'm sorry.  What did you say?
17           THE WITNESS:  Twice maybe, Your Honor.
18   BY MS. WHITE
19   Q.   And do you remember where that would have been; was it in
20   this building or in Templeman?
21   A.   I'm thinking one of each.  Once here and once in
22   Templeman.
23   Q.   And each of those, or either of those, do you recall what
24   you were discussing with him, you and Mr. Boyer, at those two
25   meetings?
```

1    A.    The second meeting that I told you about in Templeman with

2    the discovery, I believe that Mr. Boyer was present for that

3    one.

4    Q.    Is that one of the two meetings?

5    A.    That would be one of the two.

6    Q.    All right.  And then when was the other meeting that both

7    of you met with Mr. Handy?

8    A.    It was either the last -- well, I'm thinking it would be

9    the third meeting, and we would have met him at Templeman to

10   explain to him -- I know there was one day I went back with a

11   guideline book and Harry Boyer was with me the day before that.

12          We didn't have the book with us.  So then the next

13   time --

14   Q.    So that would be the two meetings?

15   A.    No, that would be -- that would be at three right there

16   then.  So when I said between three and four, then it would be

17   four.  Because we went back another time to explain to him what

18   he was facing and, you know, we were waiting for a presentence

19   report the next time, I believe.

20          So that would have been the next time that we would

21   have seen him, the fourth time.

22   Q.    So let me get this straight.  You met with him several

23   times on your own, you said three or four?  On your own?

24   A.    Well, no.  Harry Boyer would have been present for two of

25   all of my meetings, correct.

1  Q.    So you and Mr. Boyer met two different times, once with

2  the discovery?

3  A.    Correct.  I believe so.

4  Q.    And then the second time with Mr. Boyer, what was it that

5  you were discussing with the client?  Was it when you brought

6  the book back?

7  A.    No, he didn't come with me that time because we had

8  already gone over it and I knew what to explain to Harry Handy.

9  Q.    So you met with him without a book when you went to

10 discuss his sentence?

11 A.    No, no, no.  Met with him without a book to discuss the

12 discovery.  Then once we knew the facts and circumstances of

13 his arrest and what his charges were, then we were able to even

14 give him a little more light into what kind of situation he was

15 facing; not just his indictment, but, you know, some of the

16 facts.

17           I don't remember what some of them were.  But, you

18 know, I knew to ask him questions:  Hey, did you have a gun

19 with you that night?  Because that's going to be something

20 that's going to be important.  We didn't know those things

21 before we got that report.

22 Q.    The PSI report?

23 A.    The PSI report.  No, no, no, the discovery.

24 Q.    Okay.  So when you met with Mr. Boyer the second time with

25 Mr. Handy, what do you think you discussed with Mr. Handy?

1   A.   The discovery.

2   Q.   The discovery?

3   A.   Right.  And that he was facing a serious situation and a

4   hell of a lot of time in jail.

5   Q.   Did you ever meet with Mr. Handy and Mr. Boyer and go over

6   the guidelines with him, the two lawyers with the client?

7   A.   I really don't recall.  I know -- I remember myself

8   explaining the guidelines at one point.  I can't tell you if

9   they were explained to him more than once or --

10  Q.   I'm just asking if Mr. Boyer was with you when you

11  discussed the guidelines.

12  A.   And I do not recall whether or not he was with me.

13  Q.   And you do not recall, does that mean no?

14  A.   No, that means I just don't remember because it was in

15  2001.

16  Q.   And you only remember discussing the guidelines with him

17  one time and you were the only lawyer on that side of the

18  window?

19  A.   Well, we discussed the guidelines when he got his

20  presentence report as well.

21  Q.   Okay.

22  A.   But --

23  Q.   Was Mr. Boyer with you then?

24  A.   I believe he was.  Because at that point we started

25  discussing on the objections that we were going to work on.

1   Q.    All right.  Now, this was your first federal criminal
2   case?
3   A.    Correct.
4   Q.    And had you taken any type of course or primer, or how did
5   you learn about the federal sentencing guidelines?
6   A.    Harry Boyer.
7   Q.    Harry told you or showed you?
8   A.    Well, the purpose of bringing Harry in was because I had
9   never done a case before.  So I didn't want to mess anything up
10  or make a fool out of myself.  So I brought Harry in with me.
11  Harry would explain things to me and I would understand them
12  because it's criminal law.  So then some things I would relay
13  to Harry Handy, some things Harry Boyer would relay to him and
14  I would relay to him at the same time.
15          If he didn't like what Harry Boyer was telling him,
16  he'd look over at me and look for a response from me.
17  Q.    Because you had the rapport with the client?
18  A.    Correct.
19  Q.    Now, were you relying on Mr. Boyer's interpretation of the
20  sentencing guidelines?
21  A.    In my discussions with Harry Handy?
22  Q.    All the way around.  Did you have your own independent --
23  A.    Yes.
24  Q.    Did you have your own independent --
25  A.    Yes, I didn't know what a sentencing guideline was until I

1  stepped into the building and started fooling with this case.

2  Q.   And then knowing what a sentencing guideline is, is a

3  little different from you actually understanding and working

4  the guidelines yourself?

5  A.   Well, you have to -- all you're doing is doing a little

6  guessing.  You can't tell anybody anything for certain.  So you

7  give a couple of difficult scenarios:  Hey, you may fall here,

8  you may fall there, this could happen and you could be over

9  here.

10            I felt like we discussed with him as much as we could

11  possibly expect.  And then we still told him:  You got to wait

12  for this presentence report to come out.

13  Q.   Okay.  Did you go into the specifics of the, for one, his

14  criminal history points?  Did you understand the criminal

15  history points and how that would relate to his criminal

16  history level?

17  A.   I learned the criminal history -- about criminal history

18  points at that point.  So then I went and did the research on

19  them.  I pulled his rap sheet.  I knew he had the one

20  conviction so that was a given.  I knew that that was in there

21  and he'd be getting points for that.

22            I knew he had a lot of other arrests.  So I wasn't

23  sure what he could get points for or what he couldn't, if it

24  had to be a conviction.  So that was part of the research that

25  I was doing.

1  Q.   And did you ever provide him with a letter or anything in
2  writing that would show what you thought the calculations were
3  in this case?
4  A.   No.
5  Q.   There's nothing in your file that would be that clear and
6  specific?
7  A.   No, because I met with him and we opened up the book and
8  talked about it.
9  Q.   And did you contact individuals to try to determine what
10 this person's specific criminal history category or base level
11 offense would be?
12 A.   You mean like higher, a next presentence report person or
13 somebody like that?
14 Q.   (Nods head.)
15 A.   No.
16 Q.   You relied on Harry Boyer?
17 A.   Correct.  The best way -- well, really, I didn't know.
18 So, yeah, I relied on him.
19 Q.   Now, had you ever seen a Bryan letter before the day that
20 Harry Handy signed his?
21 A.   No.
22 Q.   Did you know what it was?
23 A.   Well, before the day Harry Handy signed his?  I believe it
24 was in with the paperwork, if I'm not correct, that was given
25 to me.

1    Q.    Had you ever seen one prior to that date?

2    A.    No, no.

3    Q.    You didn't know what a Bryan letter was, did you?

4    A.    No.

5    Q.    And had you been to jail to discuss the Bryan letter with

6    Mr. Handy?

7    A.    I believe the Bryan letter would have been in with the

8    factual basis, correct, or with the plea?

9    Q.    I'm asking you.  When would you have received it?

10   A.    I can't tell if it was or if it wasn't.  But I can tell

11   you that the factual basis and everything else that came from

12   the U.S. Attorney's Office I took all of that and went over

13   that with him.

14   Q.    And did you go over that with him in court before he

15   signed it?

16   A.    I believe I did both.  I believe since Harry Boyer was not

17   going to be here on that day, you know -- you got to remember,

18   I wanted to make sure I was doing everything the way it was

19   supposed to be done.  So I wasn't going to wait around.  I

20   couldn't remember if I went to see him that night in jail.

21           But I think what I did was I saw him the next day in

22   the U.S. Marshal's Office.  Because I remember Harry Boyer

23   telling me:  You've got to do this, you've got do that, this

24   has to be done.

25           So I was trying to start things a little bit early to

1    make sure that I didn't have any problems.

2    Q.    Do you specifically remember the instructions that Harry

3    Boyer was giving you?

4              THE COURT:  I'm sorry.  What was the question?

5    BY MS. WHITE

6    Q.    Do you specifically remember the instructions that Harry

7    Boyer was giving you to be sure and do in this case?

8    A.    All of the instructions or -- well, when we were talking

9    about that, he explained to me:  You got to read this, you got

10   to do that.  The day that we were coming into court, I had come

11   down to the courtroom.  I had explained to Harry Handy what to

12   expect when he got in here, where he'd probably be sitting,

13   where the judge was.

14         Harry Boyer told me -- gave me some advice on how to

15   handle yourself in the courtroom, what the judge expects from

16   you, what to tell your client.  You know, the way to act in the

17   courtroom.

18   Q.    Did you and Mr. Boyer decide what to tell the client about

19   his sentence?

20              MR. SANDERS:  I'm sorry.  I didn't hear the question.

21   BY MS. WHITE

22   Q.    Did you and Mr. Boyer decide and discuss what to tell the

23   client about the sentence?

24   A.    In terms of the guidelines?

25   Q.    The sentence.

1    A.    We didn't know what the sentence was going to be.

2    Q.    What did you tell the client?

3    A.    In terms of a sentence?

4    Q.    Uh-huh.

5    A.    My recollection of it is when we looked at it, taking into

6    account his conviction, because that was the one thing I knew

7    that was definitely there, I believe I told him he was going

8    fall between either a category I and a category II, or a

9    category II and a category III.

10          But the numbers that I remember in my head of

11   where -- you know, there's a range.  I went a little bit to the

12   left and a little bit to the right because we weren't sure.

13   The numbers I recall were 13 to 17.

14   Q.    Years?

15   A.    And then the presentence report has to come.

16   Q.    Was that years?

17   A.    Years, correct.

18   Q.    And is that what your client was banking on as a result of

19   you telling him that's what it looked like under the

20   guidelines?

21   A.    Well, he didn't understand the federal system.  You have

22   to -- especially when it's the defendant's first time in the

23   federal system.  They think they're at Tulane and Broad.  You

24   know, Tulane and Broad has a plea form where it says, you know:

25   Your sentence is, or your sentence will be, and they write it

1  in.

2       And usually defendants' attitudes are over there,

3  they want to hold out to try to get the best deal they can, or

4  they just drag things on.  I had to explain to him:  It does

5  not happen like that in federal court.

6       So I had to teach him what -- some things about the

7  federal system, and the fact that you don't get a number in

8  concrete like you do with the state.

9  Q.   So you would agree that it was incumbent upon you, as his

10  lawyer and the one that had the rapport with him, to explain

11  how the federal system worked?

12  A.   Well, to be honest with you, Harry Boyer probably wasn't

13  going to take the time to answer all of the questions that he

14  had about the system and the things like that and teach him

15  about the federal system.  So then that's where I came in.

16  Q.   And you were the one, basically, in charge of explaining

17  to him how his sentence would be in that range, but you

18  couldn't promise anything?

19  A.   Harry Boyer was involved in the conversation as well at

20  some point.  I don't recall when.

21  Q.   Did you ever discuss with your client the fact that he was

22  pleading to a charge that would net him a life sentence

23  potentially?

24  A.   If he went to trial.  Because he was talking -- you know,

25  he was asking about trial and I -- I remember him asking about

1  going to trial when we were in Templeman and, you know, we had

2  to explain to him:  Look, these are the facts.  They got you.

3  This is it for you.

4          You know, this is not something you go to trial on.

5  And I -- honestly, I didn't want him to go to trial because he

6  would definitely be doing the rest of his life in jail.

7  Q.   But the sentence that he actually -- excuse me -- the

8  statute that he actually pled under, did you explain to him

9  that he could potentially receive a life sentence?

10 A.   That was explained to him at the first appearance and

11 then -- see, that would have been explained to him in the

12 conversations of trying to discourage him from considering --

13 Q.   Going to trial?

14 A.   -- going to trial.  So they would have taken place at that

15 point.

16 Q.   Would you have ever after that discussed with him like

17 maybe when you say you went over the factual basis with him or

18 the Bryan letter --

19 A.   Right.

20 Q.   -- did you discuss with him at that time that he was

21 pleading to a statute that he actually could potentially get a

22 life sentence?

23 A.   I'm guessing here.  I really can't tell you.

24 Q.   Just if you know.  We don't want a guess.

25 A.   I remember the discussions about life sentences being:  If

1    you go to trial, you're done, you don't see daylight again.

2    And then the life sentence came up at the first appearance like

3    it always does and then your client looks at you and says:

4    What did he say, life?

5          And then at that point you say:  Well, listen, that's

6    when you start trying to work out a deal, you know, get

7    something done with the U.S. Attorney's Office and come to a

8    plea agreement.  Because they don't like hearing the *life*

9    either.

10   Q.   Do you have any recollection of discussing with your

11   client the fact that his sentence would be a mandatory minimum

12   ten years or up to a life sentence, even on a guilty plea?

13   A.   That would have taken place in the first appearance.

14   Because, as I recall, when the fact that life came up, I think

15   that concerned him at that point.  And I'm remembering back to

16   2001 here, but that would have been the only time that he would

17   have heard about life, other than when we discussed with him

18   going to trial.

19   Q.   Okay.  So when he was pleading guilty, signing the Bryan

20   letter, going into court for his rearraignment, he wouldn't

21   have known or been aware from discussions with you that the

22   judge could still potentially give him a life sentence?

23   A.   Well, the judge could go outside of the guidelines if he

24   wanted to.  Honestly, I can't remember if I threw that part in

25   there, but...

1    Q.    All right.  Now, the number from -- is it from 13 to 17

2    which you thought the guidelines would work out for him?

3    A.    I believed that from what we could tell that when he pled

4    to what we had worked out and the amount, that he would fall

5    between those numbers.

6    Q.    All right.

7    A.    He kept wanting me to give him a number.  And I said:  I

8    can't give you a number.  This is where you fall and then you

9    wait for the report.

10   Q.    But you discussed numbers with him, didn't you,

11   Mr. Stoutz?

12   A.    Oh, absolutely.

13   Q.    And you always discussed specific numbers, like 13 to 17

14   with him, didn't you?

15   A.    Well, specific in the sense that we were talking about the

16   guidelines.  I told him that's where he would fall, but I threw

17   in:  We have to wait for the report.  You know, whenever we

18   would talk about that.

19   Q.    When you were discussing, you know, his guilty plea to the

20   one count?

21   A.    Correct.

22   Q.    And you appeared in court that day and signed on for him?

23   A.    Correct.

24   Q.    Had you gone over the factual basis with Mr. Morello to

25   maybe change anything in the factual basis or work out --

1   A.   We did.

2   Q.   -- any changes?

3   A.   Well, we caught a mistake that was there in the amount of

4   drugs.  I believe it was either a mistake or it was something

5   we believed should not have been attributed to Harry Handy and,

6   therefore, it was dropped down.  It wasn't a lot.  It was 30 or

7   40-something grams, maybe.

8   Q.   So other than -- do you recall that in the transcript from

9   the rearraignment the client actually brings up that that

10  amount should be changed?

11  A.   Well, we knew about it ahead of time.  But when Harry

12  Handy and I got to the last page of the paperwork that we were

13  reading in the jury box prior to the judge coming out, he had

14  seen that.  And I guess he jumped right to it or looked right

15  to that line and the number was wrong.

16          So he said:  Look, Cliff, that number's wrong right

17  here.  I said:  Oh, you're right.  I went over to John's table,

18  talked to John for a second.  John looked up in his book.  We

19  confirmed the fact that --

20          THE COURT:  For the record, you're talking about John

21  Morello?

22          THE WITNESS:  Morello, Your Honor, correct.  I'm

23  sorry.  And John Morello and I spent a minute or so at his

24  table.  He confirmed the fact that it was a mistake and it was

25  the same thing we had talked about previously.  He changed the

1    number and I know we both initialled it.  I don't know if Harry

2    Handy initialled it.  I would think he probably did.

3    **BY MS. WHITE**

4    Q.   I'm going to show you what's marked as the Government's

5    Exhibit F from their trial book, the factual basis.  And I'm

6    going to also do that as a joint exhibit.

7              THE COURT:  I'm sorry.  Would you speak louder,

8    Ms. White.

9              MS. WHITE:  And that would be a joint exhibit, but I

10   would like to put --

11             THE COURT:  It doesn't make any difference to me.  If

12   an exhibit's admissible, whose it is is irrelevant.

13             MS. WHITE:  All right.  Exhibit F.  I'd like to

14   approach the witness, please?

15             THE COURT:  All right.

16   **BY MS. WHITE**

17   Q.   If you could take a look at that.  Do you recognize that?

18   A.   I do.

19   Q.   And what is it?

20   A.   The factual basis in the matter of Harry Handy.

21   Q.   And who signed it?

22   A.   Myself and Harry Handy.

23   Q.   All right.  What date was that?

24   A.   March 21st, 2001.

25   Q.   And you signed your name, but it was where Mr. Harry

1   Boyer's name was; is that right?

2   A.   That's correct.

3   Q.   Did John Morello even know whether you were going to be

4   the lawyer present that day?

5   A.   I think I gave him a copy of my motion.  I had to drop off

6   a copy.  So I would have given him a copy that morning probably

7   or that -- I don't know if I would have faxed it to him, or, if

8   I would have brought it to him, but I know I gave him a copy.

9   Q.   And that factual basis, was it prepared by Mr. Morello and

10  submitted to you, or did you actually talk about it with

11  Mr. Morello and go through it line-by-line or any of the

12  details in that factual basis?

13  A.   I believe it was provided to Harry Boyer first.  There was

14  the -- not a rough, but we were provided one the day before, I

15  believe, but it went to Harry Boyer.  I don't know if I got it

16  from Harry Boyer at that same night, but I got a copy of it.

17          And then when I saw John Morello the next morning,

18  the day of the 21st, then he gave me the copy that we signed

19  off on.

20  Q.   All right.  Do you have any specific recollection of you

21  dealing with John Morello and making any changes in the factual

22  basis?

23  A.   Yes, on the 21st.

24  Q.   That would have been in court?

25  A.   In court.

```
 1   Q.   Okay.  Prior to that, you didn't make any changes or --
 2   A.   No, Harry Boyer --
 3   Q.   -- there were no discussions?
 4   A.   Harry Boyer did that with him --
 5   Q.   And but you're not aware?
 6   A.   -- and I was the one that caught it.
 7             No, it was done prior to the 21st.  It was discussed,
 8   it was agreed upon, and it was gotten out of the way before we
 9   came in to plead.
10   Q.   Okay.  Now, the amount that your client brought up that
11   was incorrect and you changed it --
12   A.   Right.
13   Q.   -- did you calculate that amount?
14   A.   We did.
15   Q.   And are you aware that that calculation actually doesn't
16   add up to how much drugs were in the case?
17   A.   Well, it was drugs -- I believe it was drugs -- I figured
18   this out the other day, and I don't recall the exact numbers
19   that I put together.  But if you add everything up, you get a
20   certain number and I think maybe it's if you take 60 grams out.
21             I believe it was some drugs that were found -- maybe
22   some crack that was found in an abandoned house, or some drugs
23   that were found somewhere that John Morello agreed that should
24   not be attributed to the amount that was on Harry Handy.
25   Q.   Okay.  So the factual basis, you received it and it had
```

 1    listed over 500 grams; right?

 2    A.    Right.  This 500 --

 3    Q.    9?

 4    A.    -- 9, I believe.

 5    Q.    Yes.

 6    A.    Right.

 7    Q.    And you and Mr. Boyer discussed that and agreed to it with

 8    Mr. Morello?

 9    A.    Yes.

10    Q.    And then you say that you took that to your client at jail

11    the night before?

12    A.    I can't tell you if it was the night before; but it was

13    before going into court on the 21st.  Because he was aware of

14    it.  He's the one that caught the mistake.  He caught this

15    mistake before I did.  Because we had all talked about it

16    before.  So we all had the knowledge of what it should be.

17    Q.    So your client caught the mistake and you brought it to

18    Mr. Morello's attention in court that morning?

19    A.    Correct.  He caught the mistake on the factual basis and

20    it was changed in court that morning.

21    Q.    And, in fact, your client came up with the number of

22    464.9-grams of cocaine for which you suggested that needed to

23    be changed and Mr. Morello agreed to that; is that right?

24    A.    The number that it was changed to?

25    Q.    Uh-huh.

1  A.   No, I don't think -- we may have come up with it together,
2  Harry Handy and I.  I don't know.  But that number was come up
3  to -- I don't remember.  I don't remember if it was Harry Boyer
4  or Harry Handy.
5  Q.   So you don't know the origin of that calculation?
6  A.   Right.  But I know I was sitting down with one of the two
7  and, you know, we were looking for something to get in this
8  case.  We weren't getting anything and we had caught a little
9  mistake, so we thought we had something great.
10 Q.   Are you aware that after the PSI report was prepared that
11 the actual calculation was 441.9 grams; were you aware of that
12 later from the PSI?
13 A.   Not that I recall.  I mean, if you're telling me that
14 that's what it is, then I would believe that.
15 Q.   You knew that it was important to have the calculations,
16 even on the weight of the drugs, correct and the lower would be
17 better for you client?
18 A.   I think the number was 500, if I'm not mistaken, and this
19 was going to bring him under the 500 maybe.  I don't know.  I
20 don't recall how much good it was going to do him, but I think
21 it was -- I thought it was significant.
22 Q.   So from your understanding of the law of the weight at
23 that time, anything under 500 would have been better for him so
24 it didn't really matter of the specific amount?
25 A.   If I'm recalling correctly, that 500 is one of the numbers

```
 1   in the statutes, then, yes, that we knew that that would be
 2   better for him.
 3   Q.   Now, in that factual basis -- in that -- I believe it's
 4   the second paragraph.
 5            MR. SANDERS:  What page, counsel?
 6   BY MS. WHITE
 7   Q.   Second paragraph on the first page.  Do you see where the
 8   facts set forth that there was a drug organization --
 9   trafficking organization headed by Harry Handy a/k/a Dubie?
10   A.   I'm looking at authorized electronic surveillance.  The
11   first page?
12   Q.   Second paragraph.
13   A.   One second.
14            Correct.  I see it.
15   Q.   So did you realize at the time your client was signing the
16   factual basis, he was agreeing to have been the leader and it
17   was actually called the Harry Handy Organization?
18   A.   No.
19   Q.   But you went over this, didn't you?
20   A.   Yes.
21   Q.   And you went over it with your client, and you say you
22   went over it with Mr. Boyer, Mr. Morello?
23   A.   That's probably something I just learned from you asking
24   me the question.  I don't think I've known that until today.
25   So I wouldn't recognize that.
```

1  **Q.**    You wouldn't have recognized that?

2  **A.**    That those words were being put in there in order that

3  when he signs it, that's something he's admitting to that could

4  come back on him in a presentence report.

5  **Q.**    And as a matter of fact, it did, didn't it?

6  **A.**    I believe he got some points for being a leader, possibly,

7  and that was one of our objections.  Because I was familiar

8  with the three people in the case and I knew their personal

9  relationships.  And I -- you know, my opinion was I didn't

10  think he was a leader, therefore, that was the basis of my

11  objection.

12  **Q.**    But you allowed your client to sign that knowing that

13  everything in the factual basis was something that he was

14  admitting?  Just like when you offer a guilty plea in state

15  court or anywhere, the factual basis is something the client

16  agrees to; right?

17  **A.**    That's correct.

18  **Q.**    Now, do you recall Harry Boyer telling you that everything

19  in that factual basis was okay and the client could sign it?

20  **A.**    I don't think he used the word *okay*.  I think he probably

21  would have said:  You have to go over the factual basis with

22  him, read it to him, and then sign it at the end.

23  **Q.**    At that time, Mr. Stoutz, were you even aware that when

24  you're handling a federal criminal case that you could have

25  negotiated differences, changed the words, different things in

1    that factual basis with Mr. Morello, the U.S. Attorney?

2              Were you aware of that at that time?

3    A.   Well, that was the purpose of Harry Boyer being in the

4    case.

5    Q.   Were you aware of it?

6    A.   Me, no.

7    Q.   Did Mr. Boyer tell you that those things could be

8    discussed, perhaps changed, or made to be exactly correct so

9    that your client could agree to everything in it?

10              Did Mr. Boyer tell you that?

11   A.   Well, to the extent that if you see something that --

12   well, I don't want to say if you see something that's not true,

13   but --

14   Q.   My question is:  Did Mr. Boyer tell you that?

15   A.   Give me one second.  Mr. Boyer told me that if we saw

16   things that were not true in the factual basis of his arrest,

17   like what happened, how much drugs, things of that sort, that's

18   what I was looking for, myself, in there.

19              You know, that if they said that:  After leaving 1809

20   Feliciana Street, if that would have been a different address,

21   that would have been the types of things that I was looking

22   for.

23   Q.   Because of your level expertise as a criminal defense

24   lawyer in federal court, you were not necessarily aware of

25   anything, other than just looking to see if the details were

1  correct; is that right?

2  A.   That would be fair to say.

3  Q.   Did you even know about enhancements and what that meant

4  with the sentencing guidelines?

5  A.   I knew that you get a presentence report.  I knew that the

6  presentence report goes into the defendant's background, the

7  circumstances of his arrest, what took place, and that the

8  federal government could enhance you for various things that

9  you may have done during the course of committing a crime.

10         One of them I knew about was if you did it with a gun

11  and you had a gun with you.  Which is one first things I had

12  asked him:  Did you have a gun in the car when you were running

13  from the police?  I asked him the things that I was aware of.

14  You know, I'm sure there was hundreds of things I was not aware

15  of that could be added.

16  Q.   So from your understanding of the case, and the facts, and

17  from the discovery, and your investigation, and talking to your

18  client, did you explain or consider any enhancements that your

19  client could face?

20  A.   Yes, but no enhancements specifically.  I couldn't think

21  of any.  I didn't know of any at that point.  In other words,

22  I'll give you -- I would not have known that he would have

23  gotten a point for the car chase because it was a car chase of

24  such that endangered lives, I believe.

25  Q.   In fact, he got more than one point?

A.    I don't recall what he got.  But that was something else
that I had learned from this case, that a car chase and if you
endanger lives will get you more points.  I wasn't aware of
that at the time.

Q.    And you asked your client if he, in fact, had a gun when
he was involved in that car chase and, apparently, there was
this gun seized; is that what you recall?

A.    As I recall, that's correct.

Q.    So you thought as a matter of your understanding,
therefore, no gun found, he would not be held accountable for
any gun; is that right?

A.    Later on I knew there could be an issue with this gun that
they were talking about in an abandoned house.  But my
assumption was he was so far removed from that, that that might
not be something that affects him.

       But there was a recorded conversation on the phone --
I think that that's where that came from -- where him and
Brandon Smith were talking and that's where the word *toy* came
up, I think.  So, you know, that's another example.

       I would have thought if he got caught with one in the
car in his pocket, then that would be his problem there.  I
would have never thought -- you know, going through the tapes
is the first time, and then I heard about it on the paper with
the *toy*.

Q.    When you say you heard about it on paper, what do you mean

1   by that?

2   A.   In the presentence report.

3   Q.   Where the presentence report actually brought up the fact

4   that there was a telephone call discussing a *toy*, had you

5   discussed that with your client from that telephone --

6   A.   Honestly, I don't recall.  I listened to so many of those

7   CDs and they were all the same.  I mean, it was, you know, they

8   were all 10:00 at night, running around on the phone and all

9   the same subjects.

10  Q.   So you didn't discuss the audio tapes with your client for

11  your client to decipher what they might have been talking

12  about, did you?

13  A.   No, I knew what they were talking about, and I told him.

14  That was one of my reasons of telling him:  They got you.

15  Q.   So you didn't think that you needed to even run the

16  discovery by -- if you could let me finish.

17  A.   I'm sorry.

18  Q.   You didn't think you needed to run the discovery tapes --

19  audiotapes by your client because you knew what they were

20  talking about?

21  A.   Well, it's not that I didn't feel like I shouldn't run

22  them by him.  I was even making attempts to make copies of

23  them.  I think, in fact, I did make copies.  I think I made

24  three set of copies at a place out on Veterans where they

25  transcribed those tapes.

1          The problem was getting them into the jail.  The jail

2    didn't want to hear anything about:  Hey, can we bring this in

3    for him to listen to?  That was like beating your head against

4    the wall.

5    Q.   So did you make transcriptions of these audiotapes?

6    A.   Yes.

7    Q.   Transcripts, like court reporter --

8    A.   No, no, no, no.  I just copied them.

9    Q.   You made audio recordings?

10   A.   I made other CD copies, correct.

11   Q.   And then what did you do with those?

12   A.   Well, one was for me; one was for Harry Boyer; and one was

13   for Harry Handy.  But Harry Handy never got his because we

14   couldn't bring it into the jail.  So I sat around on the

15   computer listening to, I think, 2,000 phone calls.  And then I

16   would explain those to him.

17   Q.   You would explain the calls to the client?

18   A.   Right.  For instance, I talked to him -- he was on the

19   phone one night talking to somebody and he was actually

20   speaking the word *crack*.  I mean the word *crack* came out of his

21   mouth.  There were conversations like that.  Those I would tell

22   him about:  Harry, you're on the phone, you're talking about

23   crack.  They recorded it.

24          Those are the kind of things that if you go to trial,

25   you're going to get buried and you're going to do life and

1    never see daylight.  So I picked out -- there was a lot on the

2    tape that wasn't important, talking to girlfriends and things

3    like that.  But anything that had to do with drugs or anything

4    about any kind of criminal activity is what I discussed with

5    him.

6            THE COURT:  Did you-all discuss the *toys*, the use of

7    the word *toy*s?

8            THE WITNESS:  No, sir, Judge, not until later on once

9    we became aware that that word *toy* came into play.  And,

10   honestly, I don't recall if I heard the word *toy* in all of

11   those tapes, but I listened to so many conversations.

12   BY MS. WHITE

13   Q.   So when you heard the tape that talked about a *toy*, you

14   didn't know it meant a gun, did you?

15   A.   I can't tell you I heard that one or I didn't hear that

16   one.  I don't recall hearing it.  I listened to so many -- I

17   listened to these things at night with headphones with my

18   laptop on my lap.

19   Q.   Did you know that *a toy* meant gun?

20   A.   Do I know that or did I know that --

21   Q.   Did you know that at that time when you had the discovery?

22   A.   I don't know if it was mentioned in the discovery.  I

23   just -- I don't recall.  If it was in there, then I could tell

24   you.  But I didn't think we learned about it until later on.

25           THE COURT:  How did you learn about it?

1          THE WITNESS:  Judge, if I'm correct, I think we

2    learned about it in the presentence report.  But, honestly, my

3    memory is just not very good on that one.  I could have heard

4    about it before that.  But I remember *toy* became an issue at a

5    later part of the case.

6    BY MS. WHITE

7    Q.   Now, you said that you had the client sign the factual

8    basis and the Bryan letter in court and you recall talking to

9    him in the jury box?

10   A.   Correct.

11   Q.   Do you recall that there were other people in the jury box

12   that day?

13   A.   I've heard that Brandon Smith and Damien Wilson were

14   there.  For some reason I always thought Damien Wilson wasn't

15   there.  I know Brandon Smith was there.  But if Damien was

16   there, I don't recall.

17   Q.   And you did have discussions with your client in the jury

18   box in court that day?

19   A.   I did.

20   Q.   All right.  Now, when your client was reporting to the

21   probation officer and the probation officer was going to see

22   him, did you go with him and were you present when they

23   interviewed your client for the information on the PSI?

24   A.   Yes.

25   Q.   Where was that?

1    A.    Templeman.

2    Q.    All right.  And --

3    A.    Because I recall explaining some of his childhood things

4    that he went through and alcohol problems at a young age and

5    things of that sort during that meeting.

6    Q.    All right.  And then were you the person to receive the

7    PSI report?

8    A.    I know I would have gotten a copy because at that point I

9    was on the record, I believe.

10   Q.    Okay.  And what were your thoughts upon receiving the PSI?

11   A.    I was amazed.

12   Q.    What did you think at that time?

13            THE COURT:  I'm sorry.  I didn't hear the question.

14   BY MS. WHITE

15   Q.    What did you think at that time?

16            MS. WHITE:  I asked him what his thoughts were upon

17   receiving the PSR?

18            THE WITNESS:  And my answer was that I was amazed.

19   And then your next...

20   BY MS. WHITE

21   Q.    What did you find amazing about the report?

22   A.    How detailed it was.  It covered every single -- I'm

23   just -- they came up with some stuff in that report that has

24   caused me for every federal case that I ever have now to try to

25   hire somebody that knows everything about those things, if I

1   can do it.  If I can't do it, then I do my best with it.

2           But that was my first case.  It doesn't surprise me

3   much now if I get one of those.  But that was my first case.

4   And I said:  Lord, look at it, you know...

5   Q.   So you had never seen a PSR before?

6   A.   Before this case, I don't think so.

7   Q.   And when the criminal calculation came out to be a level

8   III, were you surprised by that?

9   A.   I don't recall what my reaction was.  The -- I was

10  considering either a I and a II, or a II and a III because of

11  his felony conviction.

12  Q.   But it was much higher that the PSR came back with.  It

13  was a level V.  Do you recall it being higher than what you had

14  calculated?

15          MR. SANDERS:  Objection, Your Honor.  Counsel, that's

16  not --

17          MS. WHITE:  It wasn't a V, it was III?

18  BY MS. WHITE

19  Q.   I'm sorry.  It was a III and a -- points were V and the

20  category was III?

21  A.   Okay.

22  Q.   I'm sorry.

23          MS. WHITE:  Thank you.

24          THE WITNESS:  And so your original question?

25

1    BY MS. WHITE

2    Q.    Were you surprised that he came out with a category III?

3    A.    If he was put in a III because of his felony conviction,

4    then, no, I wouldn't have been surprised.  If there was

5    something else that added to him that put him in the III, maybe

6    that I wasn't aware of, then I would have been surprised.

7    Q.    Now, the base level offense, had you ever calculated what

8    you thought it would be for the client?

9    A.    No.  Harry Boyer and I went over that together.  And then

10   I went over it with the -- once I went over it with him, then I

11   went over it with Harry Handy.

12   Q.    And what did you tell him the base level offense would be?

13   A.    Honestly, since I've been looking over this, I've come up

14   with different numbers.  But the only way I've been able to

15   determine what number I would have given him is by those years

16   that I put him in the 13 to 17.  I want to tell you it's

17   somewhere between a 33 and a 35.

18          I might be wrong, but that's -- I think that's the

19   area that I've been pounding on is for the past couple of weeks

20   to try to figure it out.

21   Q.    Now, when you got the PSI report, did you go over it with

22   your client?

23   A.    I did.

24   Q.    And when you get to the back of that PSI report and it

25   says that, you know, there's quite a lot of years being

1  suggested there, 262 years for the range up to 327 years.

2          **MR. SANDERS:**  Months, counsel.

3          **THE WITNESS:**  Months or --

4          **MR. SANDERS:**  You said years.

5          **MS. WHITE:**  Oh, I said months -- I mean months.

6  Excuse me.

7  **BY MS. WHITE**

8  **Q.**    The minimum under the sentencing guideline range in a PSR

9  would have been 21 years and 10 months.  Did you calculate that

10  and make that determination to tell your client?

11  **A.**    At what point?

12  **Q.**    When you received the PSR report?

13  **A.**    Wait.  You're saying the PSR report stated a number?

14  **Q.**    Yes.

15  **A.**    And did I point that number out to my client in going over

16  it with him?

17  **Q.**    Yes.

18  **A.**    Oh, yeah, we pointed out every number.  That's what he was

19  so upset about.

20  **Q.**    And do you recall that the PSR actually set forth it was

21  262 to 327 months as a sentencing recommendation guideline

22  range?

23  **A.**    I don't recall, but I know it was up there.

24  **Q.**    Okay.  I'll show you what's marked as Exhibit J.

25          **THE COURT:**  What is it that you're asking about now?

 1           MS. WHITE:  If he recalls what this sentencing
 2   guideline range was from the presentence investigation report.
 3   BY MS. WHITE
 4   Q.   Ask you to take a look at J.  Do you recognize that?
 5   A.   The presentence report in his case.
 6   Q.   Okay.  And can you go to the paragraph in which they
 7   provide the sentencing guideline range for your client?
 8   A.   Sure.
 9   Q.   I believe that's Page 22, Paragraph 122.
10   A.   And your question is what?
11   Q.   Do you see what the guideline range was?
12   A.   I do.
13   Q.   And what was it?
14   A.   The 262 to 327 months.
15   Q.   And what did that mean to you?
16   A.   Well, I would have stopped and divided by 12 and told him
17   exactly what it was.  And, you know, I know it was a lot.
18   Q.   And it was a lot more than 13 to 17 years; is that right?
19   A.   Correct.
20   Q.   At that point of receiving the PSI, you discussed it with
21   the client and told him he's automatically going to get 21
22   years?
23   A.   No, I didn't tell him anything.  He started complaining
24   about this, and I was just as surprised as he was.  So I,
25   basically, spent that meeting with him talking about:  Okay,

1    let me see what we can do.  Let me talk to Harry Boyer.  I

2    didn't have any answers for him in that meeting.

3    Q.    You didn't even know what to do once you got this, did

4    you?

5    A.    Well, I knew to take it, go over it with him.  But as far

6    as myself and Harry Handy sitting down and going over it, we

7    wanted to -- I wanted some more explanations of it.  Because

8    I -- you know, I didn't understand it completely.  It was my

9    first one.

10            So my thing was, I was going back to Harry Boyer and

11   sitting down and making him explain every single bit of it to

12   me so that I could go back to him and explain it to Harry

13   Handy.

14   Q.    Did you tell your client after receiving the PSI report

15   that the minimum he could receive was the 262 months?  Did you

16   tell him that?

17   A.    No.

18   Q.    And did you tell him that the maximum under the guideline

19   range was 327, somewhere in there?

20   A.    Well --

21   Q.    Did you tell him that?

22   A.    In this conversation when we went over this?

23   Q.    Yes.

24   A.    I really don't -- I really honestly don't recall.  I would

25   think we would have looked at the number at the end.  You know,

 1   the level and then flipped over and gotten to those numbers to
 2   better understand what exactly it was that that meant.
 3   Q.   Let me ask you this, if you recall:  Do you recall your
 4   client being completely freaked out after that meeting because
 5   suddenly you're telling him --
 6   A.   That would be a word for it, yes.
 7   Q.   So he was upset?
 8   A.   He was very upset.  I had to spend more time there with
 9   him saying:  Look, don't worry.  I'm going to find out about
10   this.  Let me find out --
11   Q.   But why would you tell him not to worry?  What did you
12   think you could do?  Or what were you going to do?  What were
13   you telling him you were going to do?
14   A.   I was going to go get answers for him.
15   Q.   From Harry Boyer?
16   A.   Correct.
17   Q.   And did you go over, at that point, the sentencing
18   enhancements that are listed in the PSR report?
19   A.   I would have gone over this entire document that I had
20   with him.  And, you know, there were some things I think he
21   didn't want to look at.  He was aggravated about -- he jumped
22   right straight to the point, got to the back and said:  Hey,
23   what happened to me?  And got his numbers.
24        And I can't say we went over every single line in
25   here because of the mood he was in at that point.  But I picked

1    out the important things in here, I think, and pointed some

2    things out to him, maybe to give him an explanation as to why

3    he ended up there.

4    **Q.**    Would you go to Page 12 in this PSI report, Paragraph 61?

5    **A.**    Okay.

6    **Q.**    Do you see there was a 2-point increase for a specific

7    offense characteristic?

8    **A.**    Yes.

9    **Q.**    Would that have been something you went over with the

10    client?

11    **A.**    Give me one second to read it.

12           Yes, that was the gun on the recorded conversation.

13    But if you notice, like the judge was asking me, they don't

14    refer to the word *toy* in there, I don't think.  So we did go

15    over this.  And that was my reason for saying we didn't say

16    anything or know anything about a *toy* until later on.

17    **Q.**    Did you -- from your understanding of federal criminal

18    law, were you aware that your client could receive such an

19    enhancement if he was not arrested with a gun?

20    **A.**    From what I knew, if the federal government could connect

21    a gun with the crime, whether they possessed it, or it was in

22    the car and they were making a dope deal in the parking lot, or

23    anything like that, if they could connect it, then it could be

24    there.

25           It was my belief that a gun that was in an abandoned

1    house somewhere was kind of far removed, but they had this

2    conversation of it on the phone.  So they were going to make

3    something out of it, I guess.

4    Q.    How did you know it was a gun in the abandoned house when

5    it was referred to as *toy* in the telephone calls?

6    A.    But they refer to it as gun in here.  So I didn't put this

7    with the gun in the abandoned house.

8    Q.    So you didn't realize or have knowledge of whether there

9    was a gun anywhere until you got the PSR report, because it

10   wasn't in the factual basis?

11   A.    If it wasn't -- if it was in the discovery, I would have

12   known it.  But I --

13   Q.    But if it was referred to as a *toy*.  You wouldn't have

14   known it as a gun?

15   A.    No, and I probably wouldn't have asked Harry either:  What

16   did you mean by *toy*, or what were you talking about?  But in

17   that -- that was another tape recorded conversation.  I was

18   thinking of something different.

19   Q.    On Page 13, Paragraph 63 of the PSI report, if you could

20   take a look at that, the paragraph.

21   A.    Paragraph 63?

22   Q.    Yes, Page 13.

23   A.    Okay.

24   Q.    Would that be a paragraph that you would have thought was

25   important to go over with your client?

 1    A.    The aggravated role in relation to the leader?

 2    Q.    Yes.  There was a 2-point enhancement for a role in the

 3    offense for your client's leadership.  Did you go over that

 4    with your client?

 5    A.    When we got this?

 6    Q.    Yes.

 7    A.    I would think so.  Because he wanted to know how he got to

 8    the numbers, and these were the numbers.  So when I say I may

 9    have eliminated some things, I may have eliminated all of his

10    arrests and things like that and jumped straight to the

11    paragraph that he was getting points for.

12    Q.    Were you surprised that he was given the 2-point

13    enhancement for leadership?

14    A.    Yes.

15    Q.    Despite the fact that you let him sign the factual basis

16    that set forth he was the Harry Handy leader of the

17    organization?

18    A.    Well, honestly, I just thought that that was the way that

19    they were characterizing it, you know.  And I -- my attitude

20    was, okay, the federal government thinks you're a leader.

21    Q.    And so it had absolutely no significance to you with your

22    understanding of the federal --

23    A.    I wasn't aware of a leadership role at that point when we

24    had talked about that.  But my appreciation of a leadership

25    role at that point in my law practice was when you have a drug

1   cartel or a drug ring running a big thing through the city and
2   whoever the guy at the top running it is, is the leader.
3          You know, I knew these three people and these guys
4   had grown up together.  It was my opinion that none of them
5   influenced the other ones at all.  So I thought there was more
6   of an extreme for that to be able to apply, I guess.
7   **Q.**   Okay.  Page 14 in that same Exhibit J, Paragraph 64.
8   **A.**   Uh-huh.
9   **Q.**   Do you recall if you went over the adjustment for reckless
10  endangerment enhancement?
11  **A.**   We would have gone over it when we received this.  That
12  was not something I was able to predict.
13  **Q.**   Was it something you even knew existed, such an
14  enhancement?
15  **A.**   No, because I wasn't that familiar with enhancements at
16  that point.
17  **Q.**   Did you know about any enhancements, other than a
18  potential kind and type of enhancement?
19  **A.**   I knew that you could get enhancements, and that
20  enhancements could be coming with the presentence report and
21  that that's the way it was to be explained to the client.
22  **Q.**   Did you ever discuss with Harry Boyer about any of the
23  potential enhancements that Harry Handy could face in this
24  case?
25  **A.**   We talked about them.

1  Q.   Did you anticipate, through Mr. Boyer's expertise on your

2  behalf, that there were enhancements coming?

3  A.   Yes.

4  Q.   And which enhancements did you think were coming?

5  A.   I had no idea.  When I tell you I had no idea, I think

6  Harry Boyer -- the whole idea of the presentence report coming

7  up, Harry Handy wanted to know what was a presentence report,

8  what was it about.  In explaining that to him, we told him that

9  they had to, just like I mentioned earlier, look into his

10 background, criminal history, present it to the judge and then

11 the judge makes a decision on that.

12         He wanted some answers to what that stuff was.  I

13 don't remember if Harry Boyer gave him an example of -- you

14 know, threw an example in there for the explanation or not.

15 Q.   But you wouldn't have thrown in any explanations because

16 you didn't really understand them?

17 A.   I didn't know any examples.

18 Q.   When you say you're explaining things to your client,

19 you're basically explaining procedures and what things are, and

20 where the judge will sit, and explaining the basics; would that

21 be fair to say?

22 A.   At one part I was explaining basics.  But then when I

23 received the information from Harry Boyer, if I was the one

24 relaying it, then I was relaying the law at that point.  I

25 considered myself -- I was an attorney.  It wasn't, you know, a

 1    foreign language to me.  I could understand it.  I might not be

 2    able to understand it in complete detail, but I understood it

 3    enough to relay it to Harry Handy.

 4    Q.    Now, did you work with Mr. Boyer on the objections that

 5    were filed to the PSI?

 6    A.    Yes.

 7    Q.    Okay.  And you were both successful.  Did you argue them

 8    or submit them in writing?

 9    A.    No, we argued them in front of the judge.  I think maybe

10    we lost a couple and won one.

11    Q.    When were they argued before the judge?

12    A.    Um --

13    Q.    Did you specifically argue them in front of the judge?

14    A.    Well, maybe the word *argue* is a little lengthy.  I believe

15    they came up on the record because the judge discussed them.

16    And the judge said:  Okay, I went over this, and I went over

17    these; and I don't agree with you on this, and you're not

18    getting this, but I do agree with you on this one.

19          I don't remember which one it was, but I know that

20    the judge granted one of them.

21    Q.    Do you remember arguing the objections on the record in

22    court?

23    A.    No.  I remember going on the record, saying something

24    about the objections; but going into an argument, I would think

25    I did, but I can't tell you for sure.

1  Q.   Do you recall if when you went on the record to talk about

2  these objections, would that have been just prior to Mr. Handy

3  getting a sentencing -- getting his sentencing?

4  A.   I don't know.  Because what I remember about Mr. Handy

5  getting his sentencing was that was the time that he wanted to

6  talk to the judge about trying to take his plea back.  And I

7  kind of stepped to the side and said:  Okay, it's your -- go

8  ahead and talk to the judge.

9            That's what really sticks out in my mind that

10 particular day.

11 Q.   All right.  I'm going to show you what's marked as Exhibit

12 D.  This is the sentencing transcript of Mr. Handy.  Is your

13 name reflected by the court reporter as even being present on

14 the sentencing date?  If you could look at the first page.

15 A.   Well, if I wouldn't have gone on the record -- no, it's

16 not mentioned that I'm present.  But --

17 Q.   If you could look at that transcript and see if you

18 actually went on the record then.  Your name doesn't appear in

19 that transcript having gone on the record, does it?

20 A.   No, but what that would have meant was Harry was the one

21 that was going to argue this because, obviously, he would have

22 done a better job than me.  But I can promise you, I was in the

23 courtroom.

24 Q.   Okay.

25 A.   I was always in the courtroom.  If for nothing else, to

1    explain to Harry Handy what's going on.

2    Q.    So you're responsible for all the explanations when Harry

3    might have been doing something in court?

4    A.    Well, Harry Boyer will spend a little less time with his

5    clients; and Harry Handy would expect me to spend more time

6    with him and explain things to his satisfaction, which I always

7    did for him.

8    Q.    All right.  As a result of your objections, you see or

9    recall from maybe having been there that day that the judge

10   denied all of them but one?

11   A.    Correct.

12   Q.    Okay.  Had you told your client that those objections were

13   going to be successful and he would not be facing the

14   minimum -- is it 262?

15   A.    No, I told him we'd take a shot at them.  As a matter of

16   fact, I think I'm the one that drew up the first objections and

17   I went through -- I wanted to object to everything in the whole

18   report, I think.

19            And Harry Boyer's advice was:  Don't object to too

20   much stuff.  Object to a little bit and then you might get

21   lucky and get something.  So when I presented that to him, he

22   decided to take out some of the objections that I wanted to

23   bring up, which was fine with me because he was doing the final

24   reading of it.  And then he drew it up from there.

25   Q.    So when your client went into sentencing and you were

1    there to explain to him, he knew that day that the minimum he
2    could get was not 13 to 17, but a minimum of like 21½ years?
3    A.    Yeah, he knew that when we went and saw him in the jail.
4    Q.    I'm asking if he knew it when he went into court that day
5    for sentencing?
6    A.    Yes, because it had been told to him when we went to the
7    jail.
8    Q.    But you told him that you were going to do something and
9    try to make the sentence less?
10   A.    Well, I was going to see if anything could be done.  You
11   know, again, in state court, they can try to take a plea back
12   within five days.  Federal court is different.  So I had to go
13   and ask Harry Boyer:  This is what we're faced with now, can
14   anything be done?
15   Q.    And on the record that day, do you recall that your client
16   immediately asked the judge at sentencing if he could withdraw
17   his plea?
18   A.    I do.  He had talked to me about that before and said he
19   wanted to do that.  I mentioned that to Harry Boyer.  And, you
20   know, we were told that Judge McNamara was a no-nonsense judge
21   and he wasn't going to want to hear stuff like that.  And that
22   was why I told Harry Handy, I said:  If you want to talk to the
23   judge, go ahead and try to talk to him.
24   Q.    Why did Harry Handy tell you that he wanted to withdraw
25   his guilty plea?

1    A.    Because he saw the presentence report.

2    Q.    And what made him want to withdraw his plea?

3    A.    The amount of time.

4    Q.    And was that different from what he understood from you

5    and Harry Boyer?

6    A.    Well, it's hard to say what understood, because Harry was

7    always fixated on the state system.  Now, that's why I gave him

8    the range of 13 to 17.  I don't think Harry Handy could have

9    predicted that it would come back like this.  I couldn't have

10   predicted that it would come back like this, but that was the

11   reason that Harry Boyer was in the picture.

12   Q.    And did you ever hear Harry Boyer in your presence explain

13   to the client that he never could get the 13 to 17 and the

14   minimum under the guideline range was 21 years up to life?

15   A.    I don't think so, because I'm the one that met with him

16   with the report.

17   Q.    And you're talking about Harry Handy you met with?

18   A.    Harry Handy, correct.  And I don't think Harry Boyer was

19   present for that because I had to tell him at the end of the

20   meeting:  Okay, I'll go back and talk with Harry and see what

21   can be done, if anything.

22   Q.    Now, did you ever research to determine what the legal

23   possibility was of your client withdrawing his guilty plea?

24   A.    After he pled or --

25   Q.    No.  Upon you getting that presentence investigation

 1   report --

 2   **A.**   Well, that was my --

 3   **Q.**   -- and your client asked you to withdraw the plea?

 4   **A.**   That was my question to Harry Boyer.

 5   **Q.**   And what did you two come up with?

 6   **A.**   Basically, the same thing the judge told him, that that

 7   wasn't going to happen.

 8   **Q.**   But did you research the issue?

 9   **A.**   Did I personally, no.

10   **Q.**   And did you think it was important to express your

11   client's wishes to the Court at that point since he was so

12   surprised by the PSI report outcome?

13   **A.**   Well, I was going to let him do that.

14   **Q.**   The client?

15   **A.**   The client, correct.  He was the one that wanted to speak

16   to the judge.

17   **Q.**   You didn't think, as his lawyer, you should represent that

18   to the Court?

19   **A.**   Honestly, I don't remember if I mentioned anything other

20   than:  Your Honor, my client would like to speak with you about

21   the report, or about his plea.  I don't think I went as far as

22   to say:  Taking back his plea.

23   **Q.**   You didn't say anything.  The transcript that you're just

24   looking at from the sentencing, you're not on the record; isn't

25   that right, Mr. Stoutz?

1   A.   Well, I can tell you I remember this:  I was standing next
2   to him.
3   Q.   But if the court reporter didn't put your name down then
4   you didn't say anything.
5   A.   No, then I wouldn't have said anything.
6   Q.   So if you have a memory of saying something in court that
7   day, that would be incorrect?
8   A.   Well, I would have said it to Harry Handy then.  Because I
9   remember --
10  Q.   And that's not on the record, is it, sir?
11  A.   No, but I remember speaking with Harry Handy and talking
12  with him.  I was either on his left shoulder or his right
13  shoulder.
14  Q.   But that wouldn't be on the record, would it?
15  A.   Me speaking to him, no.
16  Q.   Now, after your client was sentenced, he started filing
17  motions?
18  A.   I believe so.
19  Q.   And you were aware of that?
20       THE COURT:  I'm sorry.  What was your question?
21  BY MS. WHITE
22  Q.   After your client was sentenced, he started filing motions
23  and appeals?
24  A.   And I said that's correct, I believe so.
25  Q.   Now, the client contacted you and asked you to sign an

1  affidavit, didn't he?

2  A.   He had been begging me to sign an affidavit for a while.

3  Q.   And why was he begging you?

4  A.   Because he believed that he had one shot to be able to

5  give his plea back, and that was if I signed an affidavit for

6  him.

7  Q.   All right.  And did he, in fact, submit to you an

8  affidavit?

9  A.   He did.

10  Q.   All right.  And did you provide that affidavit -- did you

11  sign the affidavit and give it back to the client?

12  A.   No.

13  Q.   You did not?

14  A.   There's more than one affidavit in this case.  There's

15  about three or four, I think.  Which one are you speaking of?

16  Q.   Let's talk about your affidavits.  You signed an affidavit

17  for the government, didn't you?

18  A.   I did.

19  Q.   And that affidavit --

20  A.   Well, let me take that back.  I didn't sign an affidavit

21  for the government.  I was contacted by the government.  I was

22  contacted by Harry Handy.  I started hearing things about

23  there's motions over here, there's a motion over here.

24        And I said:  Wait a second.  Let me put an end to all

25  of this.  There shouldn't be motions floating around anywhere.

1   This is what happened.  This is my affidavit, and I'm going to

2   draw it up and present it.  And this should be the only

3   affidavit around.  And if it's not, this is my story.

4   Q.   All right.  I'm going to show you what's marked as Exhibit

5   Q.  Ask you to take a look at that.

6   A.   Correct.

7              THE COURT:  This is marked exhibit what?

8              MS. WHITE:  Q.

9              THE COURT:  Okay.

10  BY MS. WHITE

11  Q.   The front page of that, what is that?

12  A.   An affidavit.

13  Q.   No.  The front page would be a letter from your office?

14  A.   A letter from my office to Tony Sanders.

15  Q.   Okay.  And then attached to that letter -- what's the date

16  of your letter, please?

17  A.   October 8th, 2003.

18  Q.   All right.  Who prepared that affidavit?

19  A.   I did.

20  Q.   And did you tell the Assistant U.S. Attorney at that time

21  that you had signed either one or two other affidavits prior to

22  that day?

23  A.   I don't recall what the conversation was.  I don't think I

24  had told him that, but the -- when we had spoke, there was

25  confusion about affidavits.

1    **Q.**    *We* who?

2    **A.**    Myself and, I believe, it was Tony Sanders that I spoke

3    with on the phone.

4    **Q.**    So, in fact, there is more than one affidavit with your

5    signature on it?

6    **A.**    Absolutely.

7    **Q.**    Okay.

8    **A.**    Which there should not be.

9    **Q.**    We'll get to that.  This first one that we're looking at,

10   Exhibit Q, that's the affidavit that the government asked you

11   to prepare, and did you actually prepare and put the words

12   together or did the government prepare that after meeting with

13   you?

14   **A.**    No.  What happened was this whole issue was coming about.

15   And I had been contacted by Harry Handy.  I had been contacted

16   by Tony Sanders.  At this point -- I remember the conversation

17   with Tony.  I remember where I was driving down the street.  I

18   was getting aggravated about the fact that I'm starting to hear

19   there's affidavits here, there's this and that, and this whole

20   thing is getting a little crazy and confusing.

21           And I said:  Listen, Tony, I'm going to put an end to

22   all of this right now.  I'm going to write up an affidavit.

23   This affidavit is what I'm going to swear to tell the truth.

24   I'm going to -- it's the way I draw up all my affidavits.  And

25   you can take what I put in here to be the facts and to take

1    place of any other affidavit that may be out there that

2    shouldn't be out there.

3           And I prepared this the way I prepare all affidavits

4    in my office.  The Notary Public on it, my father, must not

5    have been in the office.  So that's the Notary Public two

6    offices down.  And it looks like the witnesses are two

7    attorneys in that office.

8    Q.    Okay.  So that affidavit was prepared after the government

9    spoke to you and that one's dated October 8th, 2003?

10   A.    That's correct.

11   Q.    Now, there's other affidavits that you signed before that

12   date.  And I'd like to show you what's -- I would mark -- or is

13   marked as Exhibit T and I'll ask you to take a look at that,

14   please.

15          What's the date -- or what is that?

16   A.    It's an affidavit.

17   Q.    And is that your signature on that affidavit?

18   A.    It looks to be my signature.

19   Q.    What's the date on that affidavit?

20   A.    November 5th, 2002.

21   Q.    You would agree with me that that affidavit would predate

22   the one from the Assistant U.S. Attorney's Office; right?

23   A.    The date's correct.

24   Q.    And do you know who prepared this affidavit?

25   A.    I have no idea.  And I honestly can't tell you why my

1    name's even on it.  My heading underneath it is not the way I

2    do my heading in my office, as you can see on the affidavit I

3    prepared for the government.

4    Q.    But, in fact, you're saying that is your signature?

5    A.    I definitely cannot say that that's not my signature.

6    That looks like my signature.

7    Q.    So you signed something that purports to be an affidavit

8    involving Harry Handy's case.  It's not notarized.

9    A.    I'm not going to tell you that I definitely signed this

10   affidavit, but it looks like it appears to be my signature on

11   it.  And I can tell you this:  If I had ever read a paragraph

12   like this or an affidavit like this, my name would have never

13   been voluntarily placed at the bottom of a page like this.

14   Q.    Mr. Stoutz, are you saying that that's your signature, but

15   somebody forced you to sign it?

16   A.    I'm saying it looks like my signature and either it was

17   put in front of my face and I didn't read it, or it was cut and

18   pasted some other kind of way.  But you can read the wordings

19   in it.  The English in it.

20   Q.    Because the English is not completely correct?

21   A.    I wouldn't let something like that go out of my office and

22   go to somebody else.

23   Q.    But it has your signature on it?

24   A.    It looks like my signature, yes.

25   Q.    Now, I'm going to show you what I'll mark as Exhibit T1.

 1          I'm going to show you what I'm marking as T1.  Ask
 2  you to take a look at that.
 3          MR. SANDERS:  Your Honor, just so there's no
 4  confusion, that affidavit is attached to Government Exhibit X
 5  in the bench book.  So if you would go to Government Exhibit X,
 6  there's a handwritten page and behind that is the affidavit
 7  which she has marked as T1.
 8          MS. WHITE:  Thank you.
 9          THE WITNESS:  This is the affidavit that Mr. Handy
10  sent me, the one that he was asking me to sign for him.
11  BY MS. WHITE
12  Q.   Okay.  So T1 you recognize as an affidavit from
13  November 5th, 2002; correct?
14  A.   Yes.  I don't know when I got it in the mail, but it was
15  sent to me from -- by him in jail on whatever paper they use in
16  jail and whatever typewriter they use.
17  Q.   All right.  And is that your signature on the affidavit?
18  A.   That looks to be my signature.
19          THE COURT:  Excuse me.  Tell me again where that is.
20          MS. WHITE:  That's under Tab XYZ on the bench book.
21  It's marked as Government Exhibit X, the second page of that
22  exhibit, Your Honor.
23          THE COURT:  All right.  Repeat your question, please,
24  ma'am.
25

1    BY MS. WHITE

2    Q.    That affidavit is dated November 5th, 2002; correct?

3    A.    Correct.

4    Q.    And is that your signature on the affidavit?

5    A.    It does look to be my signature.

6    Q.    Now, you say this is the affidavit sent to you by Harry

7    Handy?

8    A.    Correct.

9    Q.    And your signature appears on it?

10   A.    Correct.  But the original stayed in my file, which is in

11   the file that I provided to the U.S. Attorney.  The original of

12   this.  I never sent this thing out.  It stayed in my file

13   because of the way it was written and what it said.  It's a --

14   it was a complete lie.

15        I wasn't going to -- I wasn't going swear to agree to

16   that.  That's why I kept the original.

17   Q.    Okay.  You provided the original of T1 to the government;

18   is that right?  Is that what you're testifying to, T1, X?

19   A.    Yes.

20   Q.    Okay.  They have the original.  So you never sent one back

21   to Mr. Handy?

22   A.    He never got that piece of paper back.  It's still in the

23   file with the letter that he sent attached to me.

24   Q.    And if Mr. Handy had attached Exhibit T to his pleadings,

25   how would that have happened?

1    A.   I have no idea.

2    Q.   But it is your signature?

3    A.   That looks to be my signature as well.

4    Q.   Now, I'll ask you to take a look at Exhibit T and T1 and

5    tell me if there's any difference in the two?

6    A.   Any difference in --

7    Q.   Any difference in the two documents.  Two affidavits, they

8    both have your signature on it; would you agree?  They both

9    have your signature on it; would you agree?

10   A.   Well, the *T* and the *Z* is signed a little different, but

11   they both look like my signatures.

12   Q.   You've admitted they're both your signatures?

13   A.   I believe so, yes.

14   Q.   And they're both dated the same day?

15   A.   Correct.

16   Q.   What day?

17   A.   November 5th, 2002.

18   Q.   Is there any other changes in the affidavit between the

19   two, T1 and T?

20          **THE COURT:**  I'm sorry.  I'm not hearing you.

21          **MS. WHITE:**  I'm sorry.

22   BY MS. WHITE

23   Q.   Is there any other differences between T and T1

24   affidavits?

25   A.   If you look at T, the word *affidavit* is not underlined.

1  If you look at the wording in T, some of it is -- it says -- in

2  T1 it says:  The affiant.  In T it says:  The affiants, with a

3  plural, with an *S*.  Other than the wording being on different

4  lines -- give me one second to read.

5          If you look at what I was referring to as the English

6  that's used in the third line of the middle paragraph with the

7  quotes around it, the second sentence starts out, it says, in

8  T -- Exhibit T, it says:  In advising Mr. Handy.

9  **Q.**  Would that be T or T1?

10 **A.**  If you look at T, they start out the second sentence by

11 saying:  I advising Mr. Handy to plead guilty.  If you look at

12 T1, it says:  In advising Mr. Handy.  So whoever wrote this one

13 up even had worse English --

14 **Q.**  Which one?

15 **A.**  Whoever wrote up T had just as bad as English grammar as

16 the one that wrote up T1.

17 **Q.**  So you would agree with me that T had poor grammar and T1

18 appears to have improved on or changed the grammar; correct?

19          **THE COURT:**  Excuse me.  For ease for the court

20 reporter, when you're referring to these documents, please, use

21 a word.  Like if it's T, say tango or something.

22          **MS. WHITE:**  Okay.

23          **THE COURT:**  Okay.  Thank you.  For my ease, too.  My

24 ears aren't that good.

25          **THE WITNESS:**  What was your question?

1          Oh, the grammar in the two.  Give me one second

2    to look at it.

3          THE COURT:  Recite for the record which affidavits

4    you've been referring to with --

5          MS. WHITE:  Okay.  Affidavit T, Tango.

6          THE COURT:  What is it, Tango?

7          MS. WHITE:  Yes, sir.

8          THE COURT:  Okay.

9    BY MS. WHITE

10   Q.   Tango has poor grammar; is that correct, in your opinion?

11   A.   Absolutely, absolutely.

12   Q.   But it still has your signature on?

13   A.   I believe so, correct.

14   Q.   And in affidavit T, Tango Alpha, which would be the second

15   affidavit, grammar is changed.  And in the specific same area

16   instead of it saying:  I advising, it says:  In advising.  In

17   other words, the grammar has been corrected; would you agree

18   with me?

19   A.   No, it's gotten worse in Tango.  And it's my understanding

20   that Tango, meaning T, would have --

21   Q.   I asked you about Tango Alpha.

22   A.   Correct.

23   Q.   That's the one that has changed.

24          THE COURT:  Wait, wait, wait.  What's Tango Alpha

25   now?

1          MS. WHITE:  That's T1, Judge.

2          THE COURT:  Give me a --

3          MS. WHITE:  That's the X.  I'm sorry.

4          THE COURT:  Okay.  This record is going to be very

5    difficult for a court to follow --

6          MS. WHITE:  I know.

7          THE COURT:  -- upstairs somewhere.  I understand what

8    it is.  Okay.  We're going to mark the Government Exhibit X as

9    T1 now.

10         MS. WHITE:  Okay.  Or I'll call it X.  How about if

11   we do X?

12         THE COURT:  Just the second page.  Just the

13   affidavit.

14         MR. SANDERS:  That's correct, Judge.

15         THE COURT:  Go ahead.

16         MS. WHITE:  T1, Your Honor?

17         THE COURT:  Yes.

18   BY MS. WHITE

19   Q.   T1, Mr. Stoutz, is the one that actually has changes from

20   the T in an attempt to, apparently, improve the grammar; would

21   you agree?

22   A.   Yes, but I believe Tango would have been after Tango-1.

23   Q.   Now, why would you say that when they're both dated the

24   same date and your handwriting on one?

25   A.   Well, I don't know where this one came from.

1  **Q.**   Which one are you referring to?

2  **A.**   I'm sorry.  I don't know where Tango came from.

3  **Q.**   But it has what purports to be your signature?

4  **A.**   Correct.  But I can tell you that Tango-1 was mailed to me

5  by Harry Handy.

6  **Q.**   So you're saying Tango-1 was the one from Harry Handy and

7  that has the grammar that, apparently, is different from the

8  other one?

9  **A.**   That's correct.  And like you said, I believe the grammar

10  got worse with Tango.

11  **Q.**   Okay.  Now --

12  **A.**   So whoever wrote Tango was using better grammar than

13  Mr. Handy was using -- I mean, worse grammar.

14  **Q.**   Did you prepare either T, Tango or Tango-1?

15  **A.**   Absolutely not.

16  **Q.**   Did you prepare any affidavits for Mr. Handy and mail

17  them?

18  **A.**   I believe I did, but because I found a handwritten letter.

19  And the way I dictate letters to my secretary is I'll write

20  them out.  But I can't find anything that I've sent to him.

21         And I can't find a letter that my secretary would

22  have typed from my rough draft.  But there is a letter that

23  says something to Harry -- I had given him some advice as to

24  what to fight in his appeal, the gun and different things like

25  that, and, you know, just a general letter to him.

 1  **Q.**   I'll show you what's marked as Exhibit Y and ask you to
 2  take a look at that.  And that's Y.
 3  **A.**   This is the letter I'm talking about.
 4  **Q.**   All right.  Does that letter -- how do you recognize it?
 5  **A.**   It's my handwriting.
 6  **Q.**   It's a handwritten letter by you?
 7  **A.**   And it's one that would have come off of the short page
 8  legal paper and I skip lines for my secretary so she could read
 9  it, because --
10  **Q.**   Does that have a date on it?
11  **A.**   No.
12  **Q.**   And does your file contain the typewritten transcription
13  of that?
14  **A.**   I can't find the typewritten transcription or anything
15  that would have been sent out with it.
16  **Q.**   Do you have any reason to believe that it was not sent
17  out?
18  **A.**   With the secretary I had at the time, anything's possible.
19  **Q.**   So you don't know if the letter went out or not?
20  **A.**   I really don't.
21  **Q.**   And you don't know if the affidavit went out or not?
22  **A.**   I don't.
23  **Q.**   At the beginning of that handwritten letter, you're
24  referring to what appears to be an affidavit you might have
25  signed -- or you tell me from your interpretation of your

1  letter.

2  **A.**    Do you mean the first line that says:  If you need

3  anything else, let me know?

4  **Q.**    Yeah.

5  **A.**    That could have been anything.  I mean, I have no idea.

6  He's asked me to send him money in jail before.  He's asked me

7  to send him some legal information on who to contact.  I mean,

8  I had been talking to him all along just trying to give him

9  free advice on maybe what he should do.

10           But this was, you know, an appeal and things like

11  that, wasn't an area where I really knew anything.

12  **Q.**    When he asked you to do things, had you done them for him?

13  Had you put money in his account?

14  **A.**    I've given him money before.

15  **Q.**    Had you sent him information about legal sources that

16  could help him?

17  **A.**    I think I gave him some information on Tulane and Loyola.

18  **Q.**    And when he asked for an affidavit, you were willing to

19  help him with that?

20  **A.**    No, I was not willing to help him with what he wanted, and

21  that's reflected in the phone recorded conversations.

22  **Q.**    We're getting to that.

23  **A.**    But I told him I would always speak what I believed was

24  his situation.

25  **Q.**    So are you saying that Tango and Tango-1 are affidavits

1   that you would not have signed because they would not be

2   correct?

3   A.   Well, yes, and let me tell you why.  Because --

4   Q.   Yes?

5   A.   Yes, I would not have signed them because they would not

6   have been correct.  But I also would not have signed them

7   because if you look at the one that I provided to the

8   government, I wouldn't have put my name on anything like this,

9   the way it's set up, and let it go out of my office, and even

10  with the English -- the grammar in it.

11       I just -- that was one of the first things I ever

12  learned.  My father told me, he said:  Don't let something go

13  out on a piece of paper that you're going to be embarrassed of,

14  your English grammar.

15  Q.   But you testified that it does appear to be your signature

16  on both --

17  A.   It does appear to be my signature.

18  Q.   Okay.  All right.

19  A.   And, in fact, I think one of them, Tango-1, when I

20  received it, I had showed it to my father and he almost fell

21  off of his feet and then gave me some advice on how to handle

22  that situation.

23  Q.   So you have no idea then where Tango came from, you never

24  discussed that with your father?

25  A.   I believe the one I discussed with my father was Tango-1

1    when I received it in the mail.  Because I recall having a

2    conversation with my father in the doorway of my office.  And

3    he told -- he said:  Absolutely, you can't sign something like

4    that.  This is the -- he started explaining some things to me

5    and what it would mean and everything else.

6           And that's why it went straight back into my file.

7    Q.   And do you think maybe you would have signed it and then

8    your father advised you it was best for you not to send it out

9    and perhaps it was inadvertently sent out by that secretary?

10   A.   Well, it's definitely a stretch, but it's not impossible.

11   I mean, the way I get my mail and everything on my desk, I flip

12   through it right there.  If the secretary would have handed me

13   a file and said she needed me to sign something, there's a

14   chance I might not have read it before I signed it.

15   Q.   All right.  Now, you continued on good terms with the

16   client even after he received his sentence much greater than

17   what he had expected of the 13 to 17 years?

18   A.   I would say so.  I know he was upset for a while.  But I

19   think we're probably still on good terms now.

20   Q.   And you continued to talk to the client?  In fact, you're

21   aware of the recorded telephone conversation --

22   A.   Yes.

23   Q.   -- from Mr. Handy to you which appears to be

24   January 1st of 2004?

25   A.   I know there was a recorded conversation.  If that's the

1  date, then that's correct.

2  **Q.**   Have you had an opportunity to hear that?

3  **A.**   I've read it.  I haven't heard it.

4          **MS. WHITE:**  Judge, I'd like to play it and let him

5  identify his voice, if the Court would allow, or we can

6  stipulate to the transcript.

7          **MR. SANDERS:**  The government has no objection to

8  stipulation of the transcript, Your Honor.  We've reviewed the

9  tape.

10          **THE COURT:**  As I understand it, I've been furnished a

11  copy of the transcript.  And as I understand it, the parties

12  agree as to, even though there's some blanks in the transcript,

13  to the extent that it's transcribed, it's accurate.

14          **MS. WHITE:**  Yes, sir, we agreed to what we provided

15  you that that's what we hear.  And I would just like to offer

16  this into the evidence as the actual exhibit.

17          **MR. SANDERS:**  The government has no objection.

18          **THE COURT:**  Okay.  It will be admitted.

19          **MS. WHITE:**  And we'll do this as Petitioner's 1.

20          **THE COURT:**  It will be admitted into evidence.  If

21  you're going to be asking him questions about that transcript,

22  I think it's time to break for lunch so that he can have an

23  opportunity to review the transcript over lunch to see the

24  context in which all of this is pointed out.

25          **MS. WHITE:**  Okay.

1          THE COURT:  So we'll stand in recess until 1:00.

2          MS. WHITE:  Thank you.

3                          (LUNCHEON RECESS)

4                            * * * * *

5                         AFTERNOON SESSION

6                        (December 07, 2006)

7                            * * * * *

8          THE DEPUTY CLERK:  All rise.

9          THE COURT:  Be seated, please.  Let's proceed,

10   counsel.  We're wasting time.

11         MS. WHITE:  I'm sorry, Your Honor.

12   BY MS. WHITE

13   Q.   Mr. Stoutz, just to bring us back to where we were, you

14   provided an affidavit to the government that you say you

15   prepared and signed on October 8th, 2003?

16   A.   Correct.

17   Q.   And then these other two affidavits, which we referred to

18   as Tango and Tango-1.

19   A.   Correct.

20   Q.   Can you tell me by looking at it right now whether Tango

21   is the one that you say --

22   A.   This is the one that came from Harry Handy.

23         THE COURT:  When you say *this*, please identify it.

24         THE WITNESS:  I'm sorry, Your Honor, T1.

25   BY MS. WHITE

1    **Q.**   T1 you say came from Harry Handy?

2    **A.**   Correct.  That's the one where the original is still in my

3    file.

4    **Q.**   So the original's still in your file?

5    **A.**   Correct.

6    **Q.**   And is your file in court today?

7    **A.**   It's in that file.  One of those two orange folders.

8    **Q.**   These two orange folders are the folders that you provided

9    to the government?

10   **A.**   Correct.

11   **Q.**   I'm going to ask you to take a look at these and see if

12   you can find the original of T1 that you say is in that file.

13           **THE COURT:**  Do you know where it is, or is it in

14   there?  I'm trying to save some time.

15           **MS. WHITE:**  I'm sorry.  I'm not sure.

16           **THE COURT:**  Okay.  Take a look.

17           **THE WITNESS:**  I got it, Your Honor.

18           **THE COURT:**  Okay.  We got it.

19   **BY MS. WHITE**

20   **Q.**   And this from your file is the same as T1, which I've

21   shown you in court?

22   **A.**   That's correct.

23   **Q.**   There's no changes on it?  They're identical?

24   **A.**   Correct.

25   **Q.**   And the one in your file is signed by you?

1  A.    Correct.

2  Q.    And this is the original so it is your signature?

3  A.    That would be my signature, yes.

4  Q.    Okay.  And you never mailed this to the client?

5  A.    No, this is -- you can see how it's folded.  It's folded

6  with the letter that he sent me.  Actually, if you take the

7  letter itself and fold it with this, they both have the same

8  creases.  So I have the original letter and I have the original

9  affidavit that I refused to send out and put back in the file.

10 Q.    But you signed it?

11 A.    For some reason, yes.

12 Q.    Yeah.  Your signature's on it.  Okay.

13          THE COURT:  Wait, wait, wait, wait.  Let's make sure

14 the record is straight.  You signed it, but as I understand it,

15 correct me if I'm wrong, you didn't mail it because it wasn't

16 accurate; is that correct?

17          THE WITNESS:  That's correct, Your Honor.  I must

18 have signed it before I read it.  I looked over it in detail,

19 realized what it said, put it back in the file and kept it

20 there and wouldn't let it go out of my office.

21          THE COURT:  All right.

22 BY MS. WHITE

23 Q.    That's T1.  Now, T has your signature on it as well and

24 you're saying you don't know who prepared that?

25 A.    Correct.

1   **Q.**   And you don't know how it came about to have your

2   signature on it, but you recognize that as your signature?

3   **A.**   Correct.

4   **Q.**   And the information in that affidavit is extremely similar

5   to the other affidavit except for some grammatical changes; is

6   that right?

7   **A.**   Correct.  Almost identical.

8   **Q.**   And are you aware that this one that you say, T, this was

9   attached to Harry Handy's 2255?  He had possession of this.

10  **A.**   He may have, but he didn't get it sent to him by me.  And

11  it didn't -- like I said, something -- just like this wouldn't

12  have left my office with my signature on it, that wouldn't have

13  left my office with my signature on it.

14  **Q.**   Okay.  But it is your signature and he had it and it's in

15  the record, you would agree with me?

16  **A.**   That does look like my signature, yes.  And if it was in

17  the record, it was in the record.

18  **Q.**   And both of those dates are November 5th, 2002, the exact

19  same day; right?

20  **A.**   Correct.

21  **Q.**   Now, you're saying -- you're testifying that you did not

22  send any affidavit back to Harry Handy?  Either of those two

23  affidavits?

24  **A.**   I believe -- no, neither one of these two did I send back

25  to him.  I believe I drew up an affidavit that would have been

1  almost identical to the one that I provided to the government
2  and would have sent that to him.  Because the whole purpose was
3  this was not my story.  This was not the truth here.
4        If I'm going to tell you, let me put it in my
5  affidavit, which is the same affidavit that I gave to the
6  government.
7  Q.   But we don't have that affidavit that you're referring to,
8  do we?  The one that you say --
9  A.   All I have is the letter that went with it.  The
10  handwritten letter that would have gone with whatever that
11  affidavit would have been.
12  Q.   So we have, in your testimony, a missing affidavit out
13  there that would have had corrected information in it that you
14  would have been happy to have signed and had your signature on
15  it just like these other two?
16  A.   There should be an affidavit out there that has the exact
17  same information as the one that the U.S. Government has.
18  Because what they have is the exact truth of what happened.
19  Q.   Okay.  So that exact truth would be Exhibit Q from
20  Government Exhibit Q?
21  A.   Which one is that?
22  Q.   Your affidavit with the government; is that right?
23  A.   Yes, yes, the one you showed me earlier.
24  Q.   And the date of that affidavit is?
25  A.   October 8th, 2003.

1   **Q.**   Which is way after T and -- Tango and Tango-1?

2   **A.**   Correct.  Well, yeah, November.  Yeah.

3   **Q.**   Now --

4   **A.**   I'm not saying that this is the affidavit I sent to Harry

5   Handy.  But I'm saying if I refused to sign something like this

6   and put my name on this and I was going to give him something,

7   if he wanted an affidavit, I would have given him these exact

8   same facts that I provided to the government.

9   **Q.**   But your signature's on Tango and Tango-1?

10   **A.**   It may be on Tango and Tango-1.  But I'm telling you Tango

11   and Tango-1 are a lie.  This is the exact truth that's in the

12   affidavit I provided to the government.

13          **THE COURT:**  Sir, we're beating a dead horse.  He

14   admits that that appears to be his signatures on Tango and

15   Tango-1.  He has raised a question earlier of how that got

16   there, whether it was a paste over or whatever.  I don't know.

17   But this is what he said.

18              Now, we can question that for three hours and

19   you're going to be on one side and he's going to be on another.

20          **MS. WHITE:**  I'm moving on.

21   **BY MS. WHITE**

22   **Q.**   Your affidavit with the government and -- I didn't make

23   another copy -- would you turn to number 6 in your affidavit

24   with the government, Paragraph 6 in Exhibit Q.

25   **A.**   Okay.

1   Q.   And could you read that?

2   A.   Affiant would submit that at no time did he tell Mr. Handy

3   what his sentence would be in terms of exact number of years.

4   Q.   Now, that's contrary to the two Tango affidavits; is that

5   right?  Because it specifically talks about --

6   A.   Absolutely.

7   Q.   -- nothing greater than 13 years?

8   A.   Correct.

9   Q.   And your affidavit with the government was in October of

10  2003.  But as recent as January of 2004, you're still talking

11  to Harry Handy on the phone about his case; right?

12  A.   January of 2004?

13  Q.   Yes.

14  A.   Probably.

15  Q.   Probably.  That would be the transcript that we refer

16  to --

17  A.   Yes, then I did talk to him.

18  Q.   Government Exhibit -- or our Exhibit V.

19  A.   I had been talking to him prior to the transcript.  That's

20  just one recording that they happened to get.

21  Q.   And as late as January 1st of 2004, you're still

22  discussing with him the fact that it was a 13 -- 11 to 13 --

23  excuse me -- 15 to 17 year sentence?

24  A.   You'd have to show me that.  That's what I said?

25  Q.   On Page 4 at the top.

1   A.    Which document?

2   Q.    Exhibit V.

3          MR. SANDERS:  For purposes of context, I think he

4   needs to look at the beginning on Page 3.

5          THE COURT:  I'm sorry.  I can't hear you.

6          MR. SANDERS:  I'm sorry.  For context I think he

7   needs to be directed to the bottom of Page 3 because the

8   conversation carries over to Page 4.

9          THE WITNESS:  Just one second.  Well, here he's

10  saying that Harry Boyer told him the guidelines were 15 to 17

11  and that -- and then I say:  Well, it wasn't 15 to 17.  I

12  remember 13 being the number, meaning not 15, 13.

13  BY MS. WHITE

14  Q.    You're talking about the number of years?

15  A.    The lower number.  You see, he's saying that Harry Boyer

16  is telling him 15 to 17.  I'm telling him I remember 13 being

17  the number.  So in other words, 13 to 17, not the 15.

18  Q.    So you thought, even at that point in 2004, you're still

19  talking about how you thought his sentence would be 13 to 17

20  years?

21  A.    No, I'm talking about where I thought he would fall.  I

22  didn't know if it would be 13.  I didn't know if it would be

23  14, 15, 16, 17, if they'd go up higher.  I'm still referring to

24  the day that I spent with him going over the guideline book and

25  circling with him the areas where I believed he would fall

 1    after --

 2    Q.    Mr. Stoutz, why would you still be talking about those

 3    numbers when the PSI report came back with numbers that were

 4    way outside of those numbers?

 5    A.    The numbers I'm talking about are the beginning, the first

 6    time I talked about the guidelines to him.  Anytime I ever talk

 7    about 13 to 17, I'm talking about the day that I spent with him

 8    looking over the guidelines.  That is the day that I mentioned

 9    13 to 17.  13 to 17 was never continuously repeated or any

10    other numbers mentioned.

11            It was always 13 to 17.  So if he brings it up,

12    that's what it refers to is that conversation.

13            THE COURT:    As I understand it, what you're saying is

14    is that at the time of the telephone conversation, which the

15    transcript is in evidence, that you were referring to the

16    advice or suggestions that you gave Mr. Handy way back when

17    during your representation of him?

18            THE WITNESS:    Correct, Judge, so way back when within

19    the first month of his arrest.  As a matter of fact, after

20    his -- after we got his charges and everything he was charged

21    with and we went to see him at the jail, that was the second

22    meeting then was when we discussed the guidelines.

23            That was the 13 to 17, and that's what I'm

24    always referring to in going back to that date in time.

25

1  BY MS. WHITE

2  Q.   So after that initial time of you saying 13 to 17, did you

3  ever tell and discuss with Mr. Handy that he could get 17, 20,

4  22, 27 years?

5  A.   I think the way that I explained it to him was:  I believe

6  you're going to fall between 13 and 17, but you have to wait

7  for a presentence report to come, and the presentence report

8  determines -- well, the presentence report doesn't determine

9  the exact number of years -- but the presentence report

10 determines where you fall in the exact number of years and then

11 you're sentenced by the judge.

12         I would have explained it that way.

13 Q.   Would your client ever had pled guilty had he thought he

14 was getting 17, 20, 22 to 27 years?

15         MR. SANDERS:  Object to relevancy, Your Honor.  The

16 issue isn't what he thought.  The issue is what under the

17 law --

18         THE COURT:  Sustained.

19         MR. SANDERS:  -- what an objective defendant would

20 have done.

21 BY MS. WHITE

22 Q.   Do you know if your client would have pled guilty had he

23 known he was getting the sentence he was getting?

24         MR. SANDERS:  Your Honor, same objection.

25         THE COURT:  That's the same question.

1           **MR. SANDERS:**  It's the same question stated another

2    way.  Same objection, Your Honor.

3    **BY MS. WHITE**

4    Q.   All right.  You've represented this client for a number of

5    years.  You were brought in because you had the rapport with

6    the client?

7    A.   Correct.

8    Q.   And you were the one that was explaining the sentencing

9    guidelines and you were explaining the guideline range and the

10   potentials that he could receive?

11   A.   Correct, with Mr. Boyer.

12   Q.   But you were explaining?

13   A.   That's correct.

14   Q.   Yes.  And did you discuss with your client that he could

15   get 17 years, 20 years, 22 years or 27 years?

16   A.   Those exact numbers, no.

17   Q.   And --

18   A.   Other than the 17 -- well, the 17 was in with the

19   reference that I gave him, so I would have to say that exact

20   number.  But did we do any other exact numbers beyond that, no.

21   Q.   So you never explained any numbers over 17 that he could

22   get as a sentence?

23   A.   We explained life.

24   Q.   If he went to trial?

25   A.   Right, when he was talking about wanting to go to trial.

1    Q.    But when he plead guilty, did you explain that he could

2    get life, or 27 years, or 25 years, 22 years, 20 years?

3    A.    No, because I would have felt like that would have been

4    narrowing it down to telling him what he could get.  That would

5    have been close to promising him a sentence as far as I'm

6    concerned.

7    Q.    And you didn't think he would ever get anything over 17

8    years?

9    A.    No, I can't say that because I knew the presentence report

10   had to come.

11   Q.    But you didn't represent to the client that he would get

12   anything over 17 years in your expert criminal defense opinion?

13   A.    What I told him was:  When you plead, you're going to

14   fall, I believe, between 13 and 17 years.  You have to wait for

15   a presentence report to come, and that can have an affect on

16   the time you could do.  Meaning, it could be a little bit more,

17   it could be a little bit less.

18           That's probably the way I left it was right like

19   that.

20   Q.    Do you think Mr. Handy, from what you know about him,

21   would have ever pled guilty knowing he was getting more than 17

22   years?

23           **THE COURT:**  That's the same question the third time.

24   The objection is sustained.  Please don't ask it again.

25

1    BY MS. WHITE

2    Q.    Did you -- you discussed -- did you review this transcript

3    during the break?

4    A.    I didn't, but I've read it numerous times.  I'm aware of

5    everything that it says in it.

6    Q.    And did you -- do you recall that in here you -- is there

7    anything in this transcript, from your review, that you said to

8    your client in the transcript that's not true to how the case

9    was proceeding or the advice that you gave your client?

10   A.    Wait.  Is there anything I told him that's not true?

11   Q.    Is there anything in this transcription of your

12   conversation that you may have said to your client that wasn't

13   the truth?

14         MR. SANDERS:  Your Honor, I'm going to object to the

15   form.  I'm not sure I understand what the question is.

16         THE COURT:  Why don't you ask a specific question --

17         MR. SANDERS:  Because the transcript, I mean --

18         THE COURT:  Why don't you ask a specific reference to

19   the transcript.

20         MS. WHITE:  I have three times and I got in trouble,

21   that's my problem.

22         THE COURT:  No, no, no.  What you asked three times

23   was you asked him to read his client's mind, so...

24         MS. WHITE:  Okay.

25         THE COURT:  And that's a good objection, and I

 1   sustained it.  What would his client have done.
 2   **BY MS. WHITE**
 3   **Q.**   All right.  Do you recall not ever telling your client
 4   that he would never get more than 13 years?
 5   **A.**   Say that one more time for me.
 6   **Q.**   Do you recall telling your client he would never get more
 7   than 13 years?
 8   **A.**   No, because I told him 17 was one of the numbers I
 9   mentioned to him.
10   **Q.**   Okay.  Do you recall your client asking you or feeling
11   like he had been lied to because he thought he was only going
12   to get 13 years and you-all discussing that?
13   **A.**   Well, he started using the words *lied to* later on.  I
14   think at the time when he found out about it, he was amazed,
15   disappointed, and maybe let down some, but I don't think that
16   he was lied to.
17   **Q.**   Was your client fixated on how much time he thought he was
18   going to get?
19   **A.**   Yes, yes.
20   **Q.**   And when you say *fixated* on that, what do you mean?
21   Because that was your word from the transcript I'm referring
22   to.
23   **A.**   He kept wanting to talk about a deal like they do at the
24   criminal courthouse on Tulane and Broad, an exact, work out a
25   deal.  And I had to keep explaining to him that it doesn't work

1    like that.  You cannot get an exact number.  There is no deal.

2    You don't go to the U.S. Attorneys and say:  Hey, I'll do this

3    if you-all give me this number of years, and especially in his

4    situation.

5                So I just -- I explained that over and over again.

6    Q.   In this conversation do you recall that your client asked

7    you about why you had never told him about the enhancements,

8    that he didn't know anything about enhancements?

9    A.   Well, I told him that he has to wait for a presentence

10   report, and that a presentence report will have in it, like I

11   mentioned, the facts, circumstances and things like that.

12   Q.   I'm going to show you Exhibit V on Page 3 where you're

13   discussing -- Mr. Handy asked you a question.

14                MR. SANDERS:  Where are you at, counsel?

15                MS. WHITE:  Mr. Handy's question, three-quarters of

16   the way down.

17                THE COURT:  Read the question.

18   BY MS. WHITE

19   Q.   Yeah -- Mr. Handy:  Yeah, you never told me about the

20   enhancement or nothing.  I didn't know nothing about no

21   enhancements.  And your response was?

22   A.   And that's what you got to put in there.  Because if

23   that's the case and that's what we said, it's what the

24   guidelines were.

25   Q.   Mr. Handy said:  Yeah.  And then what you did say?

1  A.    Yeah.  I'm sorry.  He said:  Yeah.  Because you got to

2  remember, Harry was the main one that both of us were listening

3  to.  Referring to Harry Boyer.

4  Q.    And that's you talking about the time and what was being

5  explained in the guidelines?

6  A.    Correct.  What I'm telling him is:  Look, I don't remember

7  exactly what the situation was; but if that's what it was, then

8  follow through with it.

9          But I'm not -- I'm not going to sit here -- I'm not

10  going to sit here and respond to each one of these questions

11  he's planning in here saying:  Yeah, you never told me about

12  the enhancement or nothing.  I didn't know nothing about no

13  enhancement.

14          What I would have told him was the same thing I just

15  stated, that I told you:  You enter your plea.  Then you have

16  to wait for a presentence report.  The presentence report is

17  going to determine what your ultimate sentence is.

18          THE COURT:  Mr. Stoutz, with all due respect, you

19  will respond to whatever question counsel asks, that way

20  there's not an objection that's sustained.

21          MS. WHITE:  Thank you, Your Honor.

22  BY MS. WHITE

23  Q.    Do you remember discussing the affidavit with your client

24  and telling him that you had signed two affidavits?

25  A.    On this phone conversation?

1  Q.    Yes.

2  A.    You'd have to show it to me.

3  Q.    Okay.  Just a second.  Mr. Handy asked you:  You still got

4  the affidavit you said you signed?  And your answer was?

5  A.    Well, I answered him with a question:  The one that I

6  filed?

7  Q.    And Mr. Handy then asked you:  Yeah, that's the one you

8  signed on, but you said you didn't sign it.  And then you

9  respond again.  What did you say?

10 A.    This is the thing:  If that's the one, I signed two of

11 them, okay.

12 Q.    So in January of '04 you're telling the client you signed

13 two affidavits, but today you're saying you signed three?

14 A.    No, let me start from the beginning and I'll -- he asked

15 me:  You still got that affidavit that you signed?  At that

16 point, I can't even tell you I know which affidavit he may be

17 talking about.  And then I say:  The one that I filed?

18 Honestly, I don't remember ever filing any affidavits for him.

19 The only affidavit I thought I filed was the one that I turned

20 over to the U.S. Attorneys' Office.

21          Then he says:  Yeah, that's the one you signed on,

22 but you said you didn't sign it.  That question leads me to

23 believe that I said I signed one, but the one he's saying I

24 didn't sign would be the one I wouldn't return to him.  In

25 other words, he doesn't know whether or not I signed it in my

1    office or not, but all he knows is he didn't get it back.

2            **THE COURT:**  Now that that's perfectly clear.

3    **BY MS. WHITE**

4    **Q.**   All right.  We talked earlier about your objections to the

5    presence investigation report?

6    **A.**   Correct.

7    **Q.**   And the one that you were very clear about and knew about

8    was the one about the gun?

9    **A.**   Well --

10   **Q.**   The gun enhancement?

11   **A.**   Correct.  Well, I knew that if he was caught with a gun on

12   him or in his car, that that was a big problem for him in terms

13   of a gun.  But I became aware of the gun on the phone

14   conversation.  And, actually, I don't think there was even a

15   gun in evidence.  I think it was just the phone conversation.

16   **Q.**   And as a result of phone conversation regarding the *toy*

17   that the probation office determined was a gun, they enhanced

18   him based on that gun?

19   **A.**   That conversation, correct.

20   **Q.**   Yes.  And you filed objections, 17 of them.  And I'm going

21   to show you what's marked as Plaintiff's Exhibit 2.

22   **A.**   I think I had 22, but like I said we --

23   **Q.**   If you could actually look at P2.  Is that the document

24   that you actually filed in the court?  It was in your --

25   **A.**   It's on my letterhead, yes.

```
 1            THE COURT:  Those documents aren't routinely filed in
 2    court.  They go to the presence officer.
 3    BY MS. WHITE
 4    Q.   Do you know if you filed those with the presentence
 5    officer?
 6    A.   Honestly, they would have been completed.  I was the one
 7    in charge, basically, of completing them and perfecting them.
 8    I probably would have asked Harry Boyer:  Where do they need to
 9    go now?  And then delivered them to wherever they needed to go.
10    Q.   Because we have a response from the pretrial services
11    person pertaining to your objections, but I actually wanted to
12    get your objections and so that's why I'm introducing this.
13    A.   Then that would have been who I turned them over to.
14    Q.   If you could look at those 17.  From my review of that, I
15    do not see that you ever filed an objection to the gun
16    enhancement.
17    A.   The conversation about the gun?
18    Q.   The gun enhancement from the PSI where they increased your
19    client.
20    A.   Harry Boyer and I sat down and Harry advised me that there
21    were certain objections we should withdraw.  Because if we
22    wanted to stay with strong objections, if we threw a bunch of
23    weak objections in there, we may lose our chances on the strong
24    ones by just having the whole situation confused with things
25    that were really of not that much concern.
```

1              So the gun conversation could have been one that

2    Harry Boyer said:  We're not going to object to that one, and

3    we left it out.

4    Q.   Was your client aware that you were not objecting to the

5    gun enhancement, because you know we had talked about that?

6    A.   He got a copy of this.

7    Q.   Okay.

8    A.   And I think I even had a discussion with him telling him

9    why we were going to object to some things and not other ones.

10   Because I was the one that drew up the first objections and it

11   was more than 17.  And Harry Handy, I think, I discussed them

12   with him.  And then after meeting with Harry Boyer, I had to go

13   back and explain to Harry Handy, or tell him over the phone, or

14   at a meeting, these are the ones we're going to eliminate and

15   this is why.

16   Q.   Based on your objections to his leadership and the

17   specific offense characteristic -- excuse me -- the reckless

18   endangerment, those were each adjustments and enhancements that

19   you objected to, but not two points for the gun; correct?

20   A.   Correct.

21              What was first one you mentioned, the car?

22   Q.   The leadership --

23   A.   Leadership.

24   Q.   -- and the other one was the reckless endangerment

25   adjustment.

1   A.   Right.

2   Q.   You objected to those two, but not the gun?

3   A.   Right.

4   Q.   If you were to have won the leadership objection and the

5   reckless endangerment objection, your client still would have

6   been in the sentencing guideline range way outside of 17 years,

7   wouldn't he?

8   A.   He may have been.  This was our best shot at trying to get

9   anything done for him at that point.

10  Q.   So did you ever discuss with your client that he would

11  have gotten 20 years or 22 or 25?

12  A.   We never went to those specific -- the only specific

13  numbers I gave were 13 to 17 and then left it open.

14  Q.   Okay.

15          MS. WHITE:  Thank you.  That's all I have.  I tender

16  the witness.

17          THE COURT:  Who's up?

18                      CROSS-EXAMINATION

19  BY MR. MITCHELL

20  Q.   Good afternoon, Mr. Stoutz.

21  A.   Good afternoon.

22  Q.   Really quickly, you met with the defendant four times

23  while he was incarcerated, four times in jail for the federal

24  offense?

25  A.   Approximately, I believe so.

1   Q.   And first meeting occurred upstairs in the Marshal's

2   Office?

3   A.   The day he was arrested, correct.

4   Q.   At this time did you have an opinion of what the outcome

5   would have been if he went to trial?

6           MS. WHITE:  Objection as to his opinion.

7           THE COURT:  Objection sustained.

8           MR. MITCHELL:

9   BY MR. MITCHELL

10  Q.   And still during this meeting, did you ever promise the

11  defendant an exact sentence on an exact range?

12  A.   At that the particular meeting right there?

13  Q.   Yes.

14  A.   No, at that meeting we only realized what he was being

15  charged with.

16  Q.   Did you tell him that he had to lie under oath or induce

17  him to lie?

18  A.   Say that again.

19  Q.   Did you ever tell the defendant that he had to lie under

20  oath or induce him to lie under oath at any time?

21  A.   For what?

22  Q.   For anything.

23           THE COURT:  For any reason.

24           THE WITNESS:  Absolutely not.

25           THE COURT:  Did you ever advise him to lie under oath

JODI SIMCOX, RMR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1    for any reason?

2            **THE WITNESS:**  Not for one single thing ever.

3    **BY MR. MITCHELL**

4    Q.    And your second meeting occurred after the initial

5    appearance; is that right?

6    A.    That's correct.

7    Q.    And you had reviewed discovery?

8    A.    Yes, we had received discovery.  And the reason for the

9    second meeting was to go over the discovery with him.

10   Q.    And after you reviewed the discovery, did you ever have

11   conversations with the defendant about the possible

12   consequences of going to trial versus pleading guilty?

13   A.    We did.

14   Q.    Okay.  And what did you tell him?

15   A.    We told him if he went to trial that -- we explained it

16   probably five different ways:  You'd be frying yourself.  You

17   wouldn't see daylight.  You might as well kiss the rest of your

18   life good-bye.  You'd die in jail.

19            All of those different things to let him know that

20   that shouldn't even be a consideration because of the facts of

21   the case.

22   Q.    And still during this meeting, did you ever promise the

23   defendant that he would receive an exact sentence or an exact

24   range?

25   A.    Absolutely not.

1   Q.   And once again, still during this meeting, did you ever

2   tell the defendant or induce the defendant to lie under oath or

3   that he had to hide a secret deal?

4   A.   Absolutely not.

5   Q.   And your third meeting was to discuss the sentencing

6   guidelines; is that correct?

7   A.   The third meeting.  Yes, we had to go back.  The time we

8   went, we didn't have a book with us and I went back, I believe,

9   the next day with a book.

10  Q.   And did you promise the defendant that he would absolutely

11  fall within the 13 to 17 range?

12  A.   No, I told him 13 to 17, and it would have to be left open

13  until he gets the presentence report.

14  Q.   And did you tell him why you had to leave it open?

15  A.   Why I had to leave it open?

16  Q.   Or why you had to estimate?

17  A.   That was just the way the federal system worked.  You

18  could see where your guidelines are, do an estimate, and then

19  you have to wait until the report comes in.

20  Q.   And you told him that he would know exactly what his

21  sentence would be after the presentence investigative report or

22  after the judge read the presentence investigative report?

23  A.   He would know exactly what his sentence would be in the

24  sense of where he would fall in the exact guidelines, then the

25  ultimate sentence was up to the judge.

1  Q.   And still during this meeting, did you ever promise the
2  defendant an exact sentence or exact range?
3  A.   Absolutely not.
4  Q.   Okay.  Did you ever tell him he had to lie under oath or
5  induce him to lie during this meeting?
6  A.   Absolutely not.
7  Q.   And your fourth meeting was before the rearraignment; is
8  that correct?
9  A.   Yes.
10 Q.   Okay.  And did you have the factual basis and plea
11 agreement with you when you met with him?
12 A.   I believe so.  The fourth meeting would have been, I
13 believe, at the U.S. Marshal's Office, either at the jail the
14 night before or the U.S. Marshal's Office that morning and I
15 would have had that with me because I had it by then.
16 Q.   Okay.?
17         MR. MITCHELL:  Permission to approach the witness,
18 Your Honor.
19         THE COURT:  Sure.
20 BY MR. MITCHELL
21 Q.   Mr. Stoutz, I'm handing you Government Exhibits B and F?
22         MS. WHITE:  I'm sorry?
23         MR. MITCHELL:  B and F.
24 BY MR. MITCHELL
25 Q.   These are the plea agreements and the factual basis.

1  Mr. Stoutz, these are the documents that you had with you on
2  that day?
3  A.   Yes.
4  Q.   And did you go over them with the defendant?
5  A.   I did.  Both documents.
6         **THE COURT:**  Give me those letters again, please.
7         **MR. MITCHELL:**  B as in *boy* and F as in *Frank*.
8         **THE COURT:**  All right.
9  BY MR. MITCHELL
10  Q.   And, Mr. Stoutz, this is five years later.  How can you be
11  certain that you went over these documents with the defendant?
12  A.   Well, first reason is this is one of the steps in the
13  process that Harry Boyer was explaining to me that had to be
14  done right away and I wasn't going to put it off or wait until
15  the last minute to make sure I didn't mess anything up.
16         And when we went over it -- for example, I believe
17  it's in the -- not the factual basis, the other document, if
18  this is the one that:  Submit to interviews whenever and
19  wherever requested by law enforcement authorities.  That was a
20  concern of his.  I specifically remember that.
21  Q.   How do you know it was a concern to him?  What did he say
22  to you?
23  A.   Well, he wanted to know what that meant.  He didn't want
24  to become a rat, or a snitch, or whatever the other names for
25  it are.  And I had to talk to him and explain to him what that

1    was.  I think I may have even asked Harry Boyer exactly what

2    does that entail.

3              And Harry, I think, had told me:  You have to leave

4    yourself open and you have to be willing to meet with them and

5    speak truthfully, if they call on you.  They may never call on

6    you.  It may never happen, but if they do.

7    **Q.**   And those are his words *rat* or *snitch*?

8              **MS. WHITE:**  Objection, Your Honor.

9              **THE COURT:**  Only if you remember.  If you don't

10   remember.

11             **THE WITNESS:**  It was one of those two words.  I

12   remember that.  I couldn't tell you which one.

13   **BY MR. MITCHELL**

14   **Q.**   And that's why it sticks out in your mind?

15   **A.**   Right.  Because I had to stop.  And we had a small

16   discussion about that.

17   **Q.**   And also, once again, on Exhibit B, Paragraph 3 of Page 1.

18   **A.**   Yes.

19   **Q.**   Do you see where it says that:  The defendant further

20   understands that the maximum penalty defendant may receive --

21             **THE COURT:**  Excuse me.  Slow down a little bit,

22   Mr. Mitchell.

23             **MR. MITCHELL:**  I'm sorry, Your Honor.  Page 1 of

24   Exhibit B.

25             **THE COURT:**  All right.

1  BY MR. MITCHELL

2  Q.    Do you see where it says:  The maximum penalty the

3  defendant could receive is life imprisonment?

4  A.    Correct.  Life and/or a fine of 4 million.

5  Q.    Did you go over that with the defendant?

6  A.    Was that read to him?

7  Q.    Yes.

8  A.    Yes.

9  Q.    Okay.  And defendant was also told during the initial

10 appearance that he could receive up to life; is that correct?

11 A.    Correct, the day he was arrested.

12 Q.    And still talking about your fourth meeting with the

13 defendant before the rearraignment, did you ever induce --

14        MS. WHITE:  Judge, I'm going to object to the

15 characterization of like the numbers of them because the

16 client -- the witness has not been so clear on when these

17 meetings are.

18            So I would object to him leading the witness

19 with different dates or number of visits.

20        THE COURT:  The objection's overruled.

21 BY MR. MITCHELL

22 Q.    And during this meeting, did you ever induce or coach the

23 defendant to hide a guaranteed sentence?

24 A.    Absolutely not.

25 Q.    And still during this meeting, did you ever promise the

1    defendant an exact sentence or an exact range?

2    A.    Absolutely not.

3    Q.    Now, during the rearraignment itself on March 21st, 2001,

4    did you ever induce or coach the defendant to hide a guaranteed

5    sentence at the rearraignment?

6    A.    Absolutely not.

7    Q.    Okay.  And during the rearraignment, did you ever promise

8    the defendant an exact sentence or an exact range?

9    A.    Absolutely not.

10   Q.    And, lastly, at any time, did you ever induce or coach the

11   defendant to lie?

12   A.    To lie?

13             MS. WHITE:  Objection, asked and answered.

14             THE COURT:  Objection sustained.

15             MR. MITCHELL:  I have no further questions, Your

16   Honor.

17             THE COURT:  All right.  Are you finished with this

18   witness?

19             MS. WHITE:  Judge, I have just a couple follow-up, if

20   I might.

21                     REDIRECT EXAMINATION

22   BY MS. WHITE

23   Q.    Mr. Stoutz, do you have Exhibit Q there with you?

24             THE COURT:  Exhibit Q, did you say?

25             MS. WHITE:  Q.

1    BY MS. WHITE

2    Q.    Q, your affidavit to the government of 10/8/03?

3    A.    Yes.

4    Q.    Now, Number 6, could you read that?

5    A.    Affiant would submit that at no time did he tell Mr. Handy

6    what his sentence would be in terms of exact number of years.

7    Q.    While you didn't tell him an exact number of years, you

8    told him 13 to 17 all through your discussions, didn't you?

9    A.    That is where I believed he would fall.

10    Q.    So you gave him a range between 13 and 17?

11    A.    Correct.

12    Q.    And you also -- if you could read Number 8.

13    A.    Affiant believes that if Mr. Handy had any inclination

14    that he could receive 27 years in prison, he would not have

15    pled guilty.

16          MR. SANDERS:  Your Honor, I'm going state that that's

17    what the affidavit says, but I'm going to object to it's

18    admission.  It's not relevant to the hearing.

19          THE COURT:  Sustained.

20    BY MS. WHITE

21    Q.    Your client had to have known what his sentence was going

22    to be from the presentence investigation, so what would make

23    you swear to that statement?

24    A.    Wait.  Ask me that again, please.

25    Q.    Had to know what his range was based on the presentence

1    investigation outcome?

2    **A.**    Correct.

3    **Q.**    And you discussed that with him?

4              **MR. SANDERS:**  I'm going to object.  It's another way

5    of asking the same question.

6              **THE COURT:**  Objection sustained.

7              **MS. WHITE:**  Nothing further.

8              **THE COURT:**  You can step down.  Thank you.

9              **THE WITNESS:**  Thank you, Your Honor.

10             **THE COURT:**  Call your next witness, please.

11             **MR. SANDERS:**  Is Mr. Stoutz excused?  The government

12   has no further use of him.

13             **THE COURT:**  Do you have any?

14             **MS. WHITE:**  He can be excused.

15             **THE COURT:**  You can be excused.  Why don't you leave

16   a cell phone number in case somebody needs you.

17             **THE WITNESS:**  I won't be far, Judge.

18             **THE COURT:**  Okay.  Call your next witness.

19             **MS. WHITE:**  We'd call Mr. Harry Boyer.

20             **THE COURT:**  Mr. Stoutz, would you ask Mr. Boyer to

21   come in.

22             **THE WITNESS:**  I will, Judge.

23             (WHEREUPON, **Harry Boyer**, having been duly sworn,

24   testified as follows.)            .

25             **THE DEPUTY CLERK:**  Please state your full name and

```
 1   correct spelling for the record.
 2              THE WITNESS:  Harry Boyer, B-O-Y-E-R.
 3                        DIRECT EXAMINATION
 4   BY MS. WHITE
 5   Q.   Mr. Boyer, did you represent Harry Handy --
 6   A.   Yes.
 7   Q.   -- in the federal case for which we're back in court
 8   today?
 9   A.   Yes.
10   Q.   Were you paid or appointed?
11   A.   Paid.
12   Q.   And did you ever tell Mr. Handy that based on the amount
13   of money he paid you, you could not take his case to trial?
14   A.   No.
15   Q.   Did you ever consider that you were having a type of fee
16   dispute --
17   A.   No.
18   Q.   -- with Mr. Handy?
19              If you could wait until I get my question --
20   A.   I understand.
21   Q.   Did you have any fee dispute discussions with Mr. Handy?
22   A.   No.
23   Q.   Did he pay his entire fee to you?
24   A.   Yes.
25   Q.   Were you planning to ever try this case?
```

1    A.    If need be, yes.

2    Q.    Did you quote a fee that would be an appropriate fee for

3    you to spend the time that would be necessary to defend this

4    case at trial?

5    A.    Yes.

6    Q.    And what was your fee?

7    A.    I charged Mr. Handy -- my discussions were actually with

8    Mr. Stoutz and $5,000 is what I was paid.

9    Q.    And you planned to take this case to trial --

10    A.    If necessary.

11    Q.    -- if necessary for that?

12          And who was the prosecutor in this case, U.S.

13    Attorney?

14    A.    John Morello.

15    Q.    And did you work with John Morello to receive the

16    discovery in this case?

17    A.    Yes.

18    Q.    Did you take this case being lead counsel, or were you

19    always under the assumption that Mr. Stoutz would be

20    co-counsel?

21    A.    I was under the assumption that Mr. Stoutz would be

22    co-counsel, but I intended that I would be lead.

23    Q.    But he didn't sign on the case with you initially, did he?

24    A.    He was not admitted in the Eastern District of Louisiana

25    yet.

1   Q.   Was he a lawyer at that time?

2   A.   Yes.

3   Q.   And did you work with Mr. Morello on obtaining all of the

4   discovery?

5   A.   Yes.

6   Q.   Did you have Mr. Stoutz with you to get the discovery?

7   A.   Not at every at every phase, no.  But, yes, every time

8   something happened I communicated with Mr. Stoutz, and

9   Mr. Stoutz communicated with me at any event in the case.

10  Q.   How did you communicate, through letters or orally?

11  A.   Orally.

12  Q.   All telephone calls?

13  A.   No, I see Mr. Stoutz on a daily basis.

14  Q.   Okay.  You don't have an office together?

15  A.   No.

16  Q.   You didn't at any time?

17  A.   No, never.

18  Q.   Do you have a file in this matter?

19  A.   No.

20  Q.   Have you looked for a file and can't find it?

21  A.   I don't have any files after Katrina.

22  Q.   Okay.

23          THE COURT:  I'm sorry.  I didn't hear your answer.

24          THE WITNESS:  I don't have any files left after

25  Katrina.

1    BY MS. WHITE

2    Q.    Where was your office?

3    A.    My office was on Robert E. Lee Boulevard.

4    Q.    And that's where the file was at that time?

5    A.    The file was in my condominium two blocks away on Lake

6    Maria Drive.

7    Q.    And did you obtain audiotapes and wiretap information as

8    well as paper discovery in this case?

9    A.    Yes.

10    Q.    Do you recall you getting it from Mr. Morello?

11    A.    I don't remember who got it.

12    Q.    Do you remember if you copied it and gave it to

13    Mr. Stoutz, or if he gave it to you?

14    A.    I don't recall.  I think there was only one set of

15    discovery and he and I shared it as need be.

16    Q.    Do you recall there being a separate set prepared?

17    A.    No, no.

18    Q.    Did you listen to the audiotapes in this case?

19    A.    I listened to what I believed to be the relevant

20    conversations, yes.

21    Q.    How many would that have been?

22    A.    I have no recollection of how many.  I couldn't

23    guesstimate, Ms. White.

24    Q.    Would you remember if they were audiotapes, CDs on a

25    computer --

1  A.   I believe they were --

2  Q.   -- what form?

3  A.   I believe they were in a CD form.

4  Q.   CD for a computer?

5  A.   I believe.

6  Q.   Well, do you recall listening to them on a computer, or on

7  your tape deck?

8  A.   I don't recall how I listened to them.

9  Q.   Do you recall listening to them with your client?

10 A.   No.

11 Q.   Do you ever think you listened to them with your client at

12 all?

13 A.   I don't think I listened to them at the same time he

14 listened to them, but I think they were provided to him.

15 Q.   Did you do that?

16 A.   Did I provide it to him?  I don't recall if I did or

17 Mr. Stoutz did.  I would believe Mr. Stoutz did that.

18 Q.   Did you discuss with your client the evidence that they

19 had in the case against him?

20 A.   Yes.

21 Q.   And how did you do that?

22 A.   At a meeting with him at the jail.

23 Q.   Did you provide him any documents in this case?

24 A.   I did not -- not at that time, no.

25 Q.   Did you ever?

1  **A.**   I don't think I provided documents to Mr. Handy at all,

2  no.  I think Mr. Stoutz provided them.

3  **Q.**   Did you provide him with any type of -- like were there

4  transcriptions of audiotape wiretaps?

5  **A.**   I don't recall if there were or there weren't, but I

6  believe there were.

7  **Q.**   Do you recall going over telephone calls with the client

8  in some manner, other than your memory?

9  **A.**   You mean if I sat down with the transcript and said:

10  These are your words, these are their words.  No, I don't

11  recall doing that.

12  **Q.**   How many times do you think you saw Mr. Handy?

13  **A.**   Probably about four, if I had to -- if I can recall, four.

14  **Q.**   And you don't have any calendar or anything that would

15  show when or how many times?

16  **A.**   No, ma'am, I don't.

17  **Q.**   You don't keep time records or any type of status sheet?

18  **A.**   No.

19  **Q.**   Nothing on a computer that hasn't been destroyed by

20  Katrina?

21  **A.**   No, ma'am.

22  **Q.**   And where did you see Mr. Handy those four times?

23  **A.**   I saw him once or twice in this building at the Marshal's

24  Office and in court.  And I saw him the other two times at the

25  Orleans Parish Criminal Sheriff's Office or at the jail in

1    Orleans Parish.

2    **Q.**   Do you remember where that was?

3    **A.**   Templeman III.

4    **Q.**   Did you ever see him with Mr. Stoutz?

5    **A.**   Yes.  I don't believe I've ever seen Mr. Handy alone.  It

6    may be that I -- it may be that I arrived before Mr. Stoutz and

7    began discussions with Mr. Handy, but I don't think I was ever

8    with Mr. Handy alone.  For the most part, Mr. Handy was a

9    client of Mr. Stoutz.  Mr. Stoutz asked me for my assistance in

10   this case.  I agreed to do that.

11          So I don't think I would have met with Mr. Handy

12   without Mr. Stoutz being present.

13   **Q.**   And you don't have any recollection of any independent

14   meetings?

15   **A.**   I don't recall any, no.

16   **Q.**   Well, were you ever in a meeting with Mr. Stoutz where

17   you-all met with Mr. Handy and went over the sentencing

18   guidelines?

19   **A.**   Absolutely.

20   **Q.**   And did you have the book with you?

21   **A.**   Yes.

22   **Q.**   Did you ever have a meeting where you didn't have the book

23   at the time that you were trying to meet with him and talk to

24   him about the sentencing guidelines?

25   **A.**   Not about guidelines, no, ma'am.

1  **Q.**   Did you talk to him about the sentencing guideline range
2  that he would be facing in this case?
3  **A.**   Yes.
4  **Q.**   Did you promise him any type of range?
5  **A.**   I've never promised any federal inmate a specific
6  sentence.  I told him what I believed the guideline ranges
7  were, what the possible enhancements were, what the possible
8  objections to those enhancements would be, and that would be
9  the type of discussions I would have.
10 **Q.**   What did you discuss with him about the potential
11 guideline range for him?
12 **A.**   I told him what I believed the applicable ranges would be
13 for the charge he was --
14 **Q.**   What was that, if you recall?
15 **A.**   I believed that the government had charged -- based on
16 refreshing my recollection in the last few days -- or few
17 weeks, it was 500 kilograms of powder cocaine and 50 grams of
18 crack cocaine.  I believed the guideline ranges started
19 somewhere about 34, 36, and told him, you know, that
20 adjustments for if you accept responsibility and plead guilty,
21 this is what you get in terms of reductions in that range for
22 accepting responsibility.
23          I explained to him that there was more likely than
24 not to be some enhancements.  I told him what I believed those
25 enhancements would be.

1    Q.    And what were those?

2    A.    Well, there was a gun enhancement.  His name appeared at

3    the top of the indictment.  I figured he would be hit with a

4    leadership role of some sort.  Those are two that I know for

5    certain.  I don't know --

6              Oh, he also was alleged to have committed this

7    offense while out on bond in another case, that would probably

8    be an enhancement that I discussed with him.

9    Q.    Did you make those representations and discussions in

10   front of Mr. Stoutz?

11   A.    Yes.

12   Q.    And Mr. Stoutz would have heard those?

13   A.    Certainly.  At the time I don't know if he understood all

14   the enhancements, but I certainly talked about them.

15   Q.    Was Mr. Stoutz playing to your lead as the federal

16   criminal lawyer in this case, or was Mr. Stoutz independently

17   making suggestions and discussion with the sentencing?

18   A.    I believe he was playing to my lead.  But I don't know

19   what happened, if he had independent discussions with Mr. Handy

20   what he said outside of that.  But I don't think he would

21   have -- I don't think he would have disputed what I said, no.

22   Q.    All right.  And did you discuss the enhancements and the

23   potential enhancements and, thus, you were not surprised by the

24   enhancements in this case?

25   A.    Correct.

1   Q.   You anticipated the three that he actually got?

2   A.   Absolutely.

3   Q.   You talked about those with the client and with Mr. Stoutz

4   in jail?

5   A.   I talked to him in terms of:  These are the enhancements.

6   These are the objections we may make to those enhancements.  I

7   can't tell you what I believe the judge is going to do, but...

8   Q.   Did you --

9   A.   I certainly thought I had valid objections, and I made

10  those objections; and had I not thought those were valid, I

11  would not have filed them.

12  Q.   But when you were first handling this case and looking at

13  the sentencing guideline range, you weren't talking about

14  enhancements and objections at that point, were you?

15  A.   Certainly.  Ms. White, I will tell you that this case

16  began as a state case, I thought.  If I can recall is that I

17  think when -- when Mr. Handy may have first been arrested in

18  this case, it might have been brought as a state case that was

19  later adopted by the federal government.

20          I'm not certain of that, but that's kind of my

21  recollection.  I certainly knew about this case, I think,

22  before he was indicted.  So I knew a little bit about the

23  facts.  When I say I knew about, I knew it from discussions

24  with Mr. Stoutz.

25  Q.   And then once you had the opportunity to review the

1   evidence, then you would have known about any type of

2   enhancements that were coming?

3   A.   Yes, along with discussions with Mr. Morello, and my

4   experience and what happens in presentence reports.  Just

5   because you're charged with a certain amount of narcotics

6   doesn't mean the government's not going -- or the presentence

7   report is not going to include additional drug amounts for

8   relevant conduct is what it's called.

9         You may not be charged, but they consider it relevant

10   conduct and you can get -- the drug amount may actually be

11   higher than what you're actually charged with because of

12   relevant conduct.

13   Q.   Would you consider that Mr. Stoutz was taking the lead in

14   doing explanations for all of these possibilities?

15   A.   I didn't think Mr. Stoutz was taking the lead in making

16   explanations.  I was making the explanations.  If he made some

17   further explanation, I may be unaware of it.  I don't know.  I

18   don't think he was disputing what I said.

19   Q.   Okay.  And is it your testimony that your explanations

20   would have been sufficient for the client to understand, he

21   asked questions and you satisfied all of his inquiries about

22   his sentencing range?

23   A.   As far as I know, yes, ma'am.

24   Q.   Did you work with Mr. Morello on the factual basis in this

25   case?

1   A.   To a certain extent.

2   Q.   To what extent?

3   A.   To the extent that we had some back and forth about the

4   drug amounts.  And I think we were able to limit the drug

5   amount to less than 500 grams of cocaine, as I recall now.

6   Q.   Did you see the factual basis before it was signed and

7   presented into court for rearraignment?

8   A.   I'm sure I did.  I can't tell you today I've got some

9   independent recollection of that.  I'd be lying if I said I

10  did.  But if you want me to guess how it went --

11  Q.   No, I don't want you to guess.

12  A.   I don't have any independent recollection.

13  Q.   Do you recall ever meeting with the client and going over

14  the factual basis before he was in court?

15  A.   I can't say I remember meeting with him and specifically

16  talking about the factual basis, no.  But I did meet with

17  Mr. Handy and had discussions about what relevant information

18  in terms of a plea, or a trial and potential sentences.  I had

19  those conversations.

20         I don't know if I specifically looked word-for-word

21  at the factual basis and went through it word-for-word; but the

22  factual basis, as it came out or as it is today and the

23  discussions I had are consistent.

24  Q.   Did you go over the Bryan letter with Mr. Handy?

25  A.   I don't know if -- the same applies.  The same answer as I

1   just...

2   Q.   Did you discuss with your client that he could, even by

3   pleading guilty, still potentially receive a life sentence?

4           THE COURT:  I'm sorry.  What was the question?

5   BY MS. WHITE

6   Q.   Did you explain to your client that even by pleading

7   guilty he still potentially could receive a life sentence?

8   A.   I probably discussed that with him and made the

9   representation that that would be outside of what I believed

10  the applicable guideline ranges are, but the judge is not bound

11  by those ranges.

12  Q.   Did you give him a range of what you thought the

13  applicable guideline ranges were?

14  A.   Certainly did.

15  Q.   What were they?

16  A.   If you get out the indictment and a guideline sentencing

17  manual, I'll make a calculation right here if you want to.

18  Q.   Do you remember what you told him?

19  A.   I don't remember what I told him, but I can recreate it

20  right now if you want me to.

21          THE COURT:  I'm not interested in him recreating it.

22  The question is:  If you remember what you told him, tell us;

23  if you don't remember what you told him, then you don't

24  remember.

25          THE WITNESS:  In the discussions I had with the U.S.

 1  Attorney's Office in the time since he's filed this motion, I

 2  believed the applicable range was in the 13 to 17 year range

 3  for the guideline sentence based on the -- without the

 4  enhancements.

 5           With the enhancements and criminal history, it

 6  went somewhere higher than that.

 7  BY MS. WHITE

 8  Q.   All right.  Did you discuss with him the enhancements and

 9  where he would end up with, with the enhancements that you said

10  you were anticipating?

11  A.   Where he could end up with the enhancements?

12  Q.   Yes.

13  A.   I told him what the enhancements were what the range was

14  for those enhancements, and explained to him that there are

15  objections to those enhancements.  And like I told you, I don't

16  file frivolous objections.  I felt that the objections were

17  valid and these are the points we were fighting about.

18  Q.   Did you explain to your client that the objections could

19  be denied, and he could still --

20  A.   Or they could be granted.

21  Q.   And that he could receive a sentence in excess of 20

22  years?

23  A.   Certainly.

24  Q.   Or 25 years?

25  A.   Certainly.

1    Q.    Did he know he could face 27 years?

2    A.    I don't know what he knew.  I explained it to him.  I

3    thought he understood it.  For me to speculate as to what he

4    knew or didn't know... I certainly told him what the points

5    were, what the ranges were.  What he understood, I believed

6    that he understood what I was telling him, yes.

7    Q.    All right.  When the presentence report came out, did you

8    take it to discuss with the client?

9    A.    I think, yes.  My recollection is I did and that's where

10   we had the discussions, again, about the objections to the

11   presentence report and what objections were possible, what

12   objections were sort of frivolous.  And I think we decided we

13   would go with those that were the strongest objections as to

14   not water down those strong objections with some frivolous

15   objections.

16   Q.    Was that meeting on the PSI report with Mr. Stoutz and

17   with the client?

18   A.    Mr. Stoutz, like I said, was there every meeting I had

19   with Mr. Handy.  I would not have had any conversations with

20   Mr. Handy without Mr. Stoutz being present.  I'm saying that if

21   we had a meeting and I arrived first, I'm not going to wait for

22   him to get there before I start having conversations with

23   Mr. Handy.

24          But if Mr. Stoutz would say:  I can't be there, I

25   wouldn't go there alone.

1   **Q.**   When you obtained or received a copy of the presentence

2   investigation report, you saw he had been hit with at least

3   three enhancements that raised his minimum --

4   **A.**   Three or more as I recall.  I think there were more than

5   three.

6   **Q.**   At that point did the client talk to you about withdrawing

7   the plea that this was not what he expected or anticipated?

8   **A.**   I never heard him talk about withdrawing the plea.  I've

9   had Mr. Stoutz tell me that Mr. Handy was considering

10  withdrawing his plea maybe.

11  **Q.**   So he never, in front of you, asked to withdraw the plea?

12  **A.**   Not that I'm aware of, no, ma'am.

13  **Q.**   Do you recall him asking to withdraw his plea on the date

14  of sentencing when you were with him in court?

15  **A.**   After the sentence came down, yes.

16  **Q.**   In court?

17  **A.**   I don't know if it was in court or right after the court

18  proceeding.

19  **Q.**   Did you ever act upon Mr. Stoutz telling you that the

20  client wanted to withdraw his plea?  Did you ever research it

21  or make a determination of whether you could actually do that

22  and the legal grounds to do it?

23  **A.**   I didn't think there were grounds to do that, no.

24  **Q.**   Did you research it?

25  **A.**   No, I didn't do any research.  There was a, I thought, a

1    knowing, free and voluntary plea.  I think that, His Honor,

2    asked Mr. Handy when he, at the time he pled, you know, if he

3    understood what he was doing and he did.  And he thought -- my

4    recollection is that he believed it was in his best interests

5    at that time.

6            Especially in light of the discussions we had, not

7    only about -- about the guideline sentencing ranges and the

8    potential enhancements, but the potential point -- the downward

9    points or reductions for pleading guilty.

10   Q.   The acceptance of responsibility reduction?

11   A.   Acceptance of responsibility, and how those things would

12   be taken away should you go to trial and testify at trial and

13   then be hit with additional points for obstructing justice and

14   those kinds of things if you went to trial.

15   Q.   In your review of the discovery and information that you

16   received from the government, do you recall that this

17   investigational organization was called the Harry Handy

18   Organization?

19   A.   I recall what -- the case was referred to as the Handy

20   case because it was the lead name on the indictment.

21   Q.   Okay.  And do you recall that the factual basis actually

22   set forth that it was headed by Harry Handy in a drug

23   trafficking organization?

24   A.   Yes.

25   Q.   All right.  Are you aware as a criminal --

1   A.   I think that was an objection.  One of the objections to

2   the presentence report was that he was a leader, and I think we

3   objected to him being called or characterized as a leader in

4   his so-called organization.  I don't think there was much

5   organization, if any organization, nor was he a leader by any

6   stretch of the imagination.

7   Q.   And you're aware of the factual basis that it's facts

8   pertaining to the investigation and what the government would

9   prove if someone went to trial?

10  A.   Yes.

11  Q.   And that your client and the lawyer signs the factual

12  basis saying that everything in it is true?

13  A.   Correct.

14  Q.   And if in that factual basis it said Harry Handy was the

15  leader of the Harry Handy Organization, drug trafficking

16  organization, wouldn't that have been your time to work on that

17  rather than as an objection later on?

18       You're aware of the fact that you can work on that at

19  the time; right?

20  A.   The government wouldn't come off of that.

21  Q.   So you attempted to work with someone on that?

22  A.   In discussions with Mr. Morello, yes.

23  Q.   Okay.  And did you discuss that with Mr. Stoutz and

24  Mr. Handy that by signing that part it could potentially

25  provide him with the enhancement?

1  A.   I explained to him that they characterized it as such,

2  that they weren't coming off of that, as the case was, and that

3  we could object to it later and...

4  Q.   And you thought an objection would remove that?

5  A.   I thought an objection was the only way to go at it,

6  Ms. White.

7  Q.   Now --

8  A.   If you're asking me if I thought it would be in

9  Mr. Handy's best interest to withdraw his plea because of

10  language in a factual basis that characterized him as a

11  leader --

12  Q.   No, that's not what I'm asking you, sir.

13       I'm asking you if your client understood from you

14  explaining to him that he was going to receive 21 to 27 years

15  under the guideline range and up to life?

16  A.   I didn't believe that -- I can't say what the judge was

17  going to do.  I couldn't tell him what the judge was going to

18  do.  I can only tell you, and I can only tell the client, that

19  these are the adjustments that the government is going to seek,

20  these are the objections to the those adjustments, and we have

21  to have a hearing and the judge is going to decide those.

22       Just like I could never tell him what his sentence

23  would be here.  I didn't know.  I know what the ranges would

24  be.

25  Q.   So when the PSI came out, your client was pretty shocked,

1   wasn't he?

2   A.   I don't think he was shocked, no.  I think that he was

3   concerned about those potential enhancements.  I think we

4   explained to him, and I explained to him, that there are

5   objections to those enhancements and the judge would have to

6   decide, based upon the law and the facts that are present in

7   the case.

8   Q.   Did you talk with your client about the fact that under

9   the guidelines he's now absolutely looking at 21 to 27 to 28

10  years if you lose the objections?

11  A.   Yeah, I told him what the range is if you lose the

12  objections, yes, ma'am.

13  Q.   All right.

14  A.   I didn't say it was absolute, no.  Because I didn't think

15  it was absolute, otherwise I wouldn't have filed the

16  objections, Ms. White.

17  Q.   Now, do you recall there was no gun recovered in this

18  case?

19  A.   Yes.  There was a gun recovered, but it wasn't recovered

20  from Mr. Handy.  Yeah, I recall that.

21  Q.   There was -- okay.  And do you recall that your client got

22  a 2-point enhancement because there was telephone call

23  discussions about a *toy*?

24  A.   That was a gun, yes.

25  Q.   And how do you know that was a gun?

1    A.    Well, that was the allegation that was made.  The

2    allegation that the government made that when it had a

3    conversation that involved a *toy*, that the *toy* referred to a

4    gun.  That gun was found in a house, not in Mr. Handy's

5    possession, and that was the basis of an objection.

6    Q.    It was not from our records -- do you recall if there's

7    some other objections.  I'm going to show you what's been

8    marked as P2.  These are the 17 objections on Mr. Stoutz'

9    letterhead that were apparently submitted to the Probation

10   Department.

11          Can you review those?  Do you recognize them?

12   A.    I don't know.  Let me look at it.

13   Q.    Now, do you recognize P2?

14   A.    This is not -- I don't know that these were the objections

15   that were filed in the case.

16   Q.    Do you recognize P2?

17   A.    I may have seen this document.  This appears to be a

18   document that Mr. Stoutz prepared in accordance with some

19   discussions that we had regarding what the -- what we looked at

20   in the presentence investigation report, but this is not what I

21   filed in court.

22   Q.    Okay.

23   A.    It doesn't have my signature on it.

24   Q.    Do you think you filed your objections in court to the

25   PSI, or would you have submitted them to the pretrial people?

1   A.   Both.

2   Q.   Both?

3   A.   File them in court, provide a copy to the United States

4   Attorney, provide a copy to the Pretrial Services.

5   Q.   So whatever you filed would be in the court record?

6   A.   Should be.  I know we had a lengthy argument about it, so

7   I suspect --

8   Q.   I'm sorry.  Who did you have a lengthy argument with?

9            THE COURT:  I'm sorry.  I didn't hear your question.

10  BY MS. WHITE

11  Q.   Who did you have a lengthy argument with?

12  A.   We had an argument in court regarding whether the

13  objections would be granted or not granted.

14  Q.   And that would have been on the date of sentencing?

15  A.   Yes, ma'am.

16  Q.   Okay.

17           MS. WHITE:  If I could have one minute, Judge.

18           THE COURT:  Sure.

19  BY MS. WHITE

20  Q.   All right.  There was a -- here we go.  This is has been

21  marked as Exhibit J.  This is the PSI report from June 18th of

22  2001.

23  A.   Uh-huh.

24  Q.   All right.  As an addendum to that, you would have

25  received the 20 -- 24 pages.  As an addendum to that, the U.S.

1  Probation Officer, Blayne Anderson, submitted additional pages,

2  and I'm going show you the rest of Exhibit J, Page 30 through

3  36, where he outlines the objections made by the defense.

4          And I'll ask for you to review those.  Because my

5  review of them does not reflect that you ever objected to the

6  gun enhancement.

7  **A.**    Okay.

8  **Q.**    So do you think the Court or the probation officer missed

9  your objection to the gun enhancement and you did file one?

10 **A.**    It was my recollection, Ms. White, that we did make an

11 objection to the gun enhancement.  It may be that we decided

12 that the conversations that were had regarding that -- the gun

13 didn't warrant an objection.  I'm not certain, but that's -- I

14 thought we had; maybe we hadn't.

15 **Q.**    So even without --

16          **THE COURT:**  I'm sorry.  What?

17 **BY MS. WHITE**

18 **Q.**    So even with out the 2-point enhancement, your client

19 still would have been in the 20-year range?  Did you explain

20 that to the client?

21 **A.**    Without the 2-point enhancement?

22 **Q.**    If you won your other objections and got the other

23 enhancements taken off, your client would still be in a 20-year

24 range.  Did you explain that to him, that you weren't going to

25 object to that and his sentence couldn't go under that?

 1          MR. SANDERS:  Your Honor, what time is this?

 2          MS. WHITE:  After the PSI --

 3          MR. SANDERS:  This is after the plea's been entered;

 4   is that correct?

 5          MS. WHITE:  Yes, after the plea, before sentencing.

 6          MR. SANDERS:  I don't know what the relevancy is and

 7   that it would even matter for the hearing.

 8          THE COURT:  That objection is overruled.

 9          THE WITNESS:  I don't have an independent

10   recollection of that, but -- I don't recall.

11   BY MS. WHITE

12   Q.   All right.  Did you ever see the client after the

13   sentencing date?

14   A.   No.

15   Q.   Was Mr. Stoutz with you on that date in court?

16   A.   No.

17   Q.   You were --

18   A.   Not that I recall.

19   Q.   You were in court without Mr. Stoutz?

20   A.   I believe so.

21   Q.   And, in this case, did you discuss with the client a 5K,

22   that wasn't a possibility, was it?  He was the last defendant

23   to plead, or were they all pleading at the same time?

24   A.   He was one of the last.

25   Q.   When your client, on the record, at sentencing on

136

1   July 11th, 2001, requested to withdraw the plea, was that the

2   first time you had heard it from your client, but you had heard

3   it from Mr. Stoutz before?

4   **A.**   No, I had not heard it before.

5   **Q.**   You had not even heard it from Mr. Stoutz?

6   **A.**   No.

7   **Q.**   You didn't say earlier that Mr. Stoutz had told you that

8   he wanted to withdraw his plea?

9   **A.**   After the sentencing was the very first time I heard he

10  wanted to withdraw his plea.

11  **Q.**   And that was?

12  **A.**   And I heard that from Mr. Stoutz.

13  **Q.**   Do you recall in the sentencing that your client actually

14  asked the Court to withdraw his plea?

15  **A.**   He may have, yes.

16  **Q.**   Now, you provided an affidavit to the government

17  pertaining to your representation in this case, which is marked

18  as Exhibit P.  Was that affidavit prepared for you by the U.S.

19  Attorney's Office?

20  **A.**   I believe it was, yes.  If you say:  Prepared by them, if

21  it was typed by them with our discussions, yes.

22  **Q.**   I'll show what's marked as Government's Exhibit P -- or

23  actually Exhibit P.  Do you recognize that?

24  **A.**   Yes.

25  **Q.**   What is it?

1    A.    It's my affidavit.

2    Q.    And a letter?

3    A.    And my cover letter, correct.

4            **THE COURT:**  What exhibit is that now?

5            **MS. WHITE:**  P.

6            **THE COURT:**  P like Paul?

7            **MS. WHITE:**  Yes, sir.

8    BY MS. WHITE

9    Q.    Who was the notary on that?

10   A.    I'm not certain.  I can't read it.

11   Q.    Does it appear to be Mike Magner.

12   A.    Could be, yes.

13   Q.    Did you prepare this affidavit at the U.S. Attorney's

14   Office?

15   A.    At the USA Attorney's Office, no.

16   Q.    Did you prepare it and sign it and just send it back to

17   them?

18   A.    I can't say I recall independently.  If you want -- this

19   appears to be an affidavit prepared by me, typed by me or my

20   secretary at my office.  It just looks like the print -- do you

21   understand what I'm saying?  It's certainly my letterhead.

22   Certainly my secretary's initials at the bottom.

23   Q.    Just is it your signature on the affidavit?

24   A.    It's my signature.

25   Q.    All right.  And you don't recall Mike Magner being there

1  with you when you signed it?

2  **A.**   I don't see Mike Magner every time I come here, but I see

3  him a lot, yeah.  I don't know if he was there when I signed it

4  or while I was signing it, when I signed it.  If he signed it

5  as the notary, I'm sure he witnessed my signature.

6  **Q.**   Now, you discuss in your affidavit that you explain to the

7  defendant that 13 years was a low end, but the number 13 was

8  discussed as a sentencing range; is that right?

9  **A.**   I recall, yes, ma'am.

10  **Q.**   And do you recall any other numbers, because that's the

11  only number you use in your affidavit?

12  **A.**   I believe when I wrote this affidavit or drafted this

13  affidavit that at that time the defendant was alleging that

14  someone had told him that he would not get more than 13 years,

15  that's why the 13-year number was used in the affidavit.

16  **Q.**   Was that a number that --

17  **A.**   It's not intended to be that 13 years was the only number

18  ever discussed.  It was meant to be 13 was not never guaranteed

19  to any defendant that I represented.

20  **Q.**   All right.  Okay.

21        **MS. WHITE:**  Thank you.

22        **THE COURT:**  Counsel?

23                   **CROSS-EXAMINATION**

24  BY MR. MITCHELL

25  **Q.**   Good afternoon, Mr. Boyer.

1    A.    Good afternoon, sir.

2    Q.    Mr. Boyer, I wanted to show you government's -- it's the

3    factual basis of Harry Handy as Government's Exhibit F.

4          MR. MITCHELL:  Permission to approach the witness,

5    Your Honor?

6          THE COURT:  Yes.

7    BY MR. MITCHELL

8    Q.    Mr. Boyer, do you se the word *leader* anywhere on that

9    factual basis?

10          MS. WHITE:  I'm sorry.  I can't hear.

11   BY MR. MITCHELL

12   Q.    Do you see the word *leader* anywhere on the factual basis?

13   How about if we focus your attention on Page 1.

14   A.    Uh-huh.

15   Q.    Do you see where in the second paragraph it talks about

16   the Harry Handy Organization was headed by Mr. Handy?  You see

17   *headed*; right?

18   A.    Uh-huh, yes.

19   Q.    But you don't see *leader*?

20   A.    Right.

21   Q.    Were you aware of any facts that Mr. Handy was the leader

22   of this organization?

23   A.    As I stated before, I didn't think Mr. Handy was the

24   leader of anything, and I didn't think they had any

25   organization.  That's to the government's contentions.  That

 1   was the subject of my objection.  He was given -- the

 2   presentence investigation report suggested to the Court that

 3   Mr. Handy be given additional points for a leadership role.

 4           I objected to his being characterized as a leader

 5   always.

 6   Q.   Thank you.

 7           Mr. Boyer, you've testified that you had discussed

 8   enhancements with Mr. Handy and in front of Mr. Stoutz; is that

 9   correct?

10   A.   Yes.

11   Q.   Okay.  But you weren't sure if Mr. Stoutz understood the

12   enhancements, the language of that; is that correct?

13   A.   No, I think he understood what enhancements were.  How

14   detailed an understanding he had, I'm not certain.  Like I

15   said, this was probably his first federal criminal case.

16   Q.   And he had no experience with the federal sentencing

17   guidelines before?

18   A.   Not that I'm aware of.  I could tell you I tried to stress

19   that there was a great deal of difference between federal

20   sentencing guidelines and the state sentencing scheme at

21   Criminal District Court, Orleans Parish.

22   Q.   Mr. Boyer, how many times did you meet with the defendant?

23   A.   Three or four.  Four is my recollection.

24   Q.   Okay.

25   A.   Probably two detailed meetings.  I mean, I had a meeting

1    with Mr. Handy, I think, probably just after the initial

2    appearance and then again shortly thereafter to explain

3    guideline sentencing and what the evidence was, or what I

4    believed the evidence was going to be at the time.

5            And then when I got further discovery and we got

6    closer to deciding whether he was going to plead guilty or not

7    guilty and go to trial, we probably had another more detailed

8    discussion in connection with the sentencing guidelines --

9    Q.   Okay.

10   A.   -- and those types of issues.

11   Q.   Let's talk about that meeting where you went over the

12   sentencing guidelines with Mr. Handy.  Did you discuss the

13   possible consequences of going to trial versus pleading guilty?

14   A.   Yes.  And I can tell you that I in no uncertain terms

15   thought it was in Mr. Handy's best interest at that time, based

16   upon the government's evidence that I was aware of, that he

17   plead guilty.  But I could tell you, I don't make the decision

18   for clients.

19           I tell them what I believe that the evidence is, how

20   strong I believe it is, what you're looking at in terms of

21   sentencing range if you're found guilty after the trial and

22   what your sentencing ranges may be if -- or if you plead guilty

23   and let them make that call.

24           I have no --

25   Q.   What did you tell him about how strong the evidence was

1    against him?

2    A.    I thought the evidence in this case was real strong.

3    Q.    And did you also talk about role adjustment in terms of

4    sentencing guidelines?

5    A.    Let me say this:  Role adjustment was never some giant

6    issue that we talked about at length and focused on.  I can

7    just tell you that the entire time I talked with Mr. Stoutz and

8    Mr. Handy on three or four occasions I said:  Let me remind

9    you-all that they call this thing the Harry Handy Organization.

10   Although I don't believe there's any organization or is anybody

11   by any means or stretch of the imagination the leader of any

12   organization.

13           I said they call it that because they're looking for

14   a 2-point enhancement or more.

15   Q.    So you told him that it was possible?

16   A.    Certainly.

17   Q.    And did you talk about his criminal history?

18   A.    Certainly.  Like I said before, Mr. Handy was arrested

19   while he was on bond -- an appeal bond, I add, after a

20   conviction from another case.  I happen to know that that is

21   grounds for enhancement.

22   Q.    And were you familiar with the presiding judge, Judge

23   McNamara?

24           **THE COURT:**  That's irrelevant.  At least in this

25   court it is.

1          MR. MITCHELL:  Yes, Your Honor.

2   BY MR. MITCHELL

3   Q.    And still during this meeting, did you ever promise the

4   defendant an exact sentence or an exact range?

5   A.    I've never promised any defendant, including Mr. Handy,

6   what their sentence would be in this court, in this courthouse,

7   or in any federal court proceeding.  It's impossible.

8   Q.    And so you never told him that he would get no more than

9   13 years?

10  A.    I never told Mr. Handy anything about what he would get,

11  other than the applicable guideline sentencing ranges as I

12  perceived them to be, with enhancements and without those

13  enhancements.

14  Q.    And did you tell him that range could have been 11 to 13

15  years?

16  A.    I don't recall ever telling him that, no.  I believe that

17  the calculations that I made after having recreated them in

18  preparation for my testimony today, I believe the ranges that I

19  looked at -- the likely ranges on the initial -- on the

20  charges, without the enhancement, was probably 13 -- somewhere

21  between 13 and 17 years.

22          I believe that they were probably six or eight points

23  of enhancements, as I recall, that were likely to be argued or

24  in a presentence investigation report.  And I told him that

25  there were objections to those enhancements.  And I may not

1   have characterized the likelihood of success on those

2   enhancements.

3          I can tell you that as I recall -- now, I don't know

4   if that's consistent with the documentation -- but I believe in

5   our discussions there were more objections that could have been

6   made, like I told you I thought were probably frivolous.

7          I think the way I characterized it is that we should

8   take the strongest objections we have for the enhancements that

9   are there and object to those so as not to water down our

10  argument on those that we have some strength or some

11  possibility of winning.

12  Q.   Okay.  And you also testified that Mr. Stoutz didn't have

13  any experience in federal criminal court; is that correct?

14  A.   Not to my knowledge, he didn't.

15  Q.   And you offered advice to Mr. Stoutz?

16  A.   What do you mean?  Like advice how?  Parental advice?  No,

17  I didn't offer him that kind of advice.  I told him what I

18  thought how this case shaped up in the real world in real

19  language.  I didn't pull out the book.  I'm not

20  second-guessing.

21         I told him what I believed would go down in this case

22  as the case proceeded, and I had a lot of discussions with

23  Mr. Stoutz about that.  I don't know you'd characterize it as

24  advice.  I'm not telling anybody how to live their life or

25  practice law.  I'm just telling him:  In my experience, this is

1  how it happens.

2  Q.    And did you ever tell Mr. Stoutz that Mr. Handy would

3  absolutely fall within any particular range, or Mr. Handy would

4  get any exact sentence?

5  A.    Never ever.

6  Q.    And you never told Mr. Handy at any time --

7  A.    I never told Stoutz or Handy that.

8  Q.    -- that he would receive an exact sentence?

9  A.    Absolutely not.  I never told any client in this building

10 that.

11 Q.    And did you ever tell Mr. Stoutz that --

12         THE COURT:  Mr. Stoutz?

13         MR. MITCHELL:  Yes.

14 BY MR. MITCHELL

15 Q.    My next question is if he told Mr. Stoutz --

16         THE COURT:  Okay.  Go ahead.

17 BY MR. MITCHELL

18 Q.    -- that Mr. Stoutz would have to tell Mr. Handy that he

19 would have to lie under oath at any time?

20 A.    Absolutely not.

21 Q.    And you never told Mr. Handy --

22 A.    That would be a criminal offense.

23 Q.    -- to lie here?

24         MR. MITCHELL:  I have no further questions.

25         THE COURT:  Do you have any other questions?

1          MS. WHITE:  No, sir.

2          THE COURT:  You can step down.  Thank you.  Are

3    you-all finished with this witness?

4          THE WITNESS:  Thank you, Judge.  Good seeing you

5    again.

6          MR. SANDERS:  While we're at a break here between the

7    witnesses, the government would offer as a stipulation that if

8    the probation officer --

9          THE COURT:  I think you're free to leave.  Are

10   you-all finished with Mr. Boyer?

11         MR. SANDERS:  If we can have a cell phone number.

12         THE COURT:  Leave a cell phone number just in case

13   somebody needs you.

14         THE WITNESS:  Do you want me to put it on the record,

15   Judge?

16         THE COURT:  No.  Just give it to Mr. Mitchell.  Go

17   ahead.  Is the mover resting?

18         MS. WHITE:  No.

19         MR. SANDERS:  We're just going to do a stipulation

20   between witnesses.

21         THE COURT:  Okay.

22         MR. SANDERS:  Your Honor, I think the government's

23   offering a stipulation that the plaintiff in the case is

24   willing to agree to that if a representative from the Probation

25   Office were to testify, and the original probation officer is

1    no longer employed with the probation, he just did the PSIR,

2    which is Government's Exhibit J.

3              But if an officer from Probation were called to

4    testify that he would testify consistently with the PSIR, which

5    is in the file, as to the sentencing which most likely would

6    have occurred had Mr. Handy gone to trial and been convicted in

7    the sense that as to the drug quantity amount and the potential

8    enhancements that would have been applied based on the evidence

9    that would have been heard at trial.

10             **THE COURT:**  Okay.  So stipulated.

11             **MS. WHITE:**  That's correct.  We stipulate.

12             **THE COURT:**  Who's your next witness?

13             **MS. WHITE:**  Harry Handy.

14             **THE COURT:**  All right.  Why don't we take a ten

15   minute recess.  We'll stand in recess for ten minutes.

16             **THE DEPUTY CLERK:**  All rise.

17             **(WHEREUPON, the Court took a recess.)**

18             **THE DEPUTY CLERK:**  All rise.

19             (WHEREUPON, **Harry Handy**, having been duly sworn,

20   testified as follows.)

21             **THE DEPUTY CLERK:**  Please state your full name and

22   correct spelling for the record.

23             **THE WITNESS:**  Harry Calvin Handy, H-A-N-D-Y.

24             **THE COURT:**  All right.  Ms. White.

25

1                        DIRECT EXAMINATION

2    BY MS. WHITE

3    Q.   Mr. Handy, you've heard what's been said in court this

4    morning.  I want to talk to you about your filings.  Did you

5    prepare your filings in this case?

6    A.   Yes.

7              THE COURT:   Prepare what?

8    BY MS. WHITE

9    Q.   Your filings in this case, post-sentencing?

10   A.   Yes.

11   Q.   Did you have help from people at the jail?

12   A.   Yes.

13   Q.   Okay.  You're not the one that handled all of your

14   pleadings to get you back here?

15   A.   No.

16   Q.   All right.  You had help.

17             Now, was this your first time ever in federal court

18   with this charge?

19   A.   Yes.

20   Q.   Were you familiar with the federal courts, the sentencing

21   guidelines or how it worked over here in federal court?

22   A.   No.

23   Q.   And had you previously had cases in state court that

24   Mr. Stoutz had helped you with?

25   A.   Yes.

1    **Q.**    Did you know Harry Boyer?

2    **A.**    No.

3    **Q.**    This was the first time you ever had him help you?

4    **A.**    Yes.

5    **Q.**    All right.  And did you bring Cliff Stoutz in initially

6    because you wanted help, or you wanted Mr. Boyer, or why did

7    you have Mr. Stoutz?

8    **A.**    Mr. Stoutz referred me to Harry Boyer because he wasn't a

9    federal lawyer.

10   **Q.**    Because Mr. Stoutz wasn't?

11   **A.**    Wasn't, no.

12   **Q.**    And then did he stay on your case or talk to you about the

13   case from the beginning?

14   **A.**    Yes.

15   **Q.**    Did you ever hear the audiotape wiretaps in this case?

16   **A.**    No.

17   **Q.**    Did your lawyers ever bring them to you to listen to them?

18   **A.**    No.

19   **Q.**    Did they ever give you copies of the paper discovery in

20   this case?

21   **A.**    No.

22   **Q.**    Did you ever see any police reports or what's called like

23   a DEA-6 reports, like that the agents would have prepared?

24   **A.**    The only thing they showed me was the weight of the drugs.

25   **Q.**    Say again?

JODI SIMCOX, RMR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1  A.   The weight of the amount of the drugs is the only thing I
2  saw.
3  Q.   And what did you see that showed you that?
4  A.   It was saying the weight and the net weight, the penalty
5  of it, things like that, things of that nature.
6  Q.   They showed you documents on that?
7  A.   Yes.
8  Q.   All right.  And did they go over or show you any
9  transcriptions of the telephone calls?
10 A.   No.
11 Q.   Were you aware of what was on them?
12 A.   They were telling me what I said.
13 Q.   All right.  Did you talk to them about it or discuss with
14 them any alternatives to what was going on in your case, what
15 was going on at that time, or what you were involved with or
16 not involved with?
17 A.   They were just basically telling me that I'm charged with
18 this and that and it ain't looking good for you and I don't got
19 a chance at trial, plead guilty to this and get it over with.
20 Q.   When did they first start talking to you with that type of
21 plan?
22 A.   Once they got their -- once the superseding indictment
23 came on.
24 Q.   All right.  How many times do you think you met with
25 Mr. Stoutz?

1    A.    About four or five times.

2    Q.    Okay.  And how about Mr. Boyer?

3    A.    Twice.

4    Q.    And was Mr. Boyer with Mr. Stoutz each time he met with

5    you?

6    A.    One time he was with him, and the second time Mr. Stoutz

7    came late.

8    Q.    All right.  And who went over those sentencing guidelines

9    with you?

10   A.    Harry Boyer.

11   Q.    And was Mr. Stoutz there during that time?

12   A.    That's the time he came late.

13   Q.    Mr. Stoutz came late?

14   A.    Yes.

15   Q.    All right.  And what did he tell you about the sentencing

16   guidelines at that time?

17         THE COURT:  What did who tell you?

18   BY MS. WHITE

19   Q.    Mr. Boyer.

20   A.    Mr. Boyer told me I'm pleading out to 400-some grams of

21   crack, 400-some grams of powder.  My base level going to be 34.

22   By me pleading guilty, I'm going to take responsibility and I'm

23   going to go up three levels to 31.  That's going to put me to

24   135 months to 168 months, that's my guideline range.

25   Q.    And what did you understand by that?

1   A.   That I was pleading guilty, that's it.

2   Q.   And what about the fact that there could be enhancements;

3   did they discuss any enhancements with you?

4   A.   I didn't know nothing about no enhancements until I got my

5   PSI.

6   Q.   Did your lawyers talk to you about what enhancements were?

7   A.   No.

8   Q.   Had they ever talked to you about enhancements before you

9   got the PSI?

10  A.   No.

11  Q.   When you were pleading guilty, did you realize that you

12  were pleading guilty to a crime that the mandatory minimum was

13  ten years?

14  A.   Yes.

15  Q.   And that the maximum was life?

16  A.   Yes.

17  Q.   And then did you think that you would be relying on your

18  sentencing guidelines at that point?

19  A.   Yes.

20  Q.   Was it your -- did you plan to plead guilty knowing that

21  you could receive anything over 20 years?

22  A.   No.

23  Q.   Did your lawyers discuss with you the fact that you could

24  receive anything over 20 years?

25  A.   No, no, they didn't.

1   Q.    They didn't promise you that you would receive something

2   less than 20 years, did they?

3   A.    They promised me my range was 11 to 13 years.  That's what

4   I understood, 11 to 13 years.

5   Q.    And you thought your sentence would not go over 13?

6   A.    No.

7   Q.    Now, when the presentence investigation was conducted, who

8   was with you?

9   A.    Cliff.

10  Q.    And then when the PSI came back, who discussed it with

11  you?

12  A.    Cliff.

13  Q.    Did Mr. Boyer ever discuss it with you?

14  A.    No.

15  Q.    When did you see Mr. Boyer like the second time you said?

16  A.    That was the second time.  The first time when the

17  superseding, he told me that the case getting big and that he

18  need more money.

19  Q.    Did he go over anything else at that point?

20  A.    No, he told me the case just got bigger.  They didn't add

21  no new charges, they just superseding and adding these people

22  on the case.

23  Q.    When did he go over the PSI with you?

24  A.    He didn't go over the PSI with me.  Clifford [sic] Stoutz

25  went over it with me.

1  Q.   And so he talked to you about the enhancements at that
2  time?
3  A.   Yes.
4  Q.   You heard Mr. Boyer just testify that he went over all
5  those enhancements with you?
6  A.   No, he didn't.
7  Q.   He didn't go over the fact that there might be a gun
8  enhancement?
9  A.   No, he didn't.
10 Q.   And when they filed objections in this case, did any of
11 the lawyers come and talk to you about those objections?
12 A.   Clifford [sic] Stoutz came and showed them to me.
13 Q.   And were you aware that they were not objecting to the gun
14 enhancement?
15 A.   No, I wasn't aware.  I thought they was objecting to all
16 of them.
17 Q.   Was it your understanding from your lawyers that the
18 enhancements could be thrown out?
19 A.   Yes.
20 Q.   Did you also understand that the enhancements may not be
21 thrown out?
22 A.   Yes.
23 Q.   What was your response, or what did you think or feel, or
24 what did you say to your lawyers when you got your PSI?
25 A.   When I got the PSI, I wanted to take my plea back.  That

1  was my first reaction because they told me something different.

2  They told me 11 to 13 years and I got 21 to 27 years on the

3  thing.

4  Q.   Did you ever tell Harry Boyer that before the day of

5  sentencing?

6  A.   No, told Cliff because Harry Boyer stopped coming to see

7  me after -- after I plead guilty, he didn't come see me no

8  more.

9  Q.   Was Cliff providing you with explanations, as in legal

10  explanations -- what was he telling you?

11  A.   Trying to walk me through the process.

12  Q.   Was he able to walk you through the process or did he keep

13  telling you he needed to talk to Harry Boyer?

14  A.   He was walking me through.  He was the lawyer.

15  Q.   Cliff was?

16  A.   Cliff was.

17  Q.   Did they go over the factual basis with you before that

18  day in court?

19  A.   No.

20  Q.   Nobody did?

21  A.   Nobody.

22  Q.   All right.  When you were in court on that day, that was

23  the day that you were rearraigned, that was March 21st of '01,

24  had you ever seen the factual basis before that?

25  A.   No.

1   Q.   Had you read it before you signed it?

2   A.   Yes.  I rough drafted it like.

3   Q.   I'm sorry?

4   A.   I rough drafted it like.

5           MR. SANDERS:  I can't hear his answer.  I'm sorry.

6           THE WITNESS:  I rough drafted it, just read it brief,

7   brief.

8           THE COURT:  Where was that read to you and when?

9           THE WITNESS:  In the jury box the day of the hearing,

10  the day of the hearing.

11          THE COURT:  Someone had a rough draft of a factual

12  basis?

13          THE WITNESS:  No, I rough drafted it.  I scanned

14  through it because he was just telling me sign right here.

15          MS. WHITE:  He's saying he rough read it.  Is that

16  what you're --

17          MR. SANDERS:  Oh, rough read.

18          THE COURT:  I thought he said rough draft.

19          MR. SANDERS:  I did too, Your Honor.

20          MS. WHITE:  He did.

21  BY MS. WHITE

22  Q.   But is that what you meant, you actually just looked over

23  it, you gave it a quick, rushed read?

24  A.   Yes.

25  Q.   But it was not a rough draft, it was the one that you

1  introduced into evidence, the one we talked about today?

2  **A.**   Yes.

3  **Q.**   That was the first time you ever saw it?

4  **A.**   Yes.

5  **Q.**   Had you seen the Bryan letter?  And you know what the

6  Bryan letter is?

7  **A.**   Yes.

8  **Q.**   That's the plea letter?

9  **A.**   Yes.

10 **Q.**   Had you seen that before March 21st, 2001, when you were

11 in court pleading?

12 **A.**   That was my first time seeing it.

13 **Q.**   That day?

14 **A.**   That day.

15 **Q.**   So did any of your lawyers go over the factual basis or

16 your Bryan letter line-by-line?

17 **A.**   No.

18 **Q.**   At your sentencing, you requested that the Court allow you

19 to withdraw your plea, didn't you?

20 **A.**   Yes.

21 **Q.**   And why was that?

22 **A.**   Because -- because that wasn't the plea agreement that I

23 agreed to.  I was told -- that wasn't the range I was told.

24 **Q.**   Now --

25         **THE COURT:**  At the sentencing, did you move to

1  withdraw your plea before you learned how I ruled on the

2  enhancements, or after you learned how I ruled on the

3  enhancements?

4          THE WITNESS:  When you asked me:  Do I have anything

5  to say and I told you I would like to take my plea back.

6          THE COURT:  But was that after I had already denied

7  the objections on the enhancements?

8          THE WITNESS:  I can't remember.

9          MS. WHITE:  I believe it's right after.

10         THE COURT:  Yes, that's of some significance.

11         MS. WHITE:  It's -- that's Exhibit D and it's the

12  court --

13         THE COURT:  I'm aware of it.

14         MS. WHITE:  All right.

15  BY MS. WHITE

16  Q.   Now, did you ever receive -- did you send Harry -- excuse

17  me, you're Harry.  Did you send Cliff Stoutz an affidavit?

18  A.   Yes.

19  Q.   And did he send one back to you?

20  A.   Yes.

21  Q.   And you've heard us talk about Tango and Tango-1 today.

22  Do you know the difference between the two affidavits of which

23  one you sent to him and which one he sent back to you?

24  A.   Yes.

25  Q.   All right.  I'm going to show you what's previously been

1  marked as T and T1.  Which one did you send to Mr. Stoutz?

2  A.  This one right here.

3  Q.  And what exhibit is that?

4  A.  T1.

5  Q.  All right.  And did Mr. Stoutz send you a signed copy

6  back?

7  A.  No, he sent me this one.

8  Q.  He sent you T back?

9  A.  Yes.

10  Q.  And that's the Tango exhibit?

11  A.  Yes.

12  Q.  Okay.  Had you ever seen this exhibit, Tango-1, with his

13  signature on it?

14  A.  No.

15  Q.  Okay.  All right.  Did you attach Exhibit T to your 2255s?

16  A.  Yes.

17  Q.  Now, you're trying to withdraw your plea and face a

18  potential life sentence, aren't you?

19  A.  Yes.

20  Q.  Why are you doing that?

21  A.  Because the sentence I got is basically a life sentence,

22  27 years.

23  Q.  But didn't you understand from your PSI --

24          **THE COURT:**  I'm sorry.  You've got to speak louder.

25

1  BY MS. WHITE
2  Q.   Didn't you understand from your PSI that you had pled to
3  something that was going to net you a minimum of 21 years under
4  the sentencing guidelines to 27 years?
5  A.   No.
6  Q.   But if the PSI said that, why would you be thinking
7  something else?
8  A.   Because my lawyer told me something different.
9  Q.   Which lawyer?
10 A.   Harry Boyer and Cliff Stoutz.
11 Q.   But did they tell you that you could absolutely guarantee
12 that that sentence would be between 11 and 13 or 11 and 17?
13 A.   They said 11 to 13.  They said that's the range.  They
14 said the judge could go over the range, but this is the range.
15 They said if the judge go over the range, you could appeal it.
16 But this is the range, 11 to 13 years.
17 Q.   Harry, do you think maybe that you just wanted to hear
18 that and didn't hear them telling you the difference?
19 A.   No, they showed me on the book and everything, and that's
20 what I understood.  When I saw the crack was over 500 grams, I
21 told them to change it.  I knew that wasn't right because they
22 told me something different.
23         MS. WHITE:  If you'll answer their questions.
24         THE WITNESS:  All right.
25         THE COURT:  Counsel.

1                          CROSS-EXAMINATION

2    BY MR. MITCHELL

3    Q.    Good afternoon, Mr. Handy.

4    A.    Good afternoon.

5    Q.    Mr. Handy, you've testified on direct that you prepared

6    your filings, but you had help with them; is that correct?

7    A.    Yes.

8    Q.    And how do you know that everything in your filings is

9    true and accurate?

10   A.    Because he was helping me.  He was explaining it to me as

11   we go along.

12   Q.    Okay.  Did you read them all?

13   A.    Yes.

14   Q.    Do you agree with everything that was in there?

15   A.    Most of it.  Most of it.

16   Q.    So there are parts of your motions that you're saying you

17   did not agree with?

18   A.    All of it correct, but I don't know like case by case.  I

19   know most of the cases.

20   Q.    Oh, the case law?

21   A.    Yes, yes.

22   Q.    So you're saying that the only things you're not positive

23   about are the case laws?

24   A.    Yes.

25   Q.    But all the facts are correct, true and accurate?

1    A.    Yes.

2    Q.    And you read them?

3    A.    Yes.

4    Q.    Mr. Boyer came and talked to you about a plea agreement in

5    jail; is that correct?

6    A.    Yes.

7    Q.    And he talked about the evidence that was against you?

8    A.    Yes.

9    Q.    And Mr. Boyer eventually advised you to plead guilty; is

10   that correct?

11   A.    Yes.

12   Q.    And he told you that you had a 13-year deal; is that

13   correct?

14   A.    He told me the range 11 to 13 years.

15   Q.    Okay.  And when did you learn that you had that deal?

16   A.    Probably about two or three days before arraignment.

17   Q.    Two to three days before arraignment?

18   A.    Yes.

19   Q.    And did you just take his word for it, or were you

20   concerned that you may not get it?

21   A.    Took his word for it.

22   Q.    So you didn't call and ask for it in writing?

23   A.    He said they don't do that in writing in the federal

24   system.

25   Q.    So when you called and you asked for it in writing, he

1  called you back?

2  A.  No, he didn't call.  He come see me and he told me this.

3  He came and saw me when he told me that the deal was 11 to 13

4  years.  It was at the jailhouse.

5  Q.  So you were asking then -- when he told you that you had a

6  deal or 11 to 13 years, you told him then that you wanted it in

7  writing?

8  A.  No, I never told him I wanted it in writing.  He said

9  that's the deal and I believed him.  He's my lawyer.

10 Q.  You eventually called and told him that you wanted it in

11 writing; correct?

12 A.  I never called and told him I wanted it in writing.

13 Q.  Mr. Handy, I'm going to show you Government's Exhibit G.

14        THE COURT:  Which exhibit?

15        MR. MITCHELL:  G as in George.

16        THE COURT:  G like George?

17        MR. MITCHELL:  Yes.

18 BY MR. MITCHELL

19 Q.  Mr. Handy, I'm showing you Exhibit G.  This is your

20 affidavit?

21 A.  Yes.

22 Q.  Please focus your attention on Paragraph 4.

23 A.  Yes.

24 Q.  Just read it to yourself.

25 A.  Yes.

1   Q.   Does this refresh your recollection on whether or not you
2   called Mr. Boyer and asked for it in writing?
3   A.   I can't recall.  I can't recall.  It was after -- it was
4   after my sentencing right here.  I was trying to get him to
5   tell me the 13-year deal.
6   Q.   So you were trying to get him to tell you that you wanted
7   the 13-year deal in writing after you were already sentenced?
8   A.   Yes.
9   Q.   And you were sentenced to 27 years?
10  A.   Yes.
11  Q.   Okay.  And you called and you told him that you wanted a
12  13-year deal?
13  A.   No, that was the deal.  I wanted him to, like an
14  affidavit, I wanted him to admit to it.
15  Q.   But, Mr. Handy, this says:  Mr. Boyer immediately left the
16  Orleans Parish Jail after I agreed to take the 13-year deal.  I
17  tried to call Mr. Boyer at his office several times after I
18  agreed to take the 13 years to inform him that I wanted the
19  agreement in writing.
20          This says that it was before the sentencing.
21  A.   I understand.  The dude -- the person who was helping me
22  must have misunderstood what I was telling him.
23  Q.   I thought you read everything?
24  A.   I did.
25  Q.   And you said that all your pleadings were true and

1    accurate?

2    **A.**    It was.

3    **Q.**    Is there anything else that's not true and accurate in

4    your pleadings?

5    **A.**    This is it.  We must have had a misunderstanding with each

6    other on this right here.

7    **Q.**    Okay.  Thank you.

8              And you testified on direct that Mr. Boyer came to

9    visit you in jail and told you that the range that you would

10   fall into was 135 months to 168 months; is that correct?

11   **A.**    Yes.

12   **Q.**    And you're positive that he mentioned those two months?

13   **A.**    That guideline range, the range right there?

14   **Q.**    Yes.  Are you positive he said 135 to 168?

15   **A.**    Yes.

16   **Q.**    And how can you be so sure he used those numbers five

17   years later?

18   **A.**    Because I remember.  Because that's what I was standing

19   on.  He showed me this -- he showed me the federal guideline

20   book, too, when he was telling me this.  He was like this is

21   your range right here, level 34 for this, and go up by level

22   31.

23   **Q.**    And did he tell that you 135 months was about 11 years?

24   **A.**    Yes.

25   **Q.**    And he told you that 168 months was 13 years?

1   A.   Okay.

2   Q.   In the five years that you've been incarcerated for this,

3   have you ever divided 168 by 12?

4   A.   No.

5   Q.   Would you be surprised if I told you that's 14 years, not

6   13 years?  So the range that you're referring to is 11 to 14

7   years, not 11 to 13 years.

8   A.   All right.  11 to 14 years, maybe.

9   Q.   So you're now saying that he told you 11 to 14 years?

10  A.   He told me that range.  That's what he told me.

11  Q.   I want to know the words that he told you.

12  A.   He told me 11 to 35 months, 11 to 68 months.

13  Q.   I'm sorry.  Can you repeat that?

14  A.   11 to -- 135 to 168.

15  Q.   So he told you those numbers, not 11 to 13?

16  A.   No, he told me that number.

17  Q.   So he's never told you 11 to 13?

18  A.   No.

19  Q.   He just told you 135 months to 168 months?

20  A.   Yes.

21  Q.   In the numerous pleadings, briefs and motions that you've

22  filed, you've never once mentioned 135 months to 168 months;

23  isn't that true?

24           MS. WHITE:   Judge, I'm going to object to that.

25  That's a mischaracterization since he has, in fact, talked

1    about the guideline range being --

2         **THE COURT:**  Whatever the pleadings are, they are.

3    It's argument.  Objection sustained.  Go on.

4    **BY MR. MITCHELL**

5    **Q.**   So, Mr. Handy, you're saying that Mr. Boyer talked to you

6    in terms of months, he never talked to you in terms of 11 to

7    13; right?

8    **A.**   Yes.

9    **Q.**   But in all your documents, you say that he told you 11 to

10   13; correct?

11   **A.**   Yes.  I must have made a miscalculation on 168 months

12   because I never divided it by 12.

13   **Q.**   That's okay.

14        And did he tell you who would make the final decision

15   on where you fell between the 135 months to the 168 months?

16   **A.**   The judge.

17   **Q.**   Okay.  And he told you that the judge would make that

18   decision after he read the presentence investigative report?

19   **A.**   Yes.

20   **Q.**   Okay.  I want to talk to you about your rearraignment on

21   March 21st, 2001.

22   **A.**   Yes.

23   **Q.**   You said that you rough read the factual basis only; is

24   that correct?

25   **A.**   I read it pretty much, what -- you know, what I need to

1   read to understand what was going on.

2   Q.   And what about the plea agreement, did you read that or

3   was it rough read?

4   A.   That's what it was.  I didn't have the Bryan letter at the

5   time.

6   Q.   I'm sorry.  You didn't have the what?

7   A.   I don't recall the Bryan letter.

8   Q.   The Bryan letter?

9   A.   I just recall the plea agreement.

10  Q.   So you don't recall seeing the Bryan letter at all?

11  A.   No.

12  Q.   So you never saw the Bryan letter?

13  A.   I don't recall it, but I remember the plea.  I remember

14  the plea.  I don't recall the Bryan letter.

15  Q.   I think we may be having some confusion on what's what.

16  Let me see if I can clarify some things.

17          Mr. Handy, I'm going to show you Government Exhibit

18  B.  Is this the letter that you're referring to as the Bryan

19  letter?

20  A.   Yes.

21  Q.   And is this your understanding that this is the plea

22  agreement as well, or did you think the plea agreement was

23  something else?

24  A.   The plea agreement was something else with grams and the

25  amount of drugs on me.

```
 1   Q.   I'm sorry.  Can you repeat that?
 2   A.   The agreement with the drugs and the amount.
 3   Q.   The factual basis?
 4   A.   The factual basis.  That's what I meant.
 5   Q.   Mr. Handy, I'm showing you Government Exhibit F.  Here's
 6   the factual basis.
 7   A.   Yes, yes.  This is what I remember reading right here.
 8   Q.   So you read the factual basis, but you didn't read the
 9   Bryan letter; is that correct?
10   A.   Right.
11   Q.   Okay.  And what is your understanding of what the Bryan
12   letter is?
13   A.   It's a plea agreement.
14   Q.   Oh, it is the plea agreement?
15   A.   It's a plea agreement.  But this -- this factual basis,
16   this is what I'm pleading guilty to right here.
17   Q.   Those are the facts that you're pleading guilty to?
18   A.   Yes.
19   Q.   Now, what is the plea agreement?
20   A.   I'm pleading to 400-some grams of drugs.
21   Q.   Okay.  So it's what your pleading to?
22   A.   Yes.
23   Q.   Okay.  And is it your understanding that this contains the
24   terms of the agreement that you were pleading guilty to?
25   A.   No, what I understood -- all that I understood was I'm
```

1    pleading to the 300-some grams of powder, 400-some grams of
2    crack.  That's all I understood.  That's all that was told to
3    me.
4    **BY MR. MITCHELL**
5    **Q.**  Mr. Handy, I'm going to show you Government Exhibit G
6    again.
7    **A.**  Yes.
8    **Q.**  Why don't I remove these other ones and put them aside for
9    you.
10            Government Exhibit G is your affidavit?
11   **A.**  Yes.
12   **Q.**  Would you, please, turn to the second page?
13   **A.**  Yes.
14   **Q.**  Under Paragraph 8.
15   **A.**  Yes.
16   **Q.**  On the fourth line of Paragraph 8, towards the end it
17   starts:  I started reading the plea agreement and was still on
18   Page 1 when Mr. Stoutz started rushing me by saying:  Come on,
19   man.  I have to get this filed or you won't get the 13-year
20   deal.
21            Do you see that there?
22   **A.**  Yes.
23   **Q.**  Okay.  And you continue and you say:  I signed the plea
24   agreement and when I flipped to Page 4 of the factual basis of
25   the plea, I noticed that it stated 509 grams of cocaine base.

 1           **MS. WHITE:**  Is this a question?

 2           **THE COURT:**  What is the question?  Give me a rising

 3    inflection in your voice so I can grab it.  Now, what's the

 4    question.

 5           **MR. MITCHELL:**  I'm sorry, Judge, I've lost my place

 6    here.

 7    BY MR. MITCHELL

 8    **Q.**   Mr. Handy, you said that you started reading Page 1 of the

 9    plea agreement; is that correct?

10    **A.**   Yes.

11    **Q.**   And is that -- which document are you referring to that

12    you read Page 1 of?

13    **A.**   The factual basis.

14    **Q.**   Okay.  So that's what you read Page 1 of?

15    **A.**   Yes.

16    **Q.**   And you never read the plea agreement, the Bryan letter,

17    at all?

18    **A.**   No.

19    **Q.**   Okay.  You've also testified that Mr. Stoutz brought you

20    the plea agreement and the factual basis only minutes before

21    the proceedings began; is that correct?

22    **A.**   Yes.

23    **Q.**   Okay.  And as soon as he brought it to you, he immediately

24    began rushing you?

25    **A.**   Yes.

1    Q.    Okay.  And this is the first time that you have seen the
2    plea agreement; correct?
3    A.    Yes.
4    Q.    And he handed you the factual basis, told you to sign it,
5    and you turned to Page 4 and that's when you saw the incorrect
6    amount of cocaine; is that correct?
7    A.    Yes.
8    Q.    And about how long did this take?
9    A.    About three to four minutes.
10   Q.    Three to four minutes?
11   A.    Yes.
12   Q.    What was that spent?  Was that spent him telling you,
13   reading it to you?
14   A.    He didn't read it to me.  I rough drafted it.  Go over it,
15   see if you see something wrong, you know, I'm trying to hurry
16   you up.
17   Q.    So the three to four minutes was you rough reading the
18   plea agreement and the factual basis; is that correct?
19   A.    Yes.
20   Q.    Okay.  And you noticed the incorrect amount of cocaine?
21   A.    Yes.
22   Q.    You told it to Mr. Stoutz?
23   A.    Yes.
24   Q.    He went off, he corrected it and he came back?
25   A.    Yes.

1  Q.    And then you signed it?

2  A.    Yes.

3  Q.    And why didn't you take the time to read it more carefully

4  at that point?

5  A.    Because I was going off his judgment.  He my lawyer.

6  Q.    I'm sorry.  What?

7  A.    I was on going off his judgment.  He represent me.  I was

8  going off his judgment.

9  Q.    You were going off his judgment?

10 A.    Yes.

11 Q.    So you never asked to read it at that point?

12 A.    He was like more in a rush, trying to get it done because

13 the judge was about to come out.  He wanted to get it signed

14 for when the judge come out and go through with the process.

15 Q.    And after he took it away from you, did he say anything

16 else to you or did the judge come in?

17 A.    He told me the judge is going to ask me some questions and

18 he gonna go through the questions and gonna tell me what to say

19 to the questions.

20        He said:  If you don't answer the questions right,

21 the deal ain't gonna be made.  He said:  This ain't like state

22 court.  This is federal court, big court.  You've got to go by

23 a certain way.  You can't tell a judge that you made a -- your

24 own specific number.  So you don't tell the judge or he ain't

25 gonna accept the plea.

```
 1   Q.   Okay.  And you claim that your answers were coerced and
 2   coached; is that correct?
 3   A.   Yes.
 4   Q.   And, specifically, you claim you were told how and what to
 5   say?
 6   A.   Yes.
 7   Q.   And that he provided the answers for you?
 8   A.   Yes.
 9   Q.   Okay.  And how did he provide the answers for you; did he
10   speak up while the judge was asking you questions?
11   A.   No, he was behind me telling me in my ear, whispering in
12   my ear.
13   Q.   He was whispering in your ear in front of Judge McNamara?
14   A.   Yes, on the side of me like, you know, telling me what to
15   say.
16   Q.   And do you recall if Judge McNamara told Mr. Stoutz to
17   stop whispering in your ear?
18   A.   No.
19   Q.   Did Judge McNamara see that?
20   A.   Probably.  I don't know.
21   Q.   Okay.  Was Judge McNamara looking at you when he was
22   asking you the questions?
23   A.   Yes.
24   Q.   And Mr. Stoutz is right behind you?
25   A.   Yes.
```

1    **Q.**    Okay.  Whispering in your ear?

2    **A.**    Yes.

3    **Q.**    Mr. Handy, I want to talk to you about your 13-year deal.

4    You've testified on direct that you were promised 11 to 13

5    years; is that correct?

6    **A.**    Yes.

7    **Q.**    And you could fall anywhere in there between 11, 12, 12½,

8    13?

9    **A.**    I could what?

10   **Q.**    You could fall anywhere in there?

11   **A.**    Yes.

12   **Q.**    Okay.  So it was your understanding that you could have

13   received 12 years?

14   **A.**    Yes.

15   **Q.**    Okay.  Mr. Handy, in several of your motions and briefs,

16   you claimed that you were promised a sentence of 13 years

17   exactly.

18   **A.**    The most of 13 years.

19   **Q.**    But your documents, papers that you've signed as truthful

20   say that you were promised a sentence of 13 years.

21   **A.**    It was a range of 11 to 13.  13 was the most I could

22   receive.

23   **Q.**    Let me see if I can refresh your recollection here.

24   **A.**    13 years was the top of the guideline.

25   **Q.**    Mr. Handy, I'm going to show you Government Exhibit L.

 1    I'm going to move that out of your way.

 2              Mr. Handy, this is your appeal from denial of motion

 3    to vacate.

 4    A.    Yes.

 5    Q.    Can you, please, turn to Page 4?

 6    A.    Yes.

 7    Q.    Did you find Page 4?

 8    A.    (Witness nods head.)

 9    Q.    Okay.  Will you, please, start -- you can start reading at

10    the top:  Petitioner argued that counsels Boyer and Stoutz

11    deliberately misrepresented the guilty plea by promising

12    petitioner that he would receive a sentence of 13 years in

13    exchange for his plea.

14              Is that a typo, Mr. Handy?

15              MS. WHITE:  Judge, I'm going to object to this.  This

16    is not an affidavit.  He's testified --

17              THE COURT:  The objection's overruled.  He's

18    testified that he read everything that was filed on his behalf

19    and that it was accurate.

20              THE WITNESS:  This, basically, what we arguing right

21    here.

22    BY MR. MITCHELL

23    Q.    I'm sorry.  What?

24    A.    This is what I thought, 13 years.

25    Q.    But it says a sentence of 13 years.  It doesn't talk about

1   a range.

2   A.   Yes, but --

3   Q.   So this is a typo?

4   A.   Yeah, when you talking about -- 13 years was the top.  So

5   I thought that 13 years was the most I could, you know, plead

6   guilty of -- you know, get, receive.

7   Q.   But you said you also thought you could receive 12 years?

8   A.   The range, the guideline range was 135 months to 168

9   months.  That's the range that we was in.  That's what I

10   thought I was pleading guilty to, and I thought 13 was the top.

11   Q.   Mr. Handy, you're asking for a sentence of 13 years here

12   when you've testified that you could have received 12.  Why

13   would you ask for 13 years?

14   A.   That's the top of the guideline range I could get.  That's

15   the top.  Know what I'm saying?

16   Q.   So it's your understanding that a sentence of 13 years is

17   the same as a range of 11 to 13 years?

18   A.   Yes.

19   Q.   Okay.

20          Mr. Handy, I am showing you Government's Exhibit V.

21   This is your transcript of a telephone call that you had with

22   Cliff Stoutz on January 1st, 2004?

23   A.   Yes.

24   Q.   Do you remember that call?

25   A.   Yes.

178

1    **Q.**    Okay.  Will you, please, turn to Page 3?

2    **A.**    All right.

3    **Q.**    Toward the bottom, do you see where it says:  Mr. Handy,

4    see he lied, he talked about the guidelines were 15 or 17

5    years?

6    **A.**    Yeah.

7    **Q.**    Okay.  That's not 11 to 13 years, is it?

8    **A.**    You're talking about Clifford [sic] -- we're talking about

9    Harry Boyer on this.

10   **Q.**    Right.  Harry Boyer was the one that came to you at jail

11   and told you that you had a deal for 11 to 13 years?

12   **A.**    Yes.

13   **Q.**    And here, again, you're talking about Harry Boyer?

14   **A.**    Yeah, I'm talking about Harry Boyer.  And we talking about

15   the affidavit Harry Boyer wrote against me.  He said 15 to 17

16   years.  I said:  See, he lied.  He talking about the guideline

17   range was 15 to 17 years, and that was a lie.  The guideline

18   range was 11 to 13 years.  You just reading one sentence.

19           You talking about Harry Boyer on this thing you

20   showed me right here.  You see, he lied.

21   **Q.**    Mr. Handy, that's not the context of this --

22           **THE COURT:**  This is argument.  The transcript is in

23   the record.

24           **MR. MITCHELL:**  Yes, Your Honor.

25

1  BY MR. MITCHELL

2  Q.    So, Mr. Handy, your testimony here today is that you had a

3  deal for 11 to 13 years; correct?

4  A.    Yes.

5  Q.    And you were told that it was locked in?

6  A.    He told me that's the deal, what I'm pleading guilty to.

7  Q.    It he use the words *locked in*?

8  A.    I recall, yes.

9  Q.    And he said that nobody could change it; is that right?

10 A.    He told me the judge could change it, he could go over the

11 guidelines.

12 Q.    What about the government?

13 A.    He didn't say nothing about the government.  He told me

14 the judge.

15 Q.    But he did tell you that the judge could over go over the

16 guidelines?

17 A.    Yes.

18 Q.    And did he say why?

19 A.    No, he said the judge won't go over the guidelines.  He's

20 the judge.

21 Q.    And he said the judge can do whatever he wants?

22 A.    Whatever he wants.

23 Q.    And you knew that if he did whatever he wants, that's what

24 you would be stuck with?

25 A.    Not if it's over my guideline range, what I plead to.  So

1   he can't go over the range, but he can do what he wants.

2   Q.   He can do what he wants within it?

3   A.   Within the range, yes.

4   Q.   Okay.  But it was locked in and nobody else could change

5   it; is that correct?  The government couldn't add any --

6   A.   Yes.

7   Q.   Okay.  That's fine?

8   A.   Yes.

9   Q.   Okay.  So if it's true that you had a deal that was locked

10  in for 11 to 13 years, why did you tell Mr. Stoutz that you

11  would have been satisfied if you got 15 years?

12  A.   Satisfied?

13  Q.   Yes.  Same transcript, same exhibit, Mr. Handy.  Turn to

14  Page 10.  You may want to start on Page 9 to get the context.

15         So my question you to, Mr. Handy, is:  If you thought

16  you had a deal that was locked in and the government couldn't

17  enhance it, why would you have been satisfied with 15 years?

18  A.   Because I got 27 years.  Read the thing.

19  Q.   So you would have been satisfied -- I know how many years

20  you got.

21  A.   You got to read the thing.  We talking.  This is a

22  conversation.  11 to 13 he said -- he said:  Maybe you could

23  have ended up with 15 or something like that.  Even if you

24  ended up with 15 years instead of 11 to 13 or whatever I said.

25  Look, be glad you're not doing life.  You got two more extra

1   years.  Yeah, 15 years, or whatever.  I would have been

2   satisfied with 15 years.  I got 27 now.

3   Q.   So if you got 15 years, you probably would not have

4   appealed?

5   A.   I would have appealed because that wasn't my guideline

6   range.

7   Q.   But you would have been satisfied with it?

8   A.   I would have been more happy than the 27 years.

9   Q.   Well, that's not what it says.  It says you would have

10  been satisfied with it?

11  A.   You say satisfied.  You say satisfied.

12  Q.   All right.  Mr. Handy, isn't it true that you don't

13  remember exactly what you were told, you just remember hearing

14  the number 13 and that's what you've been fixed on this whole

15  time?

16  A.   I remember exactly what I was told, 135 months to 168.  I

17  was pleading out to a level 34, go up three spots, and that's

18  my range.  He didn't tell me nothing about no enhancements or

19  nothing else.  That's what I understood.  That's what I was

20  told.  That's why we fixed it in court because if we wouldn't

21  have fixed it, it would have been a level 36.

22  Q.   On Page 11 of Exhibit V.  The first paragraph that's

23  yours, Mr. Handy, says:  Yeah, he said.  Do you see on Line 3?

24  A.   Yes.

25  Q.   It says:  He showed me the amount of months and everything

1  right there on the table, 11 to 13 years?

2  **A.**    Yes.

3  **Q.**    It doesn't talk in months.  It says years.

4  **A.**    Yes.

5  **Q.**    And that's what he told me.  You know what I'm saying?

6  And that's what I was fixed on, that's all I'm saying.  So

7  you're not saying that you had a deal.  You're just saying that

8  you remember 11 to 13 and that's what you're fixed on, and now

9  you're upset because you didn't get 11 to 13.

10 **A.**    My lawyer told me to plead guilty to some level.  And when

11 I took his advice, he ran with it.  If he told me I was

12 pleading guilty to 20 years or 27, I would have never pled

13 guilty.  My understanding I was pleading to 11 to 13 years.

14 That was my understanding, original understanding.

15         **MR. MITCHELL:**  I have no further questions.

16         **MR. SANDERS:**  Your Honor, hold on a second.

17 BY MR. MITCHELL

18 **Q.**    All right.  Mr. Handy, I'm going to refer you back to

19 Page 3 of the Exhibit V.

20 **A.**    Yes.

21         **THE COURT:**  Exhibit what?

22         **MR. MITCHELL:**  V, the same transcript, Your Honor.

23 BY MR. MITCHELL

24 **Q.**    We're talking about the 15 or 17 years?

25 **A.**    Yes.

```
 1   Q.   And you told me that you were talking in reference to what

 2   Mr. Boyer said in his affidavit and you were calling him a

 3   liar; is that right?

 4   A.   Yes.

 5   Q.   So you read Mr. Boyer's affidavit?

 6   A.   Yes.

 7   Q.   Okay.  Mr. Handy, let me show you Government's Exhibit P.

 8           THE COURT:  Which exhibit?

 9           MR. MITCHELL:  P as in Paul.

10   BY MR. MITCHELL

11   Q.   Take a moment to review that.

12   A.   (Witness views document.)

13   Q.   Did you read it?

14   A.   Yes.

15   Q.   Do yo see any mention of 15 or 17?

16   A.   No.

17   Q.   So let's go back to Exhibit V, Page 3.

18   A.   Yes.

19   Q.   Okay.  What is the 15 or 17?  You're saying that that's

20   what Boyer was saying in his affidavit?

21   A.   Nothing was all.  I thought it was 15 to 17.  Because he

22   was talking about Harry Boyer if you read through the context.

23   Q.   So this is just another typo, another mistake?

24   A.   Yes.

25           MR. MITCHELL:  I have no further questions, Your
```

1    Honor.

2              THE COURT:  Do you have redirect?

3              MS. WHITE:  No, Your Honor.

4              THE COURT:  Step down.  Thank you.  Call your next

5    witness.

6              MS. WHITE:  Petitioner has no other witnesses, Judge,

7    but we would like to offer our exhibits.

8              THE COURT:  Do you have exhibits that are not

9    included in this exhibit book?

10             MS. WHITE:  Yes, sir, two.  Petitioner's 1 is the

11   audiotape, and Petitioner's 2 are the objections by Mr. Stoutz

12   to the PSI.

13             THE COURT:  I think that's contained -- well, not the

14   letter itself is not, the summary by the Probation Office is.

15             MS. WHITE:  Right.  I wanted exactly what they had

16   filed.

17             THE COURT:  Is there any objection to those exhibits?

18             MR. SANDERS:  No objection to those exhibits, Your

19   Honor.

20             THE COURT:  They'll be admitted.

21             MS. WHITE:  Otherwise, Judge, just I want to make

22   sure which exhibits from there that I used.

23             THE COURT:  We'll go through that at the end.  Is the

24   government calling witnesses?

25             MR. SANDERS:  No, Your Honor, just making offerings

1  of evidence.  The government at this time would move to offer

2  and introduce what's been marked for identification

3  Government's Exhibits A through Z.  All of those exhibits have

4  either been testified to previously by witnesses, identified,

5  or they would be documents which were filed in the record of

6  the court.

7          THE COURT:  Any objection to these exhibits?

8          MR. SANDERS:  And we have an original book to give

9  the Clerk with the original exhibit markers on them, Your

10 Honor.

11         MS. WHITE:  Judge, actually, I do.  Not all of these

12 exhibits were testified to.

13         MR. SANDERS:  Or that were filed in attachment to

14 something that's filed in the record.

15         THE COURT:  Specifically what exhibit do you have

16 objection to and what's the reason for your objection?

17         MS. WHITE:  Exhibit C is the original 7-count

18 indictment.  I don't really understand why there would be the

19 original indictment in this and no one testified to the

20 original indictment.

21         THE COURT:  That's part of the record.

22         MS. WHITE:  It's part of the record.

23         THE COURT:  In completeness of the record, that ought

24 to be there.  What is that exhibit you mentioned?

25         MR. SANDERS:  Exhibit C, which is the original

1  indictment.

2          **THE COURT:**  C, like Charlie.

3          **MR. SANDERS:**  It actually was testified to because

4  Mr. Boyer referenced that Harry Handy was at the top of the

5  indictment.

6          **THE COURT:**  I'm overruling that objection.  What's

7  the next one?

8          **MS. WHITE:**  My objection?

9          **THE COURT:**  Yes, ma'am.

10         **MS. WHITE:**  Okay.  That would be R, the criminal

11  court conviction from Section L and the judgment.

12         **THE COURT:**  R, judgment of *State versus Handy*?

13         **MS. WHITE:**  Uh-huh.

14         **THE COURT:**  That has to do, I assume, with the --

15         **MR. SANDERS:**  The prior state conviction, Your Honor,

16  and, factually, that was referred to in the original pleading

17  that one time was on appeal.

18         **THE COURT:**  Your objection is overruled.  Go on to

19  the next one.

20         **MS. WHITE:**  U, the DEA Thompson affidavit.

21         **MR. SANDERS:**  Just one second, Your Honor.

22         **THE COURT:**  You said U?

23         **MS. WHITE:**  Yes, sir.

24         **MR. SANDERS:**  That would be the original criminal

25  complaint filed September 27th, 2000, with the affidavit which

1   initiated the criminal case against Harry Handy, which is part

2   of the original filings in this case.

3           **THE COURT:**  That objection is overruled.

4           **MS. WHITE:**  And W, the sentencing table.  I just --

5           **THE COURT:**  The Court will take judicial notice of

6   that; but for completeness of the record, it's convenient to

7   have it here in this stack of exhibits.

8           **MS. WHITE:**  X, Your Honor.  This, apparently,

9   purports to be a letter from Dubie.  They never did anything

10  to --

11          **THE COURT:**  Which one?

12          **MS. WHITE:**  X, it's listed by the government.

13          **MR. SANDERS:**  X would be two pages, Your Honor.  The

14  first page with a sticker on it of Government Exhibit X is a

15  handwritten letter which was attached to Page 2 to our

16  Government Exhibit X, which was marked as Tango-1 and

17  identified and testified to extensively by all the witnesses in

18  this case, Your Honor.

19              The government's position is that the letter was

20  identified by Mr. Stoutz out of his file on direct examination.

21  It was the document that was attached to Tango-1 and he matched

22  it up with that by showing the Court how the documents were

23  folded together when he received them and that the tear in the

24  upper left-hand corner was the same on both of those pages.

25          **MS. WHITE:**  Actually, Judge, if I might respond to

1    that?  The letter that Mr. Stoutz identified was a handwritten

2    letter by Mr. Stoutz.  This purports to be a letter not by

3    Mr. Stoutz and no one testified to this.

4             **MR. SANDERS:**  No, Your Honor.  Specifically on direct

5    Mr. Stoutz referred to the fact, and actually, I think, held

6    the two documents up and folded them up before the Court, and

7    that is these two pages, Your Honor.  My recollection is very

8    clear on that.

9             **THE COURT:**  Objection's overruled.  What else do you

10   have?

11            **MS. WHITE:**  Was there anything else under X?

12            **MR. SANDERS:**  No, the next would be Government

13   Exhibit Y, which I believe is the letter that you were

14   referring to, the handwritten letter which he identified.

15            Z is what was --

16            **THE COURT:**  What are you talking about now?

17            **MR. SANDERS:**  Government Exhibit Z, Your Honor.  It

18   is the same exhibit as the signed exhibit, a factual basis and

19   plea letter, dated March 21st, 2001.  But it was -- came out of

20   Mr. Stoutz' file.  It's marked as Cliff's copy on the bottom

21   and it has a facsimile cover sheet page dated March 20th, 2001,

22   to Mr. Boyer on it.

23            What's the objection to that?

24            **MS. WHITE:**  It's redundant.  It's the same thing.

25            **THE COURT:**  I'm going to let it in.

1          **MS. WHITE:**  And, Judge, just the only other thing

2    was:  When I first started out here, I thought these were going

3    to be joint exhibits or we were going to use common numbers and

4    now they're all government exhibits.

5          **THE COURT:**  It doesn't make any difference.  They're

6    exhibits in evidence to be considered by this Court and any

7    other court.

8          **MS. WHITE:**  And I just want to make sure that what we

9    called Tango --

10         **THE COURT:**  Your objections are noted.

11         **MS. WHITE:**  Thank you, Judge.  What we called

12   Tango-1 --

13         **THE COURT:**  Yes.

14         **MS. WHITE:**  -- he has listed at X.

15         **MR. SANDERS:**  The second page of Government Exhibit

16   X.  I think we can make that abundantly clear.  Her Tango is

17   our original Government Exhibit T.  And I would tender that to

18   the Clerk at this time.

19         **THE COURT:**  Is there anything further?

20         **MR. SANDERS:**  Not on behalf of the government, unless

21   the Court wishes argument.

22         **THE COURT:**  Does either party want to file some

23   post-trial memos?

24         **MS. WHITE:**  Sure, Judge.  I'll do it on any point you

25   suggest, or I'll do everything.

1          **THE COURT:**  You better do it on the whole thing.

2          **MS. WHITE:**  Yes, sir, okay.

3          **THE COURT:**  But I'm going to want you to order a

4    transcript, or have the government order it or you order it or

5    somebody order it.  If you'd just let Pam know when you give

6    the transcript and whatever day you-all get the transcript,

7    what about a brief within -- we're at Christmastime -- within,

8    let's say, by Monday, January the 8th.

9                    Is that adequate?

10         **MS. WHITE:**  Judge, this is the first time in the

11   history of my career that I'm talking off two weeks at the end

12   of the year.  Now, I'm coming back on the 8th, and I don't mind

13   doing that.  If you could give me another week.

14         **THE COURT:**  Let's make it the 18th.

15         **MS. WHITE:**  Sounds wonderful.

16         **MR. SANDERS:**  Ten days for government response.  Is

17   that appropriate, Judge?

18         **THE COURT:**  Yes, within ten days after that, the

19   government will respond.

20         **MS. WHITE:**  Thank you.

21         **THE COURT:**  And when I give any dates, it's by

22   3:00 in the afternoon on that date.

23         **MS. WHITE:**  Thank you, Judge.

24         **THE COURT:**  Anything further?

25         **MS. WHITE:**  Is my client on an order to be returned

1  somewhere or is he to stay through that?

2       THE COURT:  I assume he's here on a writ of habeas

3  corpus.

4       MR. SANDERS:  Your Honor, the writ that we filed with

5  the Marshals, which was signed by the Court, ordered that he be

6  maintained here through the pendency of the proceedings.  But

7  now that we're looking at some period of time, it would be, I

8  think, to the Court's discretion whether she wants to maintain

9  him here on the writ, or return him and we can re-writ him back

10  at some point.

11          I mean, I don't know what his --

12       THE COURT:  I don't want to writ him and re-writ him.

13       MS. WHITE:  I don't either.  I'd rather he stay here.

14  I'd like him to be here.

15       THE COURT:  Well, how long do you need him to be here

16  until January whatever, or can he be here for a couple of weeks

17  and then --

18       MS. WHITE:  Could I keep him until the -- I mean, I'm

19  not -- can I keep him until the 17th?

20       THE COURT:  Let's keep the defendant here until

21  January 18th.

22       MS. WHITE:  Thank you, Your Honor.

23       THE MARSHAL:  Yes, Your Honor.

24       MR. SANDERS:  Thank you, Your Honor.

25       THE COURT:  We'll stand in recess.

1    **THE DEPUTY CLERK:**  All rise.

2         **(WHEREUPON, the Court was adjourned.)**

3                              *****

4                           <u>**CERTIFICATE**</u>

5         I, Jodi Simcox, RMR, Official Court Reporter for the

6    United States District Court, Eastern District of Louisiana, do

7    hereby certify that the foregoing is a true and correct

8    transcript, to the best of my ability and understanding, from

9    the record of the proceedings in the above-entitled and

10   numbered matter.

11

12

13                              _____

14                              Jodi Simcox, RMR
                                Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25